UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

PETER F. GAITO ARCHITECTURE, LLC d/b/a
PETER F. GAITO AND ASSOCIATES,

Plaintiff,

– against –

SIMONE DEVELOPMENT CORP., SIMONE
CHURCH STREET LLC, JOSEPH SIMONE,
THOMAS METALLO, SACCARDI & SCHIFF,
INC., TNS DEVELOPMENT GROUP LTD., and
SLCE ARCHITECTS, LLP

Defendants.

----------------------------------------------------------------X

# 08 CIV. 6056

**COMPLAINT**

### JUDGE CONNER

Dk # _____

**Jury Trial Demanded**



The Plaintiff, PETER F. GAITO ARCHITECTURE, LLC d/b/a PETER F. GAITO AND ASSOCIATES, by its attorneys, The Scher Law Firm, LLP, alleges the following as its Complaint:

## I.    PARTIES, JURISDICTION AND VENUE

1.    The Plaintiff, PETER F. GAITO ARCHITECTURE, LLC d/b/a PETER F. GAITO AND ASSOCIATES, (hereinafter the "Plaintiff") is a domestic limited liability company with its principal place of business located at 399 Knollwood Road, White Plains, New York.

2.    Upon information and belief, the Defendant SIMONE DEVELOPMENT CORP., (hereinafter the "Defendant Simone Development") is a domestic corporation with its principal place of business located at 1000 Main Street, New Rochelle, New York.

3.    Upon information and belief, the Defendant SIMONE CHURCH STREET, LLC, (hereinafter the "Defendant Church Street") is a domestic limited liability company with its principal place of business located at 1000 Main Street, New Rochelle, New York.

4.    Upon information and belief, the Defendant JOSEPH SIMONE (hereinafter the "Defendant Joseph") was and still is a natural person whose principal office is located at 1000 Main Street, New Rochelle, New York.

5.    Upon information and belief, the Defendant THOMAS METALLO (hereinafter the "Defendant Metallo") was and still is a natural person whose principal office is located at 18-35 130th Street, College Point, New York.

6.    Upon information and belief, the Defendant SACCARDI & SCHIFF, INC. (hereinafter the "Defendant Saccardi") is a domestic corporation with its principal place of business located at 445 Hamilton Avenue, Suite 404, White Plains, County of Westchester, State of New York.

7.    Upon information and belief, the Defendant TNS DEVELOPMENT GROUP LTD. (hereinafter the "Defendant TNS") is a domestic business corporation whose principal office is located at 18-35 130th Street, College Point, New York.

8.    Upon information and belief, the Defendant SLCE ARCHITECTS, LLP (hereinafter the "Defendant SLCE") is a domestic limited liability company with its principal place of business located at 841 Broadway, New York, New York.

9.     This is a civil action seeking damages and injunctive relief for copyright infringement under the copyright laws of the United States (17 U.S.C. § 101 *et seq.*).

10.     This court has subject matter jurisdiction under, 17 U.S.C. § 101; 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1338(a) (copyright).

11.     This Court has further supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a), over related claims for relief for common law unjust enrichment.

12.     This court has personal jurisdiction over the Defendants, and venue is proper in this District under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(a) in that the Defendants are doing business in this District, and the acts of the infringement complained of herein occurred in this District.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c), because, *inter alia*, it is where the Defendants have sufficient contacts for the Court to have personal jurisdiction over the Defendants and/or this Court is within the district wherein all causes of action occurred.

## II.    FACTS

**A.    Background**

14.     Upon information and belief, the Defendant Simone Development is a real estate development corporation.

15.     Upon information and belief, the Defendant Joseph is the President of the Defendant Simone Development. *See,* **Exhibit A,** a copy of the Defendant Joseph's biography from the website of the Defendant Simone Development.

16.    The Plaintiff is an architect and planning firm that has its offices in the County of Westchester.

17.    Prior to August 2004, the Plaintiff and the Defendant Joseph had a relationship.

18.    Prior to August 2004 the Defendant Joseph requested from the Plaintiff an opportunity to work with the Plaintiff if the Plaintiff obtained an opportunity to develop property.

**B.    Request for Proposal**

19.    On or about August 20, 2004, the Plaintiff received from the City of New Rochelle, New York (hereinafter the "City") a Request for Proposal for the development of the air rights above the Church Division Garage located in the City's downtown. *See*, **Exhibit B**, a copy of the Request for Proposal (hereinafter "RFP").

18.    Based upon the Defendant Joseph's request of the Plaintiff made prior to August 2004, the Plaintiff contacted the Defendant Joseph to discuss submitting a proposal to develop the Church Division Garage parcel (hereinafter the "Project") in accordance with the Request for Proposal.

19.    The Plaintiff and the Defendant Joseph had numerous communications regarding the role each would play in the joint effort to successfully win the designation as the developer for the Project.

20.    The Plaintiff agreed to conceive architectural plans for the Defendant Joseph's and the Plaintiff's presentation to the City in their attempt to win the designation as the developer for the Project.

21.    The Plaintiff agreed to design architectural plans for the Defendant Joseph's and the Plaintiff's presentation to the City in their attempt to win the designation as the developer for the Project.

22.    The Plaintiff agreed to develop architectural plans for the Defendant Joseph's and the Plaintiff's presentation to the City in their attempt to win the designation as the developer for the Project.

23.    The Plaintiff agreed to delineate architectural plans for the Defendant Joseph's and the Plaintiff's presentation to the City in their attempt to win the designation as the developer for the Project.

24.    The Plaintiff's agreed to draft the architectural plans for the Defendant Joseph's and the Plaintiff's presentation to the City in their attempt to win the designation as the developer for the Project.

25.    The Plaintiff agreed to create a video presentation of the Plaintiff's Designs for the Defendant Joseph's and the Plaintiff's presentation to the City in their attempt to win the designation as the developer for the Project.

26.    The Defendant Joseph was responsible for securing financing for the Project.

27.    Upon information and belief, the Defendant Joseph invited the Defendant Metallo into the effort to win the designation as the developer on the Project.

28.    Upon information and belief, the Defendant Metallo invited the Defendant TNS into the effort to win the designation as the developer on the Project.

29.    The Plaintiff proceeded to draft architectural plans which included all of the design contents, concepts, zoning information and statistics regarding the proposal to be made to the City (hereinafter "Plaintiff's Designs"). *See,* **Exhibit C**, a copy of the Plaintiff's Designs.

30.    As requested by the Defendant Joseph, the Plaintiff proceeded to conceive the Plaintiff's Designs.

31.    As requested by the Defendant Joseph, the Plaintiff proceeded to design the Plaintiff's Designs.

32.    As requested by the Defendant Joseph, the Plaintiff proceeded to develop the Plaintiff's Designs.

33.    As requested by the Defendant Joseph, the Plaintiff proceeded to delineate the Plaintiff's Designs.

34.    As requested by the Defendant Joseph, the Plaintiff proceeded to draft the Plaintiff's Designs.

35.    As requested by the Defendant Simone Development, the Plaintiff proceeded to conceive the Plaintiff's Designs.

36.    As requested by the Defendant Simone Development, the Plaintiff proceeded to design the Plaintiff's Designs.

37.    As requested by the Defendant Simone Development, the Plaintiff proceeded to develop the Plaintiff's Designs.

38.    As requested by the Defendant Simone Development, the Plaintiff proceeded to delineate the Plaintiff's Designs.

39.    As requested by the Defendant Simone Development, the Plaintiff proceeded to draft the Plaintiff's Designs.

40.    As requested by the Defendant Metallo, the Plaintiff proceeded to conceive the Plaintiff's Designs.

41.    As requested by the Defendant Metallo, the Plaintiff proceeded to design the Plaintiff's Designs.

42.    As requested by the Defendant Metallo, the Plaintiff proceeded to develop the Plaintiff's Designs.

43.    As requested by the Defendant Metallo, the Plaintiff proceeded to delineate the Plaintiff's Designs.

44.    As requested by the Defendant Metallo, the Plaintiff proceeded to draft the Plaintiff's Designs.

45.    As requested by the Defendant TNS, the Plaintiff proceeded to conceive the Plaintiff's Designs.

46.    As requested by the Defendant TNS, the Plaintiff proceeded to design the Plaintiff's Designs.

47.    As requested by the Defendant TNS, the Plaintiff proceeded to develop the Plaintiff's Designs.

48.    As requested by the Defendant TNS, the Plaintiff proceeded to delineate the Plaintiff's Designs.

49.    As requested by the Defendant TNS, the Plaintiff proceeded to draft the Plaintiff's Designs.

## C.    Presentation to the City

50.    On or about November 1, 2004, the Plaintiff, the Defendant Joseph, the Defendant Metallo, the Defendant TNS, and the Defendant Simone Development (collectively referred to as "Gaito Team") submitted the Plaintiff's Designs to the City for its approval in the name of the Defendant Simone Development.

51.    Upon information and belief, a total of six proposals including the Plaintiff's Designs were submitted to the City to obtain the designation as developer for the Project.

52.    On January 12, 2005, the Plaintiff participated with the Gaito Team to make its first presentation to the City's City Council. *See,* **Exhibit D,** a DVD of the video of the Gaito Team's presentation to the City.

53.    The January 12, 2005 presentation included the presentation of the Plaintiff's video presentation of the Plaintiff's Designs. *See,* **Exhibit D.**

54.    Upon information and belief, the Plaintiff's Designs were selected by the City as one of the top three proposals it would thereafter consider for the Project.

55.    On February 8, 2005 the Plaintiff participated with the Gaito Team to make a second presentation to the City's City Council.

56.    On March 11, 2005, the City awarded the Project to the Gaito Team.

57.    Upon information and belief, the Project's value is One Hundred Seventy-Five Million Dollars ($175,000,000.00).

58.    Upon information and belief, the Plaintiff's Designs were the basis for the Gaito Team being awarded the Proposal.

**E.    Copyrighted Plans**

59.    On April 5, 2005, the Plaintiff duly registered the Plaintiff's Designs with the United States Copyright Office.

60.    On April 5, 2005, the United States Copyright Office issued the Plaintiff's Designs a Certification of Registration for Published Work bearing the registration number VA #1-330-925. *See,* **Exhibit E,** a copy of the Certificate of Registration for VA # 1-330-925.

61.    On April 5, 2005, the United States Copyright Office issued the Plaintiff's Designs a Certification of Registration for Technical Drawings bearing the registration number VA # 1-330-926. *See,* **Exhibit F,** a copy of the Certificate of Registration for VA # 1-330-926.

62.    On April 5, 2005, the United States Copyright Office issued the Plaintiff's Designs a Certification of Registration for Architectural Work bearing the registration number VA # 1-330-927. *See,* **Exhibit G,** a copy of the Certificate of Registration for VA # 1-330-927.

63.    The Plaintiff's Designs provided the floor-area-ratio to be 5.5.

64.    The Plaintiff's Designs proposed a thirty-four (34) story glass tower condominium with Four Hundred Twenty-One (421) apartments.

65.    The Plaintiff's Designs proposed an eight (8) story mid-rise residential building.

66.    The Plaintiff's Designs proposed a series of shops set in attached low-rise buildings at street level that would accommodate Forty-Four Thousand Two Hundred (44,200) square feet of retail.

67.    In the Plaintiff's Designs, a portion of the glass tower was designed above the low-rise retail level and brownstone buildings, which would be topped with a public "green space" at the second floor level.

68.    The Plaintiff's Designs proposed twenty-five (25) high-end duplex units in the brownstone buildings.

69.    The Plaintiff's Designs proposed an underground parking facility to accommodate Six Hundred Thirty-Two (632) cars.

70.    The Plaintiff's Designs proposed converting a city street to a pedestrian plaza.

71.    The Plaintiff's Designs proposed a new aboveground four (4) story garage with a Five Hundred Thirty-Eight (538) car City-managed parking facility.

72.    The Plaintiff's Designs proposed a new park.

F.    **Post-Award**

73.    Upon information and belief, on or about November 22, 2005, the Defendant Joseph formed the Defendant Church Street. *See,* **Exhibit H,** a copy

of the Defendant Church Street registration with the New York State Department of State.

74.    Upon information and belief the Defendant Joseph is a member of the Defendant Church Street.

75.    Upon information and belief the Defendant Metallo is a member of the Defendant Church Street.

76.    Between March 2005 and June 2005, the Gaito Team met with the City to further the Project.

77.    Between March 2005 and June 2005, the Plaintiff prepared schematics to advance the Project to serve as the basis for the Defendant Church Street's execution of the Memorandum of Understanding. *See,* **Exhibit I,** a copy of the Plaintiff's Schematics.

78.    Upon information and belief, the Defendant Church Street entered into a Memorandum of Understanding with the City as the developer for the Project. *See,* **Exhibit J**, a copy of the Memorandum of Understanding.

79.    In or about June 2005, a dispute arose between the Defendant Joseph, the Defendant Simone Development and the Plaintiff regarding the Plaintiff's compensation for its architectural work on the Project.

80.    After the City awarded the Project to the Gaito Team, upon information and belief, the Defendant Joseph and the Defendant Metallo terminated their relationship with the Plaintiff.

81.    Upon information and belief, the Defendant Joseph retained the services of the Defendant SLCE, an architecture and planning firm, to continue the Project.

82.    Upon information and belief, the Defendant Simone Development retained the services of the Defendant SLCE, an architecture and planning firm, to continue the Project.

83.    Upon information and belief, the Defendant Church Street retained the services of the Defendant SLCE, an architecture and planning firm, to continue the Project.

84.    Upon information and belief, the Defendant Metallo retained the services of the Defendant SLCE, an architecture and planning firm, to continue the Project with the City.

85.    Upon information and belief, the Defendant TNS retained the services of the Defendant SLCE, an architecture and planning firm, to continue the Project with the City.

86.    Upon information and belief, Defendant SLCE is the architect on the Project.

87.    Upon information and belief, the Defendant Joseph retained the services of the Defendant Saccardi, a planning firm, to complete the Project.

88.    Upon information and belief, the Defendant Simone Development retained the services of the Defendant Saccardi a planning firm, to continue the Project.

89.    Upon information and belief, the Defendant Church Street retained the services of the Defendant Saccardi a planning firm, to continue the Project.

90.    Upon information and belief, the Defendant Metallo retained the services of the Defendant Saccardi a planning firm, to continue the Project with the City.

91.    Upon information and belief, the Defendant TNS retained the services of the Defendant Saccardi a planning firm, to continue the Project with the City.

92.    Upon information and belief, Defendant Saccardi is the planner for the Project.

93.    The Defendant Joseph is using the copyrighted Plaintiff's Designs for the Project without the Plaintiff's authorization.

94.    The Defendant Simone Development is using the copyrighted Plaintiff's Designs for the Project without the Plaintiff's authorization.

95.    The Defendant Church Street is using the copyrighted Plaintiff's Designs for the Project without the Plaintiff's authorization.

96.    The Defendant Metallo is using the copyrighted Plaintiff's Designs for the Project without the Plaintiff's authorization.

97.    The Defendant TNS is using the copyrighted Plaintiff's Designs for the Project without the Plaintiff's authorization.

98.    The Defendant SCLE is using the copyrighted Plaintiff's Designs for the Project without the Plaintiff's authorization.

99.    The Defendant Saccardi is using the copyrighted Plaintiff's Designs for the Project without the Plaintiff's authorization.

100.   The Defendant Joseph is using the copyrighted Plaintiff's Designs for the Project without the Plaintiff's permission.

101.   The Defendant Simone Development is using the copyrighted Plaintiff's Designs for the Project without the Plaintiff's permission.

102.   The Defendant Church Street is using the copyrighted Plaintiff's Designs for the Project without the Plaintiff's permission.

103.   The Defendant Metallo is using the copyrighted Plaintiff's Designs for the Project without the Plaintiff's permission.

104.   The Defendant TNS is using the copyrighted Plaintiff's Designs for the Project without the Plaintiff's permission.

105.   The Defendant SLCE is using the Plaintiff's Designs that were copyrighted for the Project without the Plaintiff's permission. *See,* **Exhibit K,** a DVD of the video of the Defendant SLCE's presentation to the City with the Defendant Joseph on or about January 17, 2006.

106.   The Defendant Saccardi is using the Plaintiff's Designs that were copyrighted for the Project without the Plaintiff's permission.

**G.    Access To Plaintiff's Designs**

107.   The Plaintiff provided copies of the Plaintiff's Designs to the Defendant Joseph on or about November 1, 2004.

108. After the dispute between the Defendant Joseph and the Plaintiff ended their relation in or about June 2005, the Defendant Joseph did not return the copies of the Plaintiff's Designs to the Plaintiff.

109. The Plaintiff provided copies of the Plaintiff's Designs to the Defendant Metallo on or about November 1, 2004.

110. After the dispute between the Defendant Metallo and the Plaintiff ended their relation in or about June 2005, the Defendant Mettallo did not return the copies of the Plaintiff's Designs to the Plaintiff.

111. The Plaintiff provided copies of the Plaintiff's Designs to the Defendant TNS on or about November 1, 2004.

112. After the dispute between the Defendant TNS and the Plaintiff ended their relation in or about June 2005, the Defendant TNS did not return the copies of the Plaintiff's Designs to the Plaintiff.

113. The Plaintiff provided copies of the Plaintiff's Designs to the Defendant Simone Development on or about November 1, 2004.

114. After the dispute between the Defendant Simone Development and the Plaintiff ended their relation in or about June 2005, the Defendant Simone Development did not return the copies of the Plaintiff's Designs to the Plaintiff.

115. On or about June 3, 2005, the Plaintiff provided the Defendant Saccardi with copies of the Plaintiff's Designs.

116.  On or about June 6, 2005, the Defendant Saccardi confirmed receipt of the copies of the Plaintiff's Design. *See,* **Exhibit L,** a copy of the email confirmation.

117.  The Defendant Saccardi has not returned the Plaintiff's Designs to the Plaintiff.  *See,* **Exhibit M,** a copy of the email asserting the Plaintiff's copyright in the Plaintiff's Designs.

118.  Upon information and belief, the Defendant Joseph provided the Plaintiff's Designs to the Defendant SCLE.

119.  Upon information and belief, the Defendant Metallo provided the Plaintiff's Designs to the Defendant SCLE.

120.  Upon information and belief, the Defendant Simone Development provided the Plaintiff's Designs to the Defendant SCLE.

121.  Upon information and belief, the Defendant Saccardi provided the Plaintiff's Designs to the Defendant SCLE.

122.  Upon information and belief, the Defendant TNS provided the Plaintiff's Designs to the Defendant SCLE.

123.  Upon information and belief, the Defendant Joseph provided the Plaintiff's Designs to the Defendant Church Street.

124.  Upon information and belief, the Defendant Metallo provided the Plaintiff's Designs to the Defendant Church Street.

125.   Upon information and belief, the Defendant Simone Development provided the Plaintiff's Designs to the Defendant Church Street.

126.   Upon information and belief, the Defendant Saccardi provided the Plaintiff's Designs to the Defendant Church Street.

127.   Upon information and belief, the Defendant TNS provided the Plaintiff's Designs to the Defendant Church Street.

**H.**    **Violations Of The Plaintiff's Registered Copyright**

128.   The Plaintiff's Designs provided the floor-area-ratio to be 5.5.

129.   The Defendant SCLE's alleged "re-design" provides for the floor-area-ratio to be 5.5. *See,* **Exhibit N,** a copy of the Defendant SLCE's alleged "re-design."

130.   The Defendant SLCE's alleged "re-design" for the Prospect Parking Lot Garage provides for Eight Hundred Fifty-Nine (859) parking spaces.

131.   The Plaintiff's Designs included the creation of a new Prospect Parking Garage.

132.   The Defendant SLCE's alleged "re-design" includes the creation of a new Prospect Parking Garage.

133.   The Plaintiff's Prospect Parking Lot Garage is off-site on Prospect Avenue.

134. The Defendant SLCE's alleged "re-design" includes the creation of a new Prospect Park similar in size and in the exact location as the Plaintiff's Designs.

135. The Plaintiff's Designs included Six Hundred Thirty-Two (632) parking spaces for residential and retail use is below-ground.

136. The Defendant SLCE's alleged "re-design" includes Six Hundred Thirty-Two (632) on-site parking spaces for residential and retail use is similar but in the same location as the Plaintiff's Designs, but above-ground.

137. The Plaintiff's Designs for the Prospect Parking Lot Garage provided for Eight Hundred Fifty-Nine (859) parking spaces.

138. The Defendant SLCE's alleged "re-design" for the Prospect Parking Lot Garage provides for Eight Hundred Fifty-Nine (859) parking spaces.

139. The Plaintiff's Designs for the Prospect Parking Lot Garage provided for a vehicular point of exit/entry from Centre Avenue.

140. The Defendant SLCE's alleged "re-design" for the Prospect Parking Lot Garage provides for a vehicular point of exit/entry from Centre Avenue.

141. Plaintiff's Designs featured a landscaped street level plaza that was publicly accessible.

142. The Defendant SLCE's alleged "re-design" features a landscaped street level plaza that was publicly accessible.

143. The Plaintiff's Design included on-site parking for both residential and retail use was belowground.

144.  The Defendant SLCE's alleged "re-design" features on-site parking for both residential and retail use aboveground.

145.  Plaintiff's Designs included a water feature on the street level plaza.

146.  The Defendant SLCE's alleged "re-design" includes a water feature on the street level plaza below ground.

147.  The Plaintiff's Designs included on-site parking for both residential and retail units except above ground.

148.  The Defendant SLCE's alleged "re-design" includes on-site parking for both residential and retail units similar in size and location as the Plaintiff's Designs.

149.  The Plaintiff's Designs included public plaza space.

150.  The Defendant SLCE's alleged "re-design" includes public plaza space in a similar location as the Plaintiff's Designs.

151.  The Plaintiff's Designs provided for a plaza connection to the new Prospect Park.

152.  The Defendant SLCE's alleged "re-design" provides for a plaza connection to the new Prospect Park in the same location as the Plaintiff's Designs.

153.  The Plaintiff's Designs provided for a plaza connection to the new Prospect Parking Garage.

154. The Defendant SLCE's alleged "re-design" provides for a plaza connection to the new Prospect Parking Garage similar in size and location as the Plaintiff's Designs.

155. The Plaintiff's Designs provided for the use of public art.

156. The Defendant SLCE's alleged "re-design" provides for the use of public art.

157. The Plaintiff's Designs provided for the abandonment of Clinton Place between Church and Division Streets.

158. The Defendant's SLCE's alleged "re-design" provides for the abandonment of Clinton Place between Church and Division Streets.

159. The Plaintiff's Designs provided for the purchase and removal of buildings along Main Street to enlarge the Project beyond the original RFP.

160. The Defendant SLCE's alleged "re-design" provides for the purchase and removal of buildings along Main Street to enlarge the Project beyond the original RFP.

161. The Plaintiff's Designs included Forty-Four Thousand (44,000) square feet of retail space.

162. The Defendant SLCE's alleged "re-design" includes Forty-Four Thousand (44,000) square feet of retail space.

163. The Plaintiff's Designs included Two Thousand Five Hundred (2,500) square feet of commercial/professional office space.

164. The Defendant SLCE's alleged "re-design" includes Two Thousand Five Hundred (2,500) square feet of commercial/professional office space.

165.  The Plaintiff's Designs included active retail space at the base of the residential tower (hereinafter "Tower").

166.  The Defendant SLCE's alleged "re-design" includes active retail space at the Tower.

167.  The Plaintiff's Designs provided that retail spaces be designed for boutique shops have the flexibility for a potential single larger tenant.

168.  The Defendant SLCE's alleged "re-design" provides that retail spaces be designed for boutique shops have the flexibility for a potential single larger tenant.

169.  The Plaintiff's Designs for the Tower featured architecture that was light, airy, transparent, made of glass with hints of traditional materials.

170.  The Defendant SLCE's alleged "re-design" for the Tower features architecture that was light, airy, transparent, made of glass with hints of traditional materials.

171.  The Plaintiff's Designs for the Tower was for a slender profile.

172.  The Defendant SLCE's alleged "re-design" for the Tower is for a slender profile.

173.  The Plaintiff's Designs for the Tower was oriented with the longer side perpendicular to Main Street.

174.  The Defendant SLCE's alleged "re-design" for the Tower is oriented with the longer side perpendicular to Main Street.

175.  The Plaintiff's Designs was for the Tower apartments to be oriented to ensure Long Island Sound views.

176.  The Defendant SLCE's alleged "re-design" is for the Tower apartments to be oriented to ensure Long Island Sound views.

177.  The Plaintiff's Designs included balconies for the residential units.

178.  The Defendant SLCE's alleged "re-design" includes balconies for the residential units.

179.  The Plaintiff's Designs for the Prospect Lot Parking Garage provided for a pre-cast masonry façade.

180.  The Defendant SLCE's alleged "re-design" for the Prospect Lot Parking Garage provides for a pre-cast masonry façade.

181.  The Plaintiff's Designs for the Prospect Parking Lot Garage provided for greening of the façade all around the garage.

182.  The Defendant's alleged "re-design" for the Prospect Parking Lot Garage provides for greening of the façade all around the garage.

183.  The Plaintiff's Designs for the Prospect Parking Lot Garage main entry elevator stair entry tower was located near the corner of Leroy Street and Division Street.

184.  The Defendant SLCE's alleged "re-design" for the Prospect Parking Lot Garage main entry elevator stair entry tower is located near the corner of Leroy Street and Division Street.

185. The Plaintiff's Designs for the Prospect Parking Lot Garage provided that the Leroy Street side would be landscaped and sensitive to the Davenport Lofts residents.

186. The Defendant SLCE's alleged "re-design" for the Prospect Parking Lot Garage provided that the Leroy Street side to be landscaped and sensitive to the Davenport Lofts residents.

187. The Plaintiff's Designs for the Prospect Parking Lot Garage provided that the Division Street façade to be designed as the backdrop to the new park.

188. The Defendant SLCE's alleged "re-design" for the Prospect Parking Lot Garage provides that the Division Street façade to be designed as the backdrop to the new park.

189. The Plaintiff's Designs for the Prospect Parking Lot Garage provided that the garage be designed to accommodate future parking levels.

190. The Defendant SLCE's alleged "re-design" for the Prospect Parking Lot Garage provides that the garage be designed to accommodate future parking levels.

191. The Plaintiff's Designs for the Prospect Parking Lot Garage included public landscaped open space along LeRoy Place.

192. The Defendant SLCE's alleged "re-design" for the Prospect Parking Lot Garage includes public landscaped open space along LeRoy Place.

193. The Plaintiff's Designs included the creation of a new Prospect Park.

194. The Plaintiff's Designs for Prospect Park provided for the park to be built adjacent to the new parking garage.

195. The Defendant SLCE's alleged "re-design" for Prospect Park provides for the park to be built adjacent to the new parking garage.

196. The Plaintiff's Designs for Prospect Park intended that the park be for general public use with recreational and retail opportunities.

197. The Defendant's SLCE's alleged "re-design" for Prospect Park intended that the park be for general public use with recreational and retail opportunities.

198. The Plaintiff's Designs included the use of public art in Prospect Park.

199. The Defendant SLCE's alleged "re-design" included the use of public art in Prospect Park.

200. The Plaintiff's Designs provided that Prospect Park be gated and locked at night.

201. The Defendant SLCE's alleged "re-design" provided that Prospect Park be gated and locked at night.

## III.    CAUSES OF ACTIONS & CLAIMS FOR RELIEF

### AS AND FOR A FIRST CAUSE OF ACTION
### AGAINSTTHE DEFENDANTS FOR COPYRIGHT INFRINGEMENT
### PURSUANT TO 17 U.S.C. § 101 *et seq*.

202. The Plaintiff restates the allegations contained in ¶¶ 1 through 201 as if fully set forth herein.

203. Plaintiff, at all relevant times has been the owner of exclusive rights under United States Copyright Act with respect to the Plaintiff's Designs (hereinafter the "Copyrighted Plans").

204. The Copyrighted Plans include, but are not limited to the design approved by the City for the Gaito Team to be the developer of the Project.

205. Among the exclusive rights granted to the Plaintiff under the Copyright Act are the exclusive rights to use the Copyrighted Plans.

206. Plaintiff is informed and believes that Defendants, without permission or consent of the Plaintiff have used the Copyrighted Plans substantially to "re-design" the Project.

207. Plaintiff is informed and believes that Defendants, without permission or consent of the Plaintiff have continued to use the Copyrighted Plans as a basis for their "re-design" of the Project.

208. In doing so, Defendants have violated Plaintiff's exclusive rights of use.

209. Defendant's actions constitute infringement of Plaintiff's copyrights and exclusive rights under the Copyright Act.

210. Plaintiff is informed and believes that the foregoing acts of infringement by the Defendants constitute the willful infringement of the Plaintiff's rights under the Copyright Act.

211. Plaintiff is informed and believes that the foregoing acts of infringement by the Defendants constitute the intentional infringement of the Plaintiff's rights under the Copyright Act.

212. Plaintiff is informed and believes that the foregoing acts of infringement by the Defendants have disregarded the Plaintiff's rights under the Copyright Act.

213. Plaintiff is informed and believes that the foregoing acts of infringement by the Defendants have been indifferent to the Plaintiff's rights under the Copyright Act.

214. As a result of Defendants' infringement of Plaintiff's copyrights and exclusive rights under copyright, Plaintiff's are entitled to damages pursuant to 17 U.S.C. 504 *et. seq.* for Defendant's infringement of the Copyrighted Plans.

215. Plaintiff is further entitled to its attorneys' fees and costs pursuant to 17 U.S.C. 505.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST THE DEFENDANTS FOR COPYRIGHT INFRINGEMENT DEMANDING A PERMANENT INJUNCTION

216. The Plaintiff restates the allegations contained in ¶¶ 1 through 215 as if fully set forth herein.

217. The Defendants' conduct is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great harm and irreparable injury that cannot fully be compensated or measured in law.

218. Plaintiff has no adequate remedy at law.

219. Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff is entitled to injunctive relief prohibiting Defendants from further infringing Plaintiff's copyrights and ordering Defendants to cease using, possessing, basing their designs upon, copying, or reproducing the Plaintiff's copyrighted designs for

the development using the Plaintiff's Designs as the basis of the alleged "re-designed" plans for the Project.

## AS AND FOR A THIRD CAUSE OF ACTION
## AGAINST THE DEFENDANTS FOR UNJUST ENRICHMENT

220. The Plaintiff restates the allegations contained in ¶¶ 1 through 219 as if fully set forth herein.

221. Upon information and belief, beginning at a time prior to the commencement of the Action and continuing thereafter, Defendants, without the consent of Plaintiff, have been enriched by the use of the Copyrighted Plans without the Plaintiff's permission and/or consent.

222. The Project's value is, upon information and belief, One Hundred Seventy-Five Hundred Million Dollars ($175,000,000.00).

223. The Defendants have kept the value of the enrichment resulting from the use of the Copyrighted Plans without the Plaintiff's permission and/or consent without remitting any portion thereof to the Plaintiff.

224. By reason of Defendants acts as alleged above, Defendants have been unjustly enriched in an amount estimated to be not less that ONE HUNDRED MILLION DOLLARS ($100,000,000.00), and Plaintiff is entitled to just compensation therefore.

## AS AND FOR A FOURTH CAUSE OF ACTION
## AGAINST THE DEFENDANT JOSEPH, THE DEFENDANT METALLO, THE
## DEFENDANT SIMONE DEVELOPMENT, AND THE DEFENDANT TNS
## FOR QUANTUM MERUIT

225. The Plaintiff restates the allegations contained in ¶¶ 1 through 224 as if fully set forth herein.

226. The Plaintiff conceived architectural plans for the Defendant Joseph in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

227. The Plaintiff designed architectural plans for the Defendant Joseph in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

228. The Plaintiff developed architectural plans for the Defendant Joseph furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

229. The Plaintiff delineated architectural plans for the Defendant Joseph in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

230. The Plaintiff drafted architectural plans for the Defendant Joseph in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

231. The Plaintiff conceived architectural plans for the Defendant Metallo in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

232. The Plaintiff designed architectural plans for the Defendant Metallo Development in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

233. The Plaintiff developed architectural plans for the Defendant Metallo in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

234. The Plaintiff delineated architectural plans for the Defendant Metallo in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

235. The Plaintiff drafted architectural plans for the Defendant Metallo in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

236. The Plaintiff conceived architectural plans for the Defendant Simone Development in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

237. The Plaintiff designed architectural plans for the Defendant Simone Development in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

238. The Plaintiff developed architectural plans for the Defendant Simone Development in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

239. The Plaintiff delineated architectural plans for the Defendant Simone Development in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

240. The Plaintiff drafted architectural plans for the Defendant Simone Development in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

241.   The Plaintiff conceived architectural plans for Defendant TNS in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

242.   The Plaintiff designed architectural plans for the Defendant TNS in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

243.   The Plaintiff developed architectural plans for the Defendant TNS in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

244.   The Plaintiff delineated architectural plans for the Defendant TNS in furtherance of the submission to the City of the Gaito Team's proposal to win the Project.

245.   The Plaintiff drafted architectural plans for the Defendant TNS of the submission to the City of the Gaito Team's proposal to win the Project.

246.   As requested by the Defendant Joseph, the Plaintiff conceived the architectural plans.

247.   As requested by the Defendant Joseph, the Plaintiff designed the architectural plans.

248.   As requested by the Defendant Joseph, the Plaintiff developed the architectural plans.

249.  As requested by the Defendant Joseph, the Plaintiff delineated the architectural plans.

250.  As requested by the Defendant Joseph, the Plaintiff drafted the architectural plans.

251.  As requested by the Defendant Simone Development, the Plaintiff conceived the architectural plans.

252.  As requested by the Defendant Simone Development, the Plaintiff designed the architectural plans.

253.  As requested by the Defendant Simone Development, the Plaintiff developed the architectural plans.

254.  As requested by the Defendant Simone Development, the Plaintiff delineated the architectural plans.

255.  As requested by the Defendant Simone Development, the Plaintiff drafted the architectural plans.

256.  As requested by the Defendant Metallo, the Plaintiff conceived the architectural plans.

257.  As requested by the Defendant Metallo, the Plaintiff designed the architectural plans.

258.  As requested by the Defendant Metallo, the Plaintiff developed the architectural plans.

259. As requested by the Defendant Metallo, the Plaintiff delineated the architectural plans.

260. As requested by the Defendant Metallo, the Plaintiff drafted the architectural plans.

261. As requested by the Defendant TNS, the Plaintiff conceived the architectural plans.

262. As requested by the Defendant TNS, the Plaintiff designed the architectural plans.

263. As requested by the Defendant TNS, the Plaintiff developed the architectural plans.

264. As requested by the Defendant TNS, the Plaintiff delineated the architectural plans.

265. As requested by the Defendant TNS, the Plaintiff drafted the architectural plans.

266. The Defendant Joseph accepted the Plaintiff's services that the Defendant Joseph requested.

267. The Defendant Metallo accepted the Plaintiff's services that the Defendant Metallo requested.

268. The Defendant Simone Development accepted the Plaintiff's services that the Defendant Simone Development requested.

269.  The Defendant TNS accepted the Plaintiff's services that the Defendant TNS requested.

270.  The Plaintiff was expected to receive compensation for its services from the Defendant Joseph.

271.  The Plaintiff was expected to receive compensation for its services from the Defendant Metallo.

272.  The Plaintiff was expected to receive compensation for its services from the Defendant Simone Development.

273.  The Plaintiff was expected to receive compensation for its services from the Defendant TNS.

274.  The Plaintiff is entitled to the reasonable value for its services from the Defendant Joseph.

275.  The Plaintiff is entitled to the reasonable value for its services from the Defendant Metallo.

276.  The Plaintiff is entitled to the reasonable value for its services from the Defendant Simone Development.

277.  The Plaintiff is entitled to the reasonable value for its services from the Defendant TNS.

278.  The reasonable value of the Plaintiff's services is Two Million Four Hundred Thousand ($2,400,000.00) Dollars.

279.   Therefore, the Plaintiff demands judgment in the amount of Two Million Four Hundred Thousand ($2,400,000.00) Dollars.

## AS AND FOR A FIFTH CAUSE OF ACTION
## AGAINST THE DEFENDANT JOSEPH, THE DEFENDANT
## METALLO, THE DEFENDANT SIMONE DEVELOPMENT, AND THE
## DEFENDANT TNS FOR UNJUST ENRICHMENT

280.   The Plaintiff restates the allegations contained in ¶¶ 1 through 279 as if fully set forth herein.

281.   The Plaintiff conferred a benefit upon the Defendant Joseph when it conceived the architectural plans for the Gaito Team.

282.   The Plaintiff conferred a benefit upon the Defendant Metallo when it conceived the architectural plans for the Gaito Team.

283.   The Plaintiff conferred a benefit upon the Defendant Simone Development when it conceived the architectural plans for the Gaito Team.

284.   The Plaintiff conferred a benefit upon the Defendant TNS when it conceived the architectural plans for the Gaito Team.

285.   The Plaintiff conferred a benefit upon the Defendant Joseph when it designed the architectural plans for the Gaito Team.

286.   The Plaintiff conferred a benefit upon the Defendant Metallo when it designed the architectural plans for Gaito Team.

287.   The Plaintiff conferred a benefit upon the Defendant Simone Development when it designed the architectural plans for the Gaito Team.

288.  The Plaintiff conferred a benefit upon the Defendant TNS when it designed the architectural plans for the Gaito Team.

289.  The Plaintiff conferred a benefit upon the Defendant Joseph when it developed the architectural plans for the Gaito Team.

290.  The Plaintiff conferred a benefit upon the Defendant Metallo when it developed the architectural plans for the Gaito Team.

291.  The Plaintiff conferred a benefit upon the Defendant Simone Development when it developed the architectural plans for the Gaito Team.

292.  The Plaintiff conferred a benefit upon the Defendant TNS when it developed the architectural plans for the Gaito Team.

293.  The Plaintiff conferred a benefit upon the Defendant Joseph when it delineated the architectural plans for Gaito Team.

294.  The Plaintiff conferred a benefit upon the Defendant Metallo when it delineated the architectural plans for the Gaito Team.

295.  The Plaintiff conferred a benefit upon the Defendant Simone Development when it delineated the architectural plans for the Gaito Team.

296.  The Plaintiff conferred a benefit upon the Defendant TNS when it delineated the architectural plans for the Gaito Team.

297.  The Plaintiff conferred a benefit upon the Defendant Joseph when it drafted the architectural plans for Gaito Team.

298.  The Plaintiff conferred a benefit upon the Defendant Metallo when it drafted the architectural plans for the Gaito Team.

299. The Plaintiff conferred a benefit upon the Defendant Simone Development when it drafted the architectural plans for the Gaito Team.

300. The Plaintiff conferred a benefit upon the Defendant TNS when it drafted the architectural plans for the Gaito Team.

301. The Defendant Joseph is not permitted to retain the benefit conferred upon him by the Plaintiff without adequately compensating the Plaintiff.

302. The Defendant Metallo is not permitted to retain the benefit conferred upon him by the Plaintiff without adequately compensating the Plaintiff.

303. The Defendant Simone Development is not permitted to retain the benefit conferred upon it by the Plaintiff without adequately compensating the Plaintiff.

304. The Defendant TNS is not permitted to retain the benefit conferred upon it by the Plaintiff without adequately compensating the Plaintiff.

305. As a result of the Defendant Joseph retaining the benefit conferred upon him by the Plaintiff, the Defendant Joseph is liable for the Plaintiff's damages resulting therefrom.

306. As a result of the Defendant Metallo retaining the benefit conferred upon him by the Plaintiff, the Defendant Metallo is liable for the Plaintiff's damages resulting therefrom.

307. As a result of the Defendant Simone Development retaining the benefit conferred upon him by the Plaintiff, the Defendant Simone Development is liable for the Plaintiff's damages resulting therefrom.

308. As a result of the Defendant TNS retaining the benefit conferred upon him by the Plaintiff, the Defendant TNS is liable for the Plaintiff's damages resulting therefrom.

309. The value of the benefit conferred upon the Defendant Joseph is Two Million Four Hundred Thousand ($2,400,000.00) Dollars.

310. The value of the benefit conferred upon the Defendant Metallo is Two Million Four Hundred Thousand ($2,400,000.00) Dollars.

311. The value of the benefit conferred upon the Defendant Simone Development is Two Million Four Hundred Thousand ($2,400,000.00) Dollars.

312. The value of the benefit conferred upon the Defendant TNS is Two Million Four Hundred Thousand ($2,400,000.00) Dollars.

313. Therefore, the Plaintiff demands judgment in the amount of Two Million Four Hundred Thousand ($2,400,000.00) Dollars.

## AS AND FOR A SIXTH CAUSE OF ACTION
## AGAINST THE DEFENDANTS FOR PUNITIVE DAMAGES

314. The Plaintiff restates the allegations contained in ¶¶ 1 through 313 as if fully set forth herein.

315. Defendants' acts as alleged above were willful within the meaning of the Copyright Act.

316. Defendants' acts as alleged above were wanton within the meaning of the Copyright Act.

317. Defendants' acts as alleged above were malicious within the meaning of the Copyright Act.

318. Defendants' acts as alleged above were undertaken with the intent to injure Plaintiff.

319. By reason of the foregoing acts, and by way of example, Plaintiff is entitled to punitive damages in the sum of THREE HUNDRED MILLION DOLLARS ($300,000,000.00).

**WHEREFORE**, Plaintiff Demands:

1.    On its First Cause of Action

   a. That Defendants pay to Plaintiff statutory damages for each infringement of Plaintiff's copyright in an amount to be determined at trial;

   b. The actual damages suffered by Plaintiff as a result of Defendant's infringement of Plaintiff's copyrights in an amount to be determined at trial but not less that Two Hundred Fifty Million Dollars ($250,000,000.00), and the additional profits of Defendants attributable to such infringement;

2.    On its Second Cause of Action

   a. That Defendants and their agents and servants be Permanently enjoined from infringing Plaintiff's copyright in the Project;

b.  That the Defendants and their agents and servants be directed to turn over to the Plaintiffs any and all copies of the Plaintiff's Designs in any form, whether it be on paper or in digital format;

c.  That the Defendants and their agents and servants be permanently enjoined from using, possessing, basing their designs upon, copying, or reproducing the Plaintiff's copyrighted designs in any future plans, project or proposal to any person, municipality or entity;

3.  On its Third Cause of Action

a.  All enrichment earned from the use of the Plaintiff's Designs and arising from the use of Plaintiff's copyrighted materials enriched in an amount estimated to be not less that ONE HUNDRED MILLION DOLLARS ($100,000,000.00), and Plaintiff is entitled to just compensation therefore,

4.  On its Fourth Cause of Action

a.  Two Million Four Hundred Thousand ($2,400,000.00) Dollars for the actual value of the services provided to the Defendants by the Plaintiff;

5.  On its Fifth Cause of Action

a.  Two Million Four Hundred Thousand ($2,400,000.00) Dollars for the actual value of the services provided to the Defendants by the Plaintiff;

6.    On its Sixth Cause of Action

a.  Exemplary damages in the sum of Three Hundred Million Dollars ($300,000,000.00);

7.    On all Causes of Action

a.  That the Court award Judgment against the Defendants for the full costs of this action, including reasonable fees for the services of Plaintiff's attorneys;

b.  That the Court Order such other, further and different relief as the nature of this action may require and as the Court may deem just and proper; and

c.  That the Court retain jurisdiction of this Action for the purpose of enabling Plaintiff in his discretion, to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the interpretation or execution of any Order entered in this action, for the modification of any such Order, for the enforcement of compliance therewith and for the punishment of any violation thereof.

Dated:    Carle Place, New York
          July 1, 2008

Austin Graff (AG-0096)
THE SCHER LAW FIRM, LLP
One Old Country Road, Suite 382
Carle Place, New York 11514
(516) 746-5040

Gaito, Peter\Simone Development\Fed Ct - SDNY Westchester\Pleadings\Complaint with jv.doc

# EXHIBIT C



Peter F. Gaito and Associates



Exhibit 1
**PROJECT SITE PLAN**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

*Saccardi & Schiff, Inc. - Planning and Development Consultants*

SOURCE  SLCE Architects



Exhibit 2

**PROJECT SITE PLAN
GROUND FLOOR
PARKING LEVEL 1**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

SOURCE: SLCE Architects

*Saccardi & Schiff, Inc. - Planning and Development Consultants*



Exhibit 2a
PROJECT SITE PLAN
GROUND FLOOR
PARKING LEVEL 1 DETAIL
CHURCH/DIVISION MIXED USE DEVELOPMENT
New Rochelle, New York

SOURCE SLCE Architects

Saccardi & Schiff, Inc. - Planning and Development Consultants



Exhibit 3
## PROJECT SITE PLAN
## CELLAR PLAN
## PARKING LEVEL 0

## CHURCH/DIVISION MIXED USE DEVELOPMENT
New Rochelle, New York

SOURCE SLCE Architects

*Saccardi & Schiff, Inc. - Planning and Development Consultants*



Exhibit 4

**PROJECT SITE PLAN
SECOND LEVEL
PARKING LEVELS 2 AND 3**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

SOURCE  SLCE Architects

*Saccardi & Schiff, Inc. - Planning and Development Consultants*

Exhibit 5

**PROJECT SITE PLAN**
**TYPICAL FLOOR PLAN**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

SOURCE  SLCE Architects

*Saccardi & Schiff, Inc. - Planning and Development Consultants*



Exhibit 6

**PROJECT SITE PLAN**
**SECOND AND THIRD FLOORS**
**PARKING LEVEL 4**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

*Saccardi & Schiff, Inc. - Planning and Development Consultants*

SOURCE  SLCE Architects



Exhibit 7

## PROJECT SITE PLAN
## FOURTH FLOOR
## PARKING LEVEL 5

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

SOURCE  SLCE Architects

*Saccardi & Schiff, Inc. - Planning and Development Consultants*



Exhibit 8

SCHEMATIC SECTION
PROJECT SITE PLAN

CHURCH/DIVISION MIXED USE DEVELOPMENT
New Rochelle, New York

*Saccardi & Schiff, Inc. - Planning and Development Consultants*

SCHEMATIC SECTION B
THROUGH RETAIL SPACE

SCHEMATIC SECTION A
THROUGH RETAIL SPACE

SOURCE: SLCE Architects

SECTION - REVISED 42-STORY SCHEME

SECTION - ORIGINAL 39-STORY SCHEME

Exhibit 8a

COMPARISON OF ORIGNAL
RESIDENTIAL TOWER DESIGN
WITH REVISED DESIGN

CHURCH/DIVISION MIXED USE DEVELOPMENT
New Rochelle, New York

*Saccardi & Schiff, Inc. - Planning and Development Consultants*

SOURCE: SLCE Architects



Exhibit 8b

SCHEMATIC SECTION
MUNICIPAL PARKING GARAGE

CHURCH/DIVISION MIXED USE DEVELOPMENT
New Rochelle, New York

*Saccardi & Schiff, Inc. - Planning and Development Consultants*

SCHEMATIC SECTION C

SOURCE: SLCE Architects



Exhibit 9

## SITES ELIGIBLE FOR
## DOWNTOWN HEIGHT BONUS

### CHURCH/DIVISION MIXED USE DEVELOPMENT
New Rochelle, New York

BASE MAP SOURCE: City of New Rochelle

*Saccardi & Schiff, Inc. - Planning and Development Consultants*





9:00 A.M.

3:00 P.M.

12:00 P.M.

Exhibit 10

**SHADOW STUDY
DECEMBER 21
PROPOSED ACTION**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

SOURCE SLCE Architects

*Saccardi & Schiff, Inc. - Planning and Development Consultants*









Exhibit 11
**SHADOW STUDY
JUNE 21
PROPOSED ACTION**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York



Exhibit 12
## PHOTOGRAPH SIMULATION KEY

### CHURCH/DIVISION MIXED USE DEVELOPMENT
New Rochelle, New York

BASE MAP SOURCE: *City of New Rochelle GIS*

*Saccardi & Schiff, Inc. - Planning and Development Consultants*

Exhibit 13

**PHOTOGRAPH SIMULATION 1
VIEW OF PROJECT SITE FROM
MIDBLOCK ON CLINTON PLACE**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

*Saccardi & Schiff, Inc. - Planning and Development Consultants*

SOURCE: SLCE Architects



Exhibit 13a
ACCESS POINTS ALONG
CHURCH STREET

CHURCH/DIVISION MIXED USE DEVELOPMENT
New Rochelle, New York

*Saccardi & Schiff, Inc. - Planning and Development Consultants*

SOURCE: SLCE Architects



Exhibit 14

## PHOTOGRAPH SIMULATION 2
## VIEW OF PROJECT SITE FROM
## PROSPECT STREET AT
## DIVISION STREET

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

SOURCE  SLCE Architects

*Saccardi & Schiff, Inc. - Planning and Development Consultants*



Exhibit 15

## PHOTOGRAPH SIMULATION 3 VIEW OF PROJECT SITE FROM MAIN STREET AT DIVISION STREET

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

SOURCE  SLCE Architects

*Saccardi & Schiff, Inc. - Planning and Development Consultants*



Exhibit 16

**PHOTOGRAPH SIMULATION 4
VIEW OF PROJECT SITE FROM
MAIN STREET**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

SOURCE: SLCE Architects

*Saccardi & Schiff, Inc. - Planning and Development Consultants*



Exhibit 17
## PHOTOGRAPH SIMULATION 5
## VIEW OF PROJECT SITE FROM
## MAIN STREET AT
## CHURCH STREET

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

SOURCE  SLCE Architects

*Saccardi & Schiff, Inc. - Planning and Development Consultants*



Exhibit 18
## PHOTOGRAPH SIMULATION 6
## VIEW OF MUNICIPAL PARKING
## GARAGE FROM BEAUCHAMP
## STREET AND CENTRE AVENUE

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

SOURCE SLCE Architects

*Saccardi & Schiff, Inc. - Planning and Development Consultants*



Exhibit 19

**PHOTOGRAPH SIMULATION 7
VIEW OF MUNICIPAL GARAGE
FROM DIVISION STREET**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

*Saccardi & Schiff, Inc. – Planning and Development Consultants*

SOURCE: SLCE Architects

Exhibit 20

**PHOTOGRAPH SIMULATION 8**
**VIEW OF MUNICIPAL GARAGE**
**FROM DAVENPORT LOFTS**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

*Saccardi & Schiff, Inc. - Planning and Development Consultants*

NOTE: The design of the municipal garage is a work in progress. The "greening" of the garage is currently being designed.

SOURCE: SLCE Architects

Exhibit 21

**PHOTOGRAPH SIMULATION 9**
**VIEW OF PROJECT SITE FROM**
**MIDBLOCK ON DIVISION STREET**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

*Saccardi & Schiff, Inc. - Planning and Development Consultants*

SOURCE: SLCE Architects



Exhibit 22
**SHADOW STUDY**
**JUNE 21**
**SITES ELIGIBLE FOR**
**DOWNTOWN DENSITY BONUS**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

SOURCE: SLCE Architects

*Saccardi & Schiff, Inc. - Planning and Development Consultants*



9:00 A.M.

12:00 P.M.

3:00 P.M.

Exhibit 23
**SHADOW STUDY**
**DECEMBER 21**
**SITES ELIGIBLE FOR**
**DOWNTOWN DENSITY BONUS**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

SOURCE  SLCE Architects

*Saccardi & Schiff, Inc. - Planning and Development Consultants*



**A** PROPOSED TENT LAYOUT AT MARKET AREA
NOT TO SCALE

Exhibit 24
**LEROY PLACE PARK PLAN**

**CHURCH/DIVISION MIXED USE DEVELOPMENT**
New Rochelle, New York

SOURCE SLCE Architects

# Section 3 – Development Proposal

The pages that follow provide architectural exhibits and details as follows:

- Overall Square Foot Summary

- Visuals

- Design Concept and Approach

- Firm Profile

- Floor Area Ratio Sheet

Also the following exhibits, on succeeding pages, are related to the market demand:

- The market demand for such condo housing is documented in a letter dated October 25, 2004, from The Marketing Directors, Inc., a well-recognized authority on the demand for housing within a geographic area and at specific quality and prices

- The Equity Breakdown Excerpt shows a sellout in three years from Certificate of Occupancy on a total of five years from the start of the project.

- Retail demand is indicated by a letter from Esquire Properties, Inc., concerning six potential tenants as well as by the expressions of interest from seven potential tenants as listed on the page entitled Retail Demand Indicators.

# OVERALL SQUARE FOOTAGE SUMMARY

## GROUND FLOOR

1. Retail Westside .................................................................................... 28,800 sq.ft.
2. Retail Eastside ..................................................................................... 10,200 sq.ft.
   **Total 39,000 sq.ft.**

3. Restaurant – Unit #23 Duplex ..............................................................
4. Lobby (for Tower) ............................................................................ **5,200 sq.ft.**
5. Service Area ..................................................................................... **2,000 sq.ft.**
6. Public Plaza ..................................................................................... **2,450 sq.ft.**
7. Prospect Park ................................................................................... **24,000 sq.ft.**
   ........................................................................................................ **19,200 sq.ft.**

## SECOND FLOOR

8. Duplex Apartments (above Retail) -- <u>25 Apartments</u>
   Live/Work Loft apartments
   #1-5, 7, 9-11, 13-18, 20, 22-25 ...........................................................
   #6 .................................................................................................... 1,600 sq.ft.
   #8 .................................................................................................... 2,770 sq.ft.
   #12 .................................................................................................. 1,975 sq.ft.
   #19 .................................................................................................. 1,850 sq.ft.
   #21 .................................................................................................. 2,850 sq.ft.
   ........................................................................................................ 1,920 sq.ft.
   **Total 43,365 sq.ft**

9. Residential Courtyard - Eastside ......................................................... **9,400 sq.ft.**
10. Residential Courtyard – Westside (See Tower Outdoor Amenities below)
11. Roof Gardens w/ planters and roof pavers ......................................... **8,500 sq.ft.**

## TOWER

12. Luxury Residential Apartments -- <u>360 Apartments</u>
    - 30 floors
    - 12 apartments per floor:   (4) one-bedrooms, (8) two-bedrooms
    - Totals:                              (120) one-bedrooms
                                               (240) two-bedrooms

    - 1 bedrooms              800 sq.ft.
    - 2 bedrooms              1,100 sq.ft.

                                                                **Total 450,000 sq.ft**
13. <u>Amenities -Outdoor</u>
    - Pool
    - Landscaped Courtyard ..................................................................... **3,000 sq.ft.**
    - Kitchen area ................................................................................... **30,000 sq.ft.**
14. <u>Amenities -Indoor</u> ............................................................................ **3,000 sq.ft.**
    - Luxurious lobby
    - 24 hour concierge
    - Fitness area
    - Two Entertainment Lounge areas

- Full Kitchen to service Lounges
- Media Room
- Laundry Room
- Child Play Room
- Meeting/study rooms
- Full Kitchen/ Bar at Courtyard level
- Wireless Internet Café

15. <u>Amenities- Apartment</u> - -<u>360 Apartments</u>                    **Total    8,000 sq.ft**
- Floor to ceiling windows
- L.I. Sound views
- Private Balconies
- Gourmet kitchens
- Luxury baths
- Washer/Dryer
- Spacious layouts
- Generous closet space
- Pre-wired for high speed internet

## PARKING

16. On-site, three-level underground levels -
632 Spaces + 69 Tandem  = <u>701 Total Spaces</u>
- 540 for Tower Apartments (1.5 per unit)
- 38 for Duplex Units (1.5 per unit)
- 18 for Retail Employees Parking
- 36 for 43 Church Street - Building C (1 per unit)
- 69 Tandem spaces for residents

17. Off-site, two-level relocated steel structure to be installed     **Total   239,514 sq.ft.**
on existing Prospect Lot with new stepped back profile with
garden edges to minimize impact on street.
- 438 Spaces for Retail shoppers  *(388+50 = 438)*
*+ 90 spaces*        *(438+90 = 528)*        **Total  143,352 sq.ft.**
*≈ 430 sq.ft.*

## ADDITIONAL WORK TO BE DONE

18. Renovation of City owned parks and surrounding streets: plant
grass areas, trees, concrete sidewalks

19. Remove building at corner of Main/Church              **Total   50,000 sq.ft**

                                                         **Total   10,000 sq.ft**

# GREEN TECHNOLOGY INCORPORATED IN ALL BUILDINGS

<u>HVAC</u>
- A centralized heating and air-conditioning system and fresh air ventilation system that filters 85% of the particulate matter that delivers filtered, climate controlled air to each residence.

<u>Energy Efficiency Features</u>
- Energy Star Appliances
- High-performance Windows
- Daylighting - Double insulated low-e glazing
- Occupancy-sensing lighting
- Compact Fluorescent Lights
- Photovoltaics
- Zoned HVAC

<u>Water Conservation Features</u>
- Low-flow fixtures
- Rainwater collection
- Graywater reuse
- Indoor/Outdoor Landscaping for Water Conservation

<u>Green Products</u>
- Low-VOC Paints and Adhesives
- Recycled/Recyclable floor covering
- Certified Wood - Bamboo flooring

# VISUALS

1.   Site Area Map
2.   Area Map
3.   Site Plan
4.   Ground Floor Plan
5.   Second Floor Plan
6.   Third Floor Plan
7.   Fourth Floor Plan
8.   Typical Floor Plan – Tower Apartments
9.   Parking Level 1
10.  Parking Level 2
11.  Parking Level 3
12.  Sections A-A & B-B
13.  Sections C-C & D-D
14.  North Elevation
15.  South Elevation
16.  East Elevation
17.  West Elevation
18.  Aerial Site Overview 1
19.  Aerial Site Overview 2
20.  Aerial Site Overview 3
21.  View Looking North at Tower Entry
22.  Plaza View Looking West Toward Main Street
23.  Pedestrian Plaza View Looking North
24.  Plaza View Looking Northeast
25.  View of New Park and Relocated Parking Structure
26.  View from Pedestrian Bridge Looking South Toward New Park
27.  View Looking South Toward New Park and Relocated Garage
28.  Perspective Close-up View of Pedestrian Plaza
29.  Night View of Plaza Looking Northeast



PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

SITE AREA MAP

PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004



AREA MAP

Scale: 1"=250'

0  40    140    240 FT

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
NEW ROCHELLE, NY



PROSPECT AVENUE

Proposed Retail With
Residential Duplex
Units Above

Proposed 8 Story
Residential Bldg

BONNEFOY PLACE

Proposed Roof
Top Garden

Proposed Retail With
Residential Duplex
Units Above

New Redevelon
Plaza

CLINTON PLACE

CHURCH STREET

DIVISION STREET

LE ROY PLACE

Proposed
Roof Top
Garden

Proposed Retail With
Residential Duplex
Units Above

New Park

New Dog Park

Relocated Parking
Facility With Roof
Gardens (438 cars)

Proposed
Residential Tower

Proposed Tower
Main Entrance

Proposed Tower Plaza
With Garden

MAIN STREET

N

SITE PLAN

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

Scale: 1" = 100 ft

0  20    60    100    140 FT

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

GROUND FLOOR: Retail Level and
Underground Garage access

PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004



PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS

November 1, 2004

2ND FLOOR: Town House Lower Level (Bldgs A & B) and
2ND FLOOR: Bldg C

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



BLDG "C"

8 STORY
MIXED USE
BLDG.

50'-5"

82'-10"

44'-9"

UPPER LEVEL RESIDENTIAL

UPPER LEVEL RESIDENTIAL

BLDG "B"

175'-6"

160'-4"

UPPER LEVEL RESIDENTIAL

COURT YARD BELOW

UPPER LEVEL RESIDENTIAL

104'-5"

28'-5"   15'-2"

STUDY

INTERNET LOUNGE

BLDG "A"

37'-4"

131'-5"

40'-0"

206.5"



Scale: 1" = 40 ft

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

3RD FLOOR: Town House Upper Level (Bldgs A & B) and
3ND FLOOR: Bldg C

PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004



4TH FLOOR: Tower Amenities Level and
5TH FLOOR: BLDG C

PETER F. GATTO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004

PROPOSED MIXED USE DEVELOPMENT FOR:
HURCH/DIVISION GARAGE SITE
ew Rochelle, NY



PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004

TYPICAL FLOOR: Tower

ROPOSED MIXED USE DEVELOPMENT FOR:
HURCH/DIVISION GARAGE SITE
ew Rochelle, NY

SECTION A-A
1" = 40 ft

SECTION B-B
1" = 40 ft

SECTIONS A-A & B-B

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS

November 1, 2004

SECTIONS C-C & D-D

PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS

November 1, 2004

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PROSPECT

BONNEFOY PL.

BLDG "C"

DIVISION ST.

CLINTON PL.

BLDG "B"

LE ROY PL.

BLDG "A"

CHURCH ST.

MAIN ST.

Scale: 1" = 40 ft.

PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004

PARKING LEVEL I: 208 Spaces + 23 Tandem Spaces

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PARKING LEVEL 2: 212 Spaces + 23 Tandem Spaces

PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004



PROSPECT

BONNEFOY PL.

BLDG "C"

DIVISION ST.

CLINTON PL.

BLDG "B"

LE ROY PL.

BLDG "A"

CHURCH ST.

MAIN ST

Scale: 1" = 40 ft

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PARKING LEVEL 3: 212 Spaces + 23 Tandem Spaces

PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS

November 1, 2004



NORTH ELEVATION

**PROPOSED MIXED USE DEVELOPMENT FOR:**
CHURCH/ DIVISION GARAGE SITE
New Rochelle, NY

**PETER F. GAITO and ASSOCIATES**
ARCHITECTS AND PLANNERS



SOUTH ELEVATION

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/ DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

RELOCATED PARKING STRUCTURE

DIVISION STREET

CHURCH STREET

EAST ELEVATION

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/ DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS



WEST ELEVATION

**PROPOSED MIXED USE DEVELOPMENT FOR:**
**CHURCH/ DIVISION GARAGE SITE**
New Rochelle, NY

**PETER F. GAITO and ASSOCIATES**
**ARCHITECTS AND PLANNERS**



AERIAL SITE OVERVIEW I

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS



AERIAL SITE OVERVIEW 2

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/ DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS



AERIAL SITE OVERVIEW 3

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS



PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

VIEW LOOKING NORTH AT TOWER ENTRY

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



PLAZA VIEW LOOKING WEST TOWARD MAIN STREET

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS



PEDESTRIAN PLAZA VIEW LOOKING NORTH

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



PLAZZA VIEW LOOKING NORTH EAST

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/ DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS



VIEW OF NEW PARK AND RELOCATED PARKING STRUCTURE

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS





VIEW FROM PEDESTRIAN BRIDGE LOOKING SOUTH TOWARD NEW PARK

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PLAZA VIEW LOOKING SOUTH TOWARD NEW PARK AND RELOCATED GARAGE

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



CLOSE-UP VIEW OF PEDESTRIAN PLAZA

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

# DESIGN CONCEPT AND APPROACH

## PFGA Design Concept

We are very enthusiastic and look optimistically towards the design and completion of the Church/Division Mixed Use Development Project. The Architect/Owner team's enthusiasm and efforts will produce ideas and conclusions that will result in renovated and new structures of which the current and future occupants, the organizers, New Rochelle citizens and the Church/Division Mixed Use Development Project developers will be proud.

This project will be successful on a number of levels. The buildings will be designed to suit the needs of the entire community as well as visitors to the area. The renovated and new buildings will work seamlessly with the existing buildings and main access roads. The resulting design will be a lively 24-hour campus and a complement to the streetscape, and promote a sense of welcoming, professional excellence, safety, security, enjoyment and pride for the residents and the staff living and working at the new Church/Division Mixed Use project.

Our tasks as Architects are varied and complex, and are customized for each project. We would set forth the effort and vigor with which our other projects and clients have had much success, and will continue that attention for Church/Division Mixed Use Development Project. We design according to specific site conditions, as well as local and State Governments. PFGA seeks valuable input from City Officials, local residents, and future occupants to finalize the program.

## PFGA Design Approach

We envision the creation of a place that provides a safe, fun and attractive environment for residents, retailers and shoppers alike.  Stores and restaurants situated within a lively 24-hour landscaped plaza creates an environment that is both engaging and rewarding.

The new Church/Division Mixed Use Development Project will be carefully situated to promote a sense of social interaction and effectively tie into the existing neighborhood buildings. The new buildings would stand gracefully amidst the brownstones along Main Street and its adjacent streets, highlighting its individual qualities, yet work together with the existing buildings, and improved landscaping, to yield an attractive new highly desirable destination

point for locals and visitors alike. Creating a mixed-use community will not only enhance the quality of life, but will become a catalyst for other positive development for the city.

This new Development Project will serve as a proud symbol of comfort, confidence, community and safety. It will also remedy all of New Rochelle's architectural concerns and cleverly satisfy all of the present and future program needs. The ornately-detailed interior and exterior spaces will offer a pleasant and attractive neighborhood addition. Special attention will be paid to the overall flow of public and private people traffic, noise level concerns, heating and cooling balances, maintenance concerns and multi-use flexible spaces.

Another component of this development project is the incorporation of another proposed 8-story mixed-use building (Building "C"). This brick and limestone residential building, with ground floor retail spaces, will be another handsome complement to the streetscape. Like the other proposed buildings, this building will also benefit from the richly landscaped retail plaza, new Prospect Park, proximity to Main Street shopping and walking distance to the library and the Intermodel Transportation Center. Building "C" will be physically linked to the

rest of the new mixed-use campus by a pedestrian bridge and through on-site underground garage where the residents will have ample parking.

We have many exciting ideas whereby through architecture and "green" design, we can improve upon the current success of the main street and the current revitalization of New Rochelle. We look forward to continuing to the success of New Rochelle's Restaurant Recruitment Program, Downtown Streetscape Program, and the Business Improvement District Program. Our ideas would be to effectively incorporate the following:

- **Create** a visual icon for the city, enhancing its image as a waterfront community
- **Create** a new plaza at the Main/Church Street corner to serve as a Tower entrance plaza
- **Create** a new lively pedestrian plaza by closing Clinton Place to vehicular traffic
- **Create** a project complex that promotes quality "green" environmental construction standards
- **Create** a vibrant 24-hour neighborhood
- **Create** a new park to increase outdoor community interaction

- **Create** an energized mixed-use environment to complement the Main Street corridor.

- **Create** a cohesive exciting project to help reaffirm New Rochelle as a highly desirable destination point.

- **Encourage** city residents to shop and eat locally in and around Main Street

- **Encourage** use of public transportation, the Intermodal Transportation Center and local public services

- **Establish** an inviting street presence with inviting retail/residential architecture

- **Establish** design/construction parameters that enable the new buildings to be built so that daily parking, residential, and commercial operations will not be interrupted

- **Establish** an organization of spaces to promote social interaction between citizens, merchants and visitors

- **Establish** mini-museum: A 'wall of New Rochelle history' with stories, photos, awards, past & future community events, and volunteer information, etc.

- **Establish** a high quality 'Green' HVAC system to yield energy and cost efficient buildings

- **Establish** buildings with an aesthetic and scale that complement the architectural vocabulary of the Main Street corridor

- **Establish** entire project complex as a catalyst and destination point for the entire area

- **Improve** pedestrian activity in and around Main Street

- **Improve** public parking areas by providing covered areas for protection from Winter elements

- **Improve** the exterior look of the streetscape by designing the new buildings to relate to the Main Street architectural vocabulary and offer additional site and building design support where needed

- **Improve** landscaping of surrounding areas in and around Main Street

- **Provide** appropriate building, park and street signage

- **Provide** an opportunity to effectively adapt re-use of an underutilized parking structure

- **Provide** newly relocated Garage to Prospect Lot to accommodate 438 cars in addition to the existing ground floor parking spaces

- **Provide** newly relocated garage with new concrete parking decks, brick stair /elevator towers, new paint, lighting and signage

- **Provide** a new stepped back profile with garden edges at the newly relocated garage to minimize impact on street and to increase city "green" space
- **Provide** exterior lighting that will provide safety without disturbing neighboring residences
- **Provide** well designed outdoor spaces with flexibility for varied usage
- **Provide** new green areas including a new ground level park, townhouse rooftop gardens, sculpture garden, and seating garden at tower entry plaza and richly landscaped pedestrian plaza
- **Provide** public-friendly building entrances for the retailers, restaurants, residences, and residential tower

## Residential Tower Amenities

### Amenities -Tower

- Luxurious lobby
- 24-hour concierge
- 24/7 Fitness area
- Two Entertainment Lounge areas
- Full Kitchen to service Lounges
- Media Room
- Laundry Room

- Child Play Room

- Meeting/study rooms

- Landscaped courtyard

- Outdoor pool

- Full Kitchen/ Bar at Courtyard level

- Wireless Internet Café

Amenities- Apartment

- Floor to ceiling windows

- Windowed bathrooms

- Spectacular Long Island Sound views

- Private Balconies

- Gourmet kitchens

- Luxury baths

- Washer/Dryer

- Spacious layouts

- Generous closet space

- Pre-wired Ethernet

Amenities- Parking

On-site, three-level underground garage - 701 Spaces

- 540 spaces for Tower Apartments (1.5 per unit)

- 38 spaces for Duplex Units (1.5 per unit)

- 18 spaces for Retail Employees

- 36 spaces for 43 Church St. - Building C (1 per unit)

- 69 Tandem spaces for Residents

## PFGA Green Design Technology

Our firm seeks to implement Green design standards, which are architectural methods to increase building energy savings while reducing the adverse impact on the environment. Through architectural design decisions, product choices, and engineering methods, we can deliver an aesthetically pleasing, healthy building, which will result in increased energy efficiency, which translates into lower building operating costs and less taxing for the city utilities and services. We seek to implement these Green design and engineering methods through well thought out design, selection of efficient and safe equipment and products while remaining within budget.

Such methods include the incorporation of natural light to normally dark interior environments whenever possible, providing natural vegetation inside and out, exterior sun/shade techniques, and the collection of rain water for irrigation of the site vegetation. Aside from aesthetic value, vegetation greatly

increases the amount of fresh oxygen to the entire space, and help the building become a healthier, more energy efficient, environmentally friendly machine.

## GREEN TECHNOLOGY TO BE INCORPORATED IN ALL BUILDINGS

### HVAC

- A centralized heating and air-conditioning system and fresh air ventilation system that filters 85% of the particulate matter that delivers filtered, climate controlled air to each residence.

### Energy Efficiency Features

- Energy Star Appliances
- High-performance Windows
- Daylighting - Double insulated low-e glazing
- Occupancy-sensing lighting
- Zoned HVAC
- Compact Fluorescent Lights
- Photovoltaics

### Water Conservation Features

- Low-flow fixtures
- Rainwater collection
- Graywater reuse

- Interior and exterior landscaping for water conservation

**Green Products**

- Low-VOC Paints and Adhesives

- Recycled/Recyclable floor coverings

- Certified Wood - Bamboo flooring

## PFGA Design Coordination

The specific building design of the new Church/Division Mixed Use Development Project would be developed in conjunction with the overall master plan of the entire site, the existing buildings to remain, the landscape and parking, and other surrounding areas. A complete landscaping master plan would be developed in union with the new and existing buildings, to beautify and better service the entire Church/Division Mixed Use Development Project campus and the surrounding areas. Incorporation of these site designs would be implemented based on discussions of the final scope of work, program and budget and input from City Officials.

At this time with the information available, we anticipate the design and construction will progress rapidly and smoothly, to be completed in a timely

and safe manner. The Church/Division Mixed Use Development Project promises to be a handsome compliment to the New Rochelle urban landscape. It will soon become a destination point and a suitable home, and a pleasant and safe work place for all involved residents and staff.

## Consistent Parking Availability

"How can we maintain a minimum number of City Parking spaces operational throughout the entire construction process?" we asked ourselves. Our answer to this question was part of how we originally conceived and designed the master plan.

The Church/Division Mixed Use Development Project can be done in a straightforward manner that would allow daily parking to continue completely uninterrupted. This construction process involves disassembling the existing Church/Division Garage and reassembling it with improvements across the street on the Prospect lot. Part of the Church/Division site shall remain available for parking until the reconstruction of the 'new' garage is completed. The site plan and construction staging area is planned so that the Mixed Use Development Buildings will not interfere with the daily operation of any

existing surrounding building, or recreation areas during the entire construction process. The remaining site work and completion of the landscaping can then be completed also without any interruption to daily neighborhood activities.

<u>Summary of Consistent Parking Availability</u>

1. Begin site work

2. Disassemble existing Church/Division Garage

3. Maintain minimum number of spaces on Church/Division site

4. Reassemble garage with modifications on Prospect lot

5. Update existing Prospect Lot ground level parking

6. When newly relocated garage is completed, continue Church/Division site excavation and construction

7. Construct Church/Division underground parking levels

8. Construct Buildings

9. Complete site work

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

AERIAL  OVERVIEW AT NIGHT



CHURCH / DIVISION MIXED-USE DEVELOPMENT

4

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## SITE AREA MAP



CHURCH / DIVISION MIXED-USE DEVELOPMENT

5

## SIMONE DEVELOPMENT COMPANIES

### PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC



**SITE PLAN**

## CHURCH / DIVISION MIXED-USE DEVELOPMENT

6

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## P1 - TYPICAL PARKING LEVEL



CHURCH / DIVISION MIXED-USE DEVELOPMENT

7

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## GROUND FLOOR - RETAIL LEVEL



GROUND FLOOR: Retail Level and
Underground Garage access

## CHURCH / DIVISION MIXED-USE DEVELOPMENT

8

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## SECOND & THIRD FLOORS - TOWN HOUSE LEVEL



CHURCH / DIVISION MIXED-USE DEVELOPMENT



SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## SECTION THROUGH SITE

CHURCH / DIVISION MIXED-USE DEVELOPMENT

10

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## CHURCH STREET ELEVATION



CHURCH / DIVISION MIXED-USE DEVELOPMENT

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## ELEVATION VIEW TOWARD MAIN STREET



## CHURCH / DIVISION MIXED-USE DEVELOPMENT

12

## AERIAL OVERVIEW I



## CHURCH / DIVISION MIXED-USE DEVELOPMENT

13

SIMONE DEVELOPMENT COMPANIES
PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

AERIAL OVERVIEW 2



CHURCH / DIVISION MIXED-USE DEVELOPMENT

14

SIMONE DEVELOPMENT COMPANIES
PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

VIEW LOOKING EAST AT TOWER ENTRY



CHURCH / DIVISION MIXED-USE DEVELOPMENT

15

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## PLAZA VIEW LOOKING WEST TOWARD MAIN STREET



CHURCH / DIVISION MIXED-USE DEVELOPMENT

16

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

PEDESTRIAN PLAZA VIEW LOOKING NORTH



CHURCH / DIVISION MIXED-USE DEVELOPMENT

17

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

PLAZA VIEW LOOKING NORTH EAST



CHURCH / DIVISION MIXED-USE DEVELOPMENT

18

SIMONE DEVELOPMENT COMPANIES
PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## VIEW OF PARK AND RELOCATED PARKING STRUCTURE



CHURCH / DIVISION MIXED-USE DEVELOPMENT

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC



VIEW FROM PEDESTRIAN BRIDGE LOOKING SOUTH AT NEW PARK

CHURCH / DIVISION MIXED-USE DEVELOPMENT

20

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

CLOSE-UP OF PEDESTRIAN PLAZA



CHURCH / DIVISION MIXED-USE DEVELOPMENT

21

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## MID-RISE RESIDENTIAL BUILDING



CHURCH / DIVISION MIXED-USE DEVELOPMENT

22

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## ROOF DECK PLAZA AND SCULPTURE COURTYARD



CHURCH / DIVISION MIXED-USE DEVELOPMENT

23

**EXHIBIT D**

# DVD FILED SEPARATELY

# EXHIBIT E

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE

VA 1-330-925

EFFECTIVE DATE OF REGISTRATION

**APR 05 2005**
Month     Day     Year

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1**
TITLE OF THIS WORK ▼
CHURCH/DIVISION MIXED USE RESIDENTIAL COMPLEX — "NOT YET CONSTRUCTED"

NATURE OF THIS WORK ▼ See instructions
**Published Work**

PREVIOUS OR ALTERNATIVE TITLES ▼

**Publication as a Contribution** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.  Title of Collective Work ▼

If published in a periodical or serial give: Volume ▼     Number ▼     Issue Date ▼     On Pages ▼

**2**
NAME OF AUTHOR ▼
**a** Peter F. Gaito

DATES OF BIRTH AND DEATH
Year Born ▼ 1/31/46     Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of ▶
Domiciled in ▶

Was This Author's Contribution to the Work
Anonymous?      ☐ Yes  ☒ No
Pseudonymous?   ☐ Yes  ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

NATURE OF AUTHORSHIP Check appropriate box(es). See instructions
☐ 3-Dimensional sculpture     ☐ Map             ☐ Technical drawing
☒ 2-Dimensional artwork       ☐ Photograph      ☐ Text
☐ Reproduction of work of art ☐ Jewelry design  ☐ Architectural work

**b** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of ▶
Domiciled in ▶

Was This Author's Contribution to the Work
Anonymous?      ☐ Yes  ☐ No
Pseudonymous?   ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Check appropriate box(es). See instructions
☐ 3-Dimensional sculpture     ☐ Map             ☐ Technical drawing
☐ 2-Dimensional artwork       ☐ Photograph      ☐ Text
☐ Reproduction of work of art ☐ Jewelry design  ☐ Architectural work

**3**
**a** Year in Which Creation of This Work Was Completed
2004 ◀ Year
This information must be given in all cases.

**b** Date and Nation of First Publication of This Particular Work
Complete this information ONLY if this work has been published.
Month ▶ Nov.  Day ▶ 1  Year ▶ 2004
USA ◀ Nation

**4**
COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Peter F. Gaito
399 Knollwood Road
White Plains, N.Y. 10603

APPLICATION RECEIVED
APR 05 2005 NOV 04 2005
ONE DEPOSIT RECEIVED
APR 05 2005 NOV 04 2005
TWO DEPOSITS RECEIVED
FUNDS RECEIVED

**Transfer** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

MORE ON BACK ▶
• Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.
• Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of 2 pages

EXAMINED BY

CHECKED BY

FORM VA

CORRESPONDENCE
☑ Yes

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes ☑ No   If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: **Previous Registration Number** ▼     **Year of Registration** ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

a. **Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

N/A

b. **Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

N/A

**a**

**b**

**6**

See instructions
before completing
this space.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

**Name** ▼                    **Account Number** ▼

**a**

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name/Address/Apt/City/State/ZIP ▼

Peter Gaito
Peter F. Gaito and Associates
399 Knollwood Road
White Plains, N.Y.

**b**

Area code and daytime telephone number ▶ (914) 682-3381    Fax number ▶ (914) 682-4192

Email ▶ pgaito@pfga.net

**CERTIFICATION** I, the undersigned, hereby certify that I am the

check only one ▶

☑ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of _____

Peter F. Gaito

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Peter F. Gaito      Date ▶ 4/1/05

Handwritten signature (X) ▼

X _____

**Mail
certificate
to:**

**Name** ▼
PETER F. GAITO

**Number/Street/Apt** ▼
399 KNOLLWOOD ROAD

**City/State/ZIP** ▼
WHITE PLAINS, NEW YORK    10603

• Complete all necessary spaces
• Sign your application in space 8

SEND ALL 3 ELEMENTS
IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable filing fee in check or money order payable to Register of Copyrights
3. Deposit material

MAIL TO:
Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

**9**

Certificate
will be
mailed in
window
envelope

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

April 1999—300,000     WEB REV: July 1999     ⊕ PRINTED ON RECYCLED PAPER     ☆U.S. GOVERNMENT PRINTING OFFICE: 1997-417-768/40,039

# EXHIBIT F

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, United States Code,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE

VA 1 – 330 – 926



EFFECTIVE DATE OF REGISTRATION

**APR 05 2005**
Month        Day        Year

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

## 1

**TITLE OF THIS WORK ▼**
CHURCH/DIVISION MNED USE
RESIDENTIAL COMPLEX — "NOT YET CONSTRUCTED"

**NATURE OF THIS WORK ▼** See instructions
Technical Drawings

**PREVIOUS OR ALTERNATIVE TITLES ▼**

Publication as a Contribution If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.    Title of Collective Work ▼

If published in a periodical or serial give: Volume ▼        Number ▼        Issue Date ▼        On Pages ▼

## 2

**NAME OF AUTHOR ▼**
a  Peter F. Gaito

**DATES OF BIRTH AND DEATH**
Year Born ▼  1·21·46    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of ▶ USA
     Domiciled in ▶

**Was This Author's Contribution to the Work**
Anonymous?  ☐ Yes  ☒ No
Pseudonymous?  ☐ Yes  ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Check appropriate box(es). See instructions
☐ 3-Dimensional sculpture    ☐ Map              ☒ Technical drawing
☐ 2-Dimensional artwork      ☐ Photograph        ☐ Text
☐ Reproduction of work of art ☐ Jewelry design    ☐ Architectural work

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**NAME OF AUTHOR ▼**
b

**DATES OF BIRTH AND DEATH**
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of ▶
     Domiciled in ▶

**Was This Author's Contribution to the Work**
Anonymous?  ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Check appropriate box(es). See instructions
☐ 3-Dimensional sculpture    ☐ Map              ☐ Technical drawing
☐ 2-Dimensional artwork      ☐ Photograph        ☐ Text
☐ Reproduction of work of art ☐ Jewelry design    ☐ Architectural work

## 3

a  **Year in Which Creation of This Work Was Completed**  2004  ◀ Year
This information must be given in all cases.

b  **Date and Nation of First Publication of This Particular Work**
Month NOV.  Day 1  Year 2004
Nation USA    ◀ Nation

## 4

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2 ▼
Peter F. Gaito
399 Knollwood Road
White Plains, N.Y. 10603

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

**APPLICATION RECEIVED**
APR 05 2005 NOV 04 2005
**ONE DEPOSIT RECEIVED**
APR 05 2005 NOV 04 2005
**TWO DEPOSITS RECEIVED**

**FUNDS RECEIVED**

---

MORE ON BACK ▶   • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
                 • See detailed instructions.        • Sign the form at line 8

DO NOT WRITE HERE
Page 1 of ___ pages

| EXAMINED BY | | FORM VA |
| CHECKED BY | | |
| CORRESPONDENCE Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes ☐ No If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼      Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

a. Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

*N/A*

b. Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

*N/A*

**6**
a
b

*See instructions before completing this space.*

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▼      Account Number ▼

**7**
a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name/Address/Apt/City/State/ZIP ▼

Peter Gaito
Peter F. Gaito and Associates
399 Knollwood Road
White Plains N.Y.

Area code and daytime telephone number ▶ (914) 682-3381      Fax number ▶ (914) 682-4192

Email ▶ pgaito@pfgaa.net

**b**

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

check only one ▶
☒ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of _____

*Peter F. Gaito*

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

*Peter F. Gaito*      Date ▶ 4/1/05

Handwritten signature (X) ▼

X *Peter Gaito*

**9**

Mail certificate to:

Name ▼
PETER F. GAITO

Number/Street/Apt ▼
399 KNOLLWOOD ROAD

City/State/ZIP ▼
WHITE PLAINS, NEW YORK   10603

Certificate will be mailed in window envelope

* Sign your application in space 8
* Send all 3 elements in the same package
* Nonrefundable filing fee in check or money order payable to Register of Copyrights
* Deposit material

Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

*17 U.S.C. §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.*

April 1997—200,000      PRINTED ON RECYCLED PAPER      ☆U.S. GOVERNMENT PRINTING OFFICE: 1997-417-700/40,025

WEB REV: July 1999

# EXHIBIT G

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM VA**
For a Work of the Visual Arts

VA 1-330-927

EFFECTIVE DATE OF REGISTRATION

**APR 05 2005**

Month            Day            Year

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1**

TITLE OF THIS WORK ▼

CHURCH/DIVISION MIXED USE RESIDENTIAL COMPLEX - "NOT YET CONSTRUCTED"

NATURE OF THIS WORK ▼ See instructions

Architectural Work

PREVIOUS OR ALTERNATIVE TITLES ▼

Publication as a Contribution If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.    Title of Collective Work ▼

If published in a periodical or serial give: Volume ▼        Number ▼        Issue Date ▼        On Pages ▼

---

**2**

NAME OF AUTHOR ▼

**a** Peter F. Gaito

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼
1·21·46

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶ _____

Was This Author's Contribution to the Work
Anonymous? ☐ Yes ☒ No
Pseudonymous? ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was made for hire check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

NATURE OF AUTHORSHIP Check appropriate box(es). See instructions
☐ 3-Dimensional sculpture    ☐ Map    ☐ Technical drawing
☐ 2-Dimensional artwork    ☐ Photograph    ☐ Text
☐ Reproduction of work of art    ☐ Jewelry design    ☒ Architectural work

**b** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of ▶ _____
Domiciled in ▶ _____

Was This Author's Contribution to the Work
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Check appropriate box(es). See instructions
☐ 3-Dimensional sculpture    ☐ Map    ☐ Technical drawing
☐ 2-Dimensional artwork    ☐ Photograph    ☐ Text
☐ Reproduction of work of art    ☐ Jewelry design    ☐ Architectural work

---

**3**

**a** Year in Which Creation of This Work Was Completed
2004    ◀ Year    This information must be given in all cases.

**b** Date and Nation of First Publication of This Particular Work
Complete this information ONLY if this work has been published.
Month ▶ Nov.    Day ▶ 1    Year ▶ 2004
USA    ◀ Nation

---

**4**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Peter F. Gaito
399 Knollwood Road
White Plains, N.Y. 10603

APPLICATION RECEIVED
APR 05 2005  NOV 04 2005
ONE DEPOSIT RECEIVED
APR 05 2005
TWO DEPOSITS RECEIVED
NOV 04 2005
FUNDS RECEIVED

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

---

MORE ON BACK ▶ • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.    • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of _____

| | |
|---|---|
| EXAMINED BY ___ | **FORM VA** |
| CHECKED BY ___ | |
| ☒ CORRESPONDENCE<br>☐ Yes | **FOR<br>COPYRIGHT<br>OFFICE<br>USE<br>ONLY** |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes ☒ No   If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼ _____ Year of Registration ▼ _____

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

a. Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

N/A

**a**

b. Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

N/A

**b**

**6**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▼ _____ Account Number ▼ _____

**a**

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/ZIP ▼

Peter Gaito
Peter F. Gaito and Associates
399 Knollwood Road
White Plains, N.Y.

Area code and daytime telephone number ► (914) 682-3281   Fax number ► (914) 682-4192

Email ► pgaito@pfga.net

**b**

**CERTIFICATION** I, the undersigned, hereby certify that I am the

check only one ►
☒ author
☐ other copyright claimant
☐ owner of exclusive rights
☐ authorized agent of _____

*Peter J. Gaito*

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Peter F. Gaito   Date ► 4/1/05

Handwritten signature (X) ▼

X *Peter J. Gaito*

**8**

Mail certificate to:

Name ▼
PETER F. GAITO

Number/Street/Apt ▼
399 KNOLLWOOD ROAD

City/State/ZIP ▼
WHITE PLAINS, NEW YORK   10603

**9**

# EXHIBIT H

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: SIMONE CHURCH STREET LLC

Selected Entity Status Information

**Current Entity Name:** SIMONE CHURCH STREET LLC
**Initial DOS Filing Date:** NOVEMBER 22, 2005
**County:** WESTCHESTER
**Jurisdiction:** NEW YORK
**Entity Type:** DOMESTIC LIMITED LIABILITY COMPANY
**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
SIMONE CHURCH STREET LLC
1000 MAIN STREET
NEW YORK, NEW YORK, 10801

**Registered Agent**
REGISTERED AGENT REVOKED

, ,

NOTE: New York State does not issue organizational identification numbers.

Search Results            New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

# EXHIBIT G

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM VA**
For a Work of the Visual Arts

VA 1–330–927

EFFECTIVE DATE OF REGISTRATION

**APR 05 2005**

Month        Day        Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

**TITLE OF THIS WORK ▼**
CHURCH/DIVISION MIXED USE RESIDENTIAL COMPLEX – "NOT YET CONSTRUCTED"

**NATURE OF THIS WORK** See instructions
Architectural Work

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**Publication as a Contribution** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.  **Title of Collective Work ▼**

If published in a periodical or serial give:  **Volume ▼**   **Number ▼**   **Issue Date ▼**   **On Pages ▼**

---

**2**

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**a NAME OF AUTHOR ▼**
Peter F. Gaito

**DATES OF BIRTH AND DEATH**
Year Born ▼ 1·21·46   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶

**Was This Author's Contribution to the Work**
Anonymous? ☐ Yes ☒ No
Pseudonymous? ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Check appropriate box(es). See instructions
☐ 3-Dimensional sculpture   ☐ Map   ☐ Technical drawing
☐ 2-Dimensional artwork   ☐ Photograph   ☐ Text
☐ Reproduction of work of art   ☐ Jewelry design   ☒ Architectural work

**b NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**Was This Author's Contribution to the Work**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Check appropriate box(es). See instructions
☐ 3-Dimensional sculpture   ☐ Map   ☐ Technical drawing
☐ 2-Dimensional artwork   ☐ Photograph   ☐ Text
☐ Reproduction of work of art   ☐ Jewelry design   ☐ Architectural work

---

**3**

**a** Year in Which Creation of This Work Was Completed  2004
This information must be given in all cases.

**b** Date and Nation of First Publication of This Particular Work
Month ▶ Nov.   Day ▶ 1   Year ▶ 2004
USA

---

**4**

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Peter F. Gaito
399 Knollwood Road
White Plains, N.Y. 10603

**Transfer** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED  NOV 04 2005
APR 05 2005
ONE DEPOSIT RECEIVED
APR 05 2005  NOV 04 2005
TWO DEPOSITS RECEIVED

FUNDS RECEIVED

---

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.  • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of

EXAMINED BY _____

CHECKED BY _____

FORM VA

☒ CORRESPONDENCE
☐ Yes

FOR
COPYRIGHT
OFFICE
USE
ONLY

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes ☒ No If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼          Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

a. Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

N/A

b. Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

N/A

**a**
**6**
**b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▼          Account Number ▼

**a**
**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/ZIP ▼

Peter Gaito
Peter F. Gaito and Associates
399 Knollwood Road
White Plains, N.Y.

Area code and daytime telephone number ▶ (914) 682-3281          Fax number ▶ (914) 682-4192

Email ▶ pgaito@pfga.net

**b**

**CERTIFICATION** I, the undersigned, hereby certify that I am the

check only one ▶
☒ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of _____

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

*[signature] Peter Gaito*

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Peter F. Gaito          Date ▶ 4/1/05

Handwritten signature (X) ▼

X *[signature] Peter F. Gaito*

Mail certificate to:

Name ▼
PETER F. GAITO

Number/Street/Apt ▼
399 KNOLLWOOD ROAD

City/State/ZIP ▼
WHITE PLAINS, NEW YORK    10603

Certificate will be mailed in window envelope

**9**

*17 U.S.C. §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.*

Nov 1997—7,28,000          ☆ PRINTED ON RECYCLED PAPER          ☆U.S. GOVERNMENT PRINTING OFFICE: 1997-417-730/40,063

WEB REV: July 1999

# EXHIBIT H

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: SIMONE CHURCH STREET LLC

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | SIMONE CHURCH STREET LLC |
| **Initial DOS Filing Date:** | NOVEMBER 22, 2005 |
| **County:** | WESTCHESTER |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC LIMITED LIABILITY COMPANY |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
SIMONE CHURCH STREET LLC
1000 MAIN STREET
NEW YORK, NEW YORK, 10801

**Registered Agent**
REGISTERED AGENT REVOKED

, ,

NOTE: New York State does not issue organizational identification numbers.

Search Results                    New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

# EXHIBIT I



SCHEMATIC DRAWINGS

A2.1















PARKING LEVEL 2 : 212 Spaces + 23 Tandem Spaces

SCHEMATIC DRAWINGS

A2.2



MAIN ST.

LINE OF FLOORS ABOVE

CHURCH ST.

LEROY PL.

CLINTON PL.

DIVISION ST.

BONNEFOY PL.

PROSPECT AVE.

PARKING LEVEL 3 : 212 Spaces + 23 Tandem Spaces

SCHEMATIC DRAWINGS

PARKING LEVEL 3

A2.3



2ND FLOOR PLAN : Town House Lower Level (Bldg. A&B) and 2nd Floor Bldg. C

SCHEMATIC DRAWINGS

A2.5



SCHEMATIC DRAWINGS

A2.6



4TH FLOOR PLAN : Tower Amenities Level

SCHEMATIC DRAWINGS

A2.7



SCHEMATIC DRAWINGS

A2.8









SOUTH ELEVATION

SCHEMATIC DRAWINGS

SOUTH ELEVATION

A-4.2





SCHEMATIC DRAWINGS

WEST ELEVATION

A-4.4





# EXHIBIT I



SCHEMATIC DRAWINGS

A2.1







A3.1

SCHEMATIC DRAWINGS







MAIN ST

CHURCH ST.

PARKING LEVEL 2 : 212 Spaces + 23 Tandem Spaces

LEROY PL.

CLINTON PL.

DIVISION ST.

BONNEFOY PL.

PROSPECT AVE.

SCHEMATIC DRAWINGS

A2.2







2ND FLOOR PLAN : Town House Lower Level (Bldg. A&B) and 2nd Floor Bldg. C

SCHEMATIC DRAWINGS

A2.5





4TH FLOOR PLAN : Tower Amenities Level

SCHEMATIC DRAWINGS

A2.7

5TH FLOOR PLAN : Typical Tower Plan

MAIN STREET

CHURCH STREET

206'-9"

BLDG "A"

BLDG "B"

BLDG "C"

DIVISION STREET

PROSPECT AVE

SCHEMATIC DRAWINGS

A2.8





SECTION C-C
SCALE 1/64" = 1'

SECTION D-D
SCALE 1/64" = 1'

BLDG "A"

BLDG "B"

BLDG "C"

BLDG "A"

SCHEMATIC DRAWINGS

SECTIONS C-C & D-D

A-3.2

NORTH ELEVATION

SCHEMATIC DRAWINGS

NORTH ELEVATION

A-4.1

SOUTH ELEVATION

SCHEMATIC DRAWINGS

SOUTH ELEVATION

A-4.2



EAST ELEVATION

SCHEMATIC DRAWINGS

A-4.3







# EXHIBIT A

# SIMONE

**ABOUT SIMONE** ⋮ COMMERCIAL ⋮ RESIDENTIAL ⋮ NEWS ROOM ⋮ CONTACT US ⋮ HOME

SEARCH [_____] ▶

ABOUT SIMONE    CORPORATE PROFILE    CORE PRINCIPLES    EXECUTIVE TEAM

Pat Simone

Joseph Simone

Peter Albano

Michael Colarossi

C. Alexandra Friedman

Scott A. Hill

Robert E. Montaquiza

Mark Rubin

Brian T. Sampson

Joseph Kelleher

William Ormond

Louis Russo



**Joseph Simone**
*President*

Joseph Simone has achieved major success in two industries – the automotive industry and the real estate industry.

In 1976 Joe Simone started what was to become the New York-area's most successful distribution-focused auto parts recycling business. Also during the mid-1970s, he and his father, Pat Simone, started expanding the geographic reach and the type of holdings in their then portfolio of mainly Bronx industrial buildings. Joe sold his automotive business in 1999 to the LKQ Corporation, a NASDAQ-listed company that acquired his business in order to add a New York presence to its nationwide footprint.

Today, Simone Development owns more than 90 commercial properties within a 75-mile radius of its New Rochelle headquarters. And today's properties range from stand-alone Class A office buildings to office parks to retail centers and industrial/flex buildings. Among other high-profile accomplishments, Joe Simone has been the recipient of much praise from New York State and New York City elected officials as well as from real estate leaders for his courageous assemblage of 42-acres in the Bronx on which he created the highly successful Hutchinson Metro Center. This is a campus-type property with an "as-of-right" of 1.5 million square feet of office space and with a fully leased first-phase building of 450,000 square feet. Ground breaking for a second building, a 250,000 square feet tower, will begin in 2006.

Joe Simone has also caused Simone Development to become a recognized leader in the development of housing, with a range of activities as follows:

The acquisition of highly sought after estate-area acreage on which high-end homes are built.

The development of Manhattan-view luxury apartments in Long Island City.

The artful restoration of top-dollar Upper East Side town houses, and the creation of state-of-the-art loft apartments in Tribeca.

The development of affordable housing in New York City and Westchester.

And most recently, Simone Development was selected by the City of New Rochelle as the developer of a site on which Simone will build a high-rise luxury apartment building with spectacular Long Island Sound views, some 400 units and a retail plaza.

Joe is particularly proud and pleased that his father, Pat Simone, continues to be an active partner and participant in the management of the business.

VISIONARY DEVELOPMENT

© 2007 SIMONE DEVELOPMENT COMPANIES    OFFICE / MEDICAL SPACE AVAILABLE  |  RETAIL SPACE AVAILABLE  |  INDUSTRIAL FLEX SPACE AVAILABLE  |  CAREERS

# EXHIBIT B

**OFFICE OF THE MAYOR**
CITY OF NEW ROCHELLE, N.Y.



TIMOTHY C. IDONI
MAYOR

August 16, 2004

Mr. Peter Gaito
Peter Gaito and Associates
399 Knollwood Avenue – Suite 106
White Plains, New York 10603

Dear Peter:

The success of New Roc City, Avalon on the Sound and the Davenport Lofts on Main Street (formerly Bloomingdale's) attest to the strength of a burgeoning downtown in New Rochelle. In fact, the city has produced over $ 600,000,000 in new, successful development in just the past five years. We are now presenting our newest exciting opportunity for you as an experienced, successful developer that will build on these most recent successes.

We are enclosing a Request for Proposals (RFP) for the development of the air rights above the Church Division Garage in downtown New Rochelle. For reference, Avalon Bay, located one block north of this site, is poised to begin its second phase, a 39-story residential tower. Each of these sites is located within minutes of the Metro-North/Amtrak train station, making it thirty minutes to midtown Manhattan, but with glorious water views of Long Island Sound. There is no better location or time to be developing in southern Westchester.

The Church Division Garage is located on 1.78 acres in Downtown New Rochelle. The City wishes to maintain its 388 parking spaces available to the public in some fashion but is seeking proposals for the site for mixed commercial/residential use. As part of a review of downtown zoning and the City's Comprehensive Plan, the City is willing to considered zoning changes that will result in a sustainable development project on the site.

The due date for the proposal is November 1st. A site visit and briefing is scheduled for September 8th at 9:00 a.m. at the Department of Development in New Rochelle City Hall, located at 515 North Avenue. Questions concerning the RFP can be directed to Craig King, the Commissioner of Development, at 914-654-2182.

We truly look forward to working with a development team who will make the most of this exciting opportunity. Thank you for your time and consideration.

Sincerely,

TIMOTHY C. IDONI
Mayor


# DEVELOPMENT OPPORTUNITY
## REQUEST FOR DEVELOPMENT PROPOSALS
Church/Division Garage Site
New Rochelle, New York
August 12, 2004

## THE OPPORTUNITY

**The City of New Rochelle, NY** is offering an opportunity for redevelopment of a City-owned site that currently contains a 388-space parking garage at Church and Division Streets in downtown New Rochelle. The New Rochelle Department of Development is seeking to identify a real estate development team for the mixed-use development of this 1.78-acre parcel. The RFP process will result in the designation of a developer with whom New Rochelle will negotiate a Memorandum of Understanding (MOU) leading to the execution of a Land Disposition Agreement (LDA). This LDA will identify the responsibility of the developer in the providing the City with 388 new city-owned parking spaces on the site and the City will, in turn, lease or sell the air rights over the site for the purpose of a mixed use development. The developer selected by the City for the development of this site will bear the full cost of all pre-development analysis including a full Environmental Impact Statement complying with SEQRA. The pre-development costs and responsibilities will be addressed in the MOU. The elements of the LDA will include, but not be limited to, potential site remediation, responsibility for public infrastructure, the preservation of the existing 388 parking spaces and the responsibility for the development and implementation the project as defined in the SEQRA process.

## OVERVIEW

### Project Site and General Area

The Church/Division Garage was built in the early 1970s to accommodate downtown retail patrons. The facility is a two-level, 388-space, structural steel framed garage located south of Main Street adjacent to LeRoy Place. The garage features permit parking as well as 3 and 12 hour meters. The New Rochelle Comprehensive Plan states that off street parking adjacent to Main Street is perceived as unavailable and unsafe by downtown business owners and their patrons and that the Church Division Garage has experienced deterioration and is in need of significant repair. The purpose of this development effort is to provide the same number of spaces to the public on the re-developed site in a safe and secure facility with the creation of additional market rate housing and commercial development in Downtown New Rochelle.

The project site is bounded by Church and Division Streets just south of Main Street in Downtown New Rochelle. There have been several new developments either proposed or built within the immediate area within the past year. The most recent project to be completed is the redevelopment of the former Bloomingdales Department store into 79 live/work lofts called the Davenport Lofts on Main. A majority of the new projects in or



around Downtown New Rochelle have been mixed-use developments containing both
residential and retail uses

## THE CITY'S VISION FOR REDEVELOPMENT OF THE DOWNTOWN

The City is seeking downtown development projects that will make Downtown New
Rochelle a regional destination and generate a sense of excitement and place. This growth
should reach into the surrounding area along Main Street and create an engine for
revitalization that will attract market rate housing and quality retail activity. This vision
includes mixed-use projects, live/work lofts and apartments above stores that add to the
activity level on the street

## DEVELOPMENT ASSUMPTIONS

The Development proposal must be compatible with the City's vision and plan for
Downtown New Rochelle. Basic development assumptions include:

1. Parking that is required for the development under current municipal zoning must
   be provided on-site

2. Replacement of the 388 spaces previously provided at the Church Division
   Garage must be a part of the development plan. It is anticipated that the garage
   and these parking spaces will be owned by the City

3. The City expects the highest quality of design and construction standards and will
   exercise its reasonable design review powers.

4. The continuing parking needs of the downtown business owners and residents
   during construction will need to be addressed in the proposal

5. Other Development Considerations

   - Property is sold "as is" developer responsible for any environmental
     remediation.

   - EIS and SEQR- Development proposals for the site will be required to include
     planning for the New York State Environmental Quality Review (SEQR)
     process which may include preparation of an Environmental Impact
     Statement

## SELECTION PROCESS, SCHEDULE, and EVALUATION CRITERIA

### 1. Selection Process and Schedule

In response to this RFP, developers will be expected to submit a specific development
proposal. The proposal should comprehensively address the development of the site.
The City may discuss a proposal with an individual developer. Based on responses to the
RFP, the City may select a short list of developers or select a preferred developer based
on existing proposals. Proposals do not necessarily need to adhere to the existing DB
zoning. The proposals need to articulate a sustainable project consistent with the City's
overall vision for development in the Downtown

For the purposes of additional information only, the following is a proposed schedule for the selection of a preferred developer for the Church Division garage Site:

### Proposed Schedule

- Issue RFP                                    August 12, 2004
- Proposals Due                                November 1, 2004
- Developer Selected                           December 1, 2004
- Period of Exclusive Negotiations             90 days from December 1, 2004

## 2.  Evaluation Criteria for RFP

Selection of the preferred developer will be based on the following criteria

- Experience of the Development Team with projects of similar scope
- The quality, sustainability, and thoroughness of the development proposal for the Church Division Site  The development proposal should demonstrate the positive impacts of the project and clearly articulate the overall scope and size of the project
- Developer's demonstrated capability to plan, finance and successfully carry out the development program
- Makeup of the Team and specific experience of individuals assigned
- Credibility in the real estate development community for producing quality development
- Developer's vision and or strategy for the development  Extra consideration will be given for "green" building designs that put less stress on municipal infrastructure and showcase sustainable building materials and systems including energy efficient lighting, a usable "green" roof and other "green building" technology  Points will also be given for the extent to which the plan reflects an assessment of need in the community for uses such as office, conference and exhibition space as well as high quality retail space
- Familiarity of the firm with project area, including environmental considerations, community characteristics and local real estate markets

## 3.  Project Inquiries

Contact Craig King at (914) 654-2182  Pre-Submittal Briefing and Tours and briefing will be held on September 8th at 9 AM at City Hall in the Development Conference Room  New Rochelle City Hall is located at 515 North Ave in New Rochelle New York

## SUBMISSION REQUIREMENTS

The following shall be submitted as part of the developer's proposal

1   Financial disclosure statement indicating, with appropriate documentation, the developer's financial capability to plan and successfully carry out within a prescribed time frame the development program to be approved by the City

2   The proposed development program, including a site plan indicating proposed uses, parking, elevations, overall financial operations and development budget  There will also need to be a detailed discussion of where the proposed project exceeds the existing DB zoning for the site and why these departures from the existing zoning are needed to create a sustainable project

3   Demonstration to the satisfaction of the City the feasibility of the proposed program, including (where appropriate) a market study indicating the need for the project and demand including absorption rates contemplated during the construction phases

4   A financial and fiscal impact analysis of the proposed development

5   A record of the developer's development projects of this magnitude with specific references to projects completed, success in securing financing—construction and permanent—and state and completion dates of projects

6   The names of the management team and corporate structure to be responsible for the planning and implementation of the project, together with a short statement of each of the members' ability and record with respect to the area of responsibility to be assigned to such member

7   In addition, the Department of Development is requesting that proposals include a draft plan for re-development that identifies specific land uses and densities, numbers of residential units, square footage of office and commercial space and any other such information  A pro-forma for the proposed development must be included detailing all costs, sources of revenue and estimates of expenditure including developer profit

Submit one original unbound copy and five bound copies of the RFP response

## RESPONSE DUE DATE

**Proposals should be submitted no later than 4:00 pm on November 1, 2004 to:**

Craig King, Commissioner
Department of Development
City Hall, 515 North Avenue
New Rochelle, NY  10801

## DETAILED CONTENTS OF PROPOSAL

Overview of Proposal Organization and Contents
    Section 1-Developer and Development Team Members' Project Experience
    Section 2-Developer Financial Capacity and Capability
    Section 3-Development Proposal- The proposal must clearly describe the project size, FAR, height, use, parking and any other important considerations including

an analysis of zoning changes or variances that would be required to have the
project approved

## Section 1-Developer and Development Team members' Project Experience

    a.  Developer Identification-
        Name and Address of Developer
        Name, address, phone, fax and e-mail for primary point of contact

    b.  Identification of the Development Team
        Identify each member of the development team and major consultants
        Include resumes and clearly identify the roles of each member

    c.  Financial/Equity Partner Identification
        Name and address of each financial/equity partner

    d.  Disclosures of Potential Conflict of Interest
        Disclose any relationship with any New Rochelle elected official or staff
        member

    e.  Relevant Project Experience

For each listed project please provide the following

- Summary Project description including project size (in total SF and SF per use), uses, densities, and other information as relevant including SF/unit allocations, anchor tenants, etc.
- Project Cost, budgeted and actual
- Capital and financing sources used
- Economic Performance-project profitability
- Development Timing and phasing (from Developer selection/site control to completion of construction and phasing
- One client reference per project including contact name, telephone and facsimile numbers and email address

## Section 2 -Developer Financial Capacity and Capability

The objective of this section is to demonstrate the developer's financial capacity and
capability to develop the project for which it seeks to qualify by providing the following
information

a. General Financial Information

- Composition of developer's current real estate portfolio as of the RFP issuance date (including type of project and number of SF or units owned and/or managed
- Developer's recent history in obtaining financing commitments for real estate development projects, detailing type of project, financing source and amounts committed
- Two bank references for the developer and financial equity partner
- Financial Statements for the past three years prior to the RFP issuance date from developer and each participating principal, partner, or co-venturer, that includes

the value of assets each participant would contribute to the proposing entity and verifications that such assets are available. The financial statement may also include any additional information that will be useful in evaluating the developer's financial reliability and past ability to finance projects. (If audited financial statements are not available, please provide certified financial statements. All statements, audited or certified, should be in accordance with Generally Accepted Accounting Principles)

- For developer and development team, a statement regarding any debarments, suspensions, bankruptcy or loan defaults on real estate development projects and/or government contracts
- A statement describing the expected equity requirements and sources, the anticipated sources of working capital, and the anticipated sources for financing the project, including its construction

## Section 3. Development Proposal

The objective of this section is to describe, in detail, the proposed project. This description will include a detailed site plan and elevations indicating the proposed development program, uses, parking and amenities. There must also be thorough sensitivity analysis describing changes to the existing zoning to allow the project to be approved and the direct impact of these changes with regard to density and financial feasibility. The proponent must also submit a detailed financial analysis of uses and sources for the development as well as a detailed multi-year operating statement demonstrating the feasibility of the project and the need for that specific density. The financial analysis should also include a market study indicating the need for the project and demand including absorption rates. The following details, at a minimum, are required in the development proposal:

- Total Square footage for the entire project and allocated by use.
- Proposed tenants
- Building Height, FAR and other critical dimensional elements
- Proposed parking plan and how the project will address both the need for the existing 388 spaces as well as any additional necessary to meet the parking needs of the new development
- A proposed short-term parking plan to address the ongoing parking needs of the City during construction
- Detailed site plan, elevations and renderings illustrating the visual impact of the project on Main Street and the surrounding neighborhood.
- A detailed financial analysis of the project identifying uses and sources of funds for the development of the project as well as a ten year operating pro-forma demonstrating the sustainability of the project over time
- Assessment of need for office, residential and convention or exhibition space if proposed as part of the project

## DISPOSITION VALUE AND TERMS

1. The City will entertain the purchase or lease of the air rights over the Church Division Garage for the development of this project. During exclusive negotiations, the City and developer will negotiate the schedule for the sale or lease and development of the Site.

2. Disposition price or lease and sublease terms will be determined during the period of Exclusive Negotiations. The final price agreed upon will take into account the economics of the individual uses and the total commitment of developer dollars.

3. The developer will be required to provide to the City, upon approval of the LDA, a deposit commensurate with the land value negotiated. This deposit shall be non-refundable.

4. All facts and opinions stated herein and in any additional data provided are based on available information and no representation or warranty is made with respect thereto.

**RIGHT TO REJECT PROPOSALS**- This RFP does not commit the City to award a contract, pay any cost incurred in the preparation of a proposal in response to this RFP or to procure or contract for services. The City intends to award a contract on the basis of the best interest and advantage to the City, and reserves the right to accept or reject any or all proposals received as a result of this request, to negotiate with all qualified proposers or to cancel this RFP in part or in its entirety, if it is in the best interest of the City to do so.

**CANCELLATION CLAUSES**-Any violation of the terms, conditions, requirements and/or non-performance of the agreement resulting from this RFP shall result in immediate cancellation. The agreement may be cancelled by the City for any other reason(s) upon sixty (60) days written notice.





CHURCH-DIVISION GARAGE
REDEVELOPMENT SITE

# EXHIBIT J

CHURCH/DIVISION/PROSPECT
MEMORANDUM OF UNDERSTANDING

BY AND BETWEEN

CITY OF NEW ROCHELLE,

SIMONE CHURCH STREET LLC,

JOSEPH SIMONE,

AND

THOMAS METALLO

DATED AS OF JUNE 15, 2005

Corporation Counsel
City of New Rochelle
515 North Avenue
New Rochelle, N. Y. 10801

<u>LIST OF SCHEDULES</u>

Schedule A     Description of Church/Division Lot

Schedule B     Description of Jamamy Lot

Schedule C     Description of Prospect Lot

Schedule D     Escrow Agreement

Schedule E     Schematics of Prospect Garage and Division Park

Schedule F     Schematics of Church/Division Improvements

Schedule G     Early Entry Environmental Testing License Agreement.

A Church/Division/Prospect Memorandum of Understanding ("MOU") dated as of June 15, 2005, by and between the CITY OF NEW ROCHELLE, a New York municipal corporation with offices at 515 North Avenue, New Rochelle, New York ("City"); SIMONE CHURCH STREET LLC, a New York limited liability company with offices at 1000 Main Street, New Rochelle, New York 10801 ("Developer"); JOSEPH SIMONE, residing at c/o 1000 Main Street, New Rochelle, New York 10801, and THOMAS METALLO, residing at

_____

WHEREAS, the City is the record owner of that parcel of land, with the municipal Church/Division Garage constructed thereon, located between Church and Division Streets in the City of New Rochelle, County of Westchester, and State of New York, as described on Schedule A ("Church/Division Lot"), on which the Developer wishes to construct residential condominium dwelling units, retail space, professional office space, and underground parking for such dwelling units and for the handicapped parking needs of such retail and office space ; and

WHEREAS, Jamamy Realty Corp. is the record owner of that parcel of land with improvements thereon located on the westerly side of Church Street, southeasterly of and adjoining the Church/Division Lot, in the City of New Rochelle, County of Westchester, and State of New York, as described on Schedule B ("Jamamy Lot"), which Jamamy Lot the Developer wishes to include as part of the development of the Church/Division Lot (collectively the "Church/Division Site"); and

WHEREAS, the City is the record owner of that parcel of land currently used for municipal surface parking, located between Division Street and Centre Avenue, in the City of New Rochelle, County of Westchester, and State of New York, as described on Schedule C ("Prospect Lot"), on which the City wishes Developer to construct a new public park and municipal parking garage to replace and increase the parking spaces presently located in the Church/Division Garage; and

WHEREAS, the Developer wishes to undertake such development on the Church/Division Lot and Prospect Lot in a timely and expeditious manner;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the parties agree as follows:

ARTICLE I

DEFINITIONS

Church/Division Lot - that parcel of land, with the municipal Church/Division Garage constructed thereon, located between Church and Division Streets in the City of New Rochelle,

County of Westchester, and State of New York, known as Section 2, Block 414, Lot 8 on the tax assessment maps and rolls of the City, as more fully described on Schedule A.

Church/Division Garage – municipal parking garage structure on the Church/Division Lot.

Church/Division Site - the Church/Division Lot and the Jamamy Lot, the latter only if the Developer and Jamamy reach an agreement regarding inclusion of the Jamamy Lot as part of development of the Church/Division Lot. The acquisition of the Jamamy Lot by the Developer is not a condition precedent to the parties' respective rights and obligations under this MOU.

City - City of New Rochelle.

Developer – Simone Church Street LLC.

Jamamy - Jamamy Realty Corp., owner of the Jamamy Lot.

Jamamy Lot - that parcel of land with improvements thereon located on the westerly side of Church Street, southeasterly of and adjoining the Church/Division Lot, in the City of New Rochelle, County of Westchester, and State of New York, known as Section 2, Block 414, Lot 51 on the tax assessment maps and rolls of the City, as more fully described on Schedule B.

LDA – the Church/Division/Prospect Land Disposition and Development Agreement to be made between the City and the Developer for the conveyance to the Developer of the Church/Division Lot and the development of the Project.

Project - the following work to be undertaken by the Developer:

    1) Design and build on the Prospect Lot a new municipal parking garage consisting of at least 525 new parking spaces together with 334 existing surface spaces representing all of the existing Prospect Lot surface parking spaces, for a total of at least 859 parking spaces ("Prospect Garage");

    2) Design and build on the Prospect Lot a minimum of 19,200 s.f. of publicly useable landscaped open space, which may, in the City's discretion, be dedicated as a public park ("Division Park");

    3) Demolition, removal, and legal disposal of the Church/Division Garage;

    4) Design and build on the Church/Division Site a maximum of 438 residential condominium dwelling units of which at least five (5%) percent shall be sold to families with incomes not exceeding Westchester County Median Income at the time of sale with subsequent restrictions on resale above CPI increases, for at least 20 years, to families with incomes then not exceeding the then Westchester County Median Income ("Median Income Units"). In the event that the aggregate number of residential units should change during the City Approval process, the percentages set forth herein governing the number

of Median Income Units would still apply as established hereunder. In addition, the size of Median Income Units throughout the Church/Division Site shall be commensurate with the mix of unit sizes of the market rate units and not more than two (2) Median Income Units shall be located on each floor of the Church/Division Site, beginning with the first floor containing residential condominium dwelling units and continuing on each floor thereafter until the total number of residential condominium dwelling units reaches at least 5% of the total number of residential condominium dwelling units, except that if more than one building containing residential condominium dwelling units is located on the Church/Division Site, the total number of Median Income Units located on the same level in such buildings shall not exceed an aggregate of two (2). Further specifications and qualifications for such Median Income Units shall be set forth in the LDA;

5) Design and build on the Church/Division Site approximately 44,000 s.f. of retail space;

6) Design and build on the Church/Division Site approximately 2,500 s.f. of professional office space;

7) Design and build on the Church/Division Site sufficient underground parking spaces to meet zoning requirements for the residential condominium dwellings units and the on-site handicapped parking needs for the retail and professional office space; and

8) Design and build on the Church/Division Site an approximately 24,000 s.f. landscaped public plaza ("Plaza"),

9) The Floor Area Ratio for the Church/Division Site shall not exceed 5.5.

Items 4 - 7 being collectively known as the "Church/Division Improvements."

Prospect Lot - that parcel of land currently used for municipal surface parking, located between Division Street and Centre Avenue, in the City of New Rochelle, County of Westchester, and State of New York, known as Section 2, Block 412, Lot 7 on the tax assessment maps and rolls of the City, as more fully described on Schedule C.

Unavoidable Delay - any delay, obstruction, or interference resulting from any act or event which has a material adverse effect on a party's obligations to perform under this MOU provided that such act or event is beyond the reasonable control of such party and was not separately, concurrently or partially caused by any negligent or willful act or omission of such party, and provided that such act or event could not have been prevented by reasonable action on such party's part and such party asserting such act or event has used its best efforts to remedy the delaying condition in an expedient and efficient manner, including, without limitation, acts of force majeure. If a third party, unrelated to the parties to this MOU, commences a legal proceeding (a "Proceeding") which seeks to prevent the Developer from (x) obtaining or retaining City Approvals, or (y) obtaining or retaining a building permit or performing work on the Project pursuant to a building permit, or as a result of which financing for the construction of

the Project cannot be obtained upon commercially reasonable terms, or if committed, is temporarily suspended, and as a result thereof and notwithstanding the diligent, good faith defense by the Developer of such proceedings (if Developer is a defendant therein), Developer is delayed or prohibited from timely complying with its obligations hereunder, the pendency of such Proceeding shall be deemed an Unavoidable Delay, and deadlines imposed herein shall be extended by the number of days of actual delay caused by any such injunction for purposes of determining whether Developer is in default hereunder.  However, an injunction which arises from Developer's violation of law in the manner in which Developer is constructing the Project (as opposed to the process in which it obtained its City Approvals) shall not excuse timely performance hereunder.

## ARTICLE II

## REPRESENTATIONS, WARRANTIES, COVENANTS, AND AGREEMENTS

Section 2.1.  City.  The City represents, warrants, covenants, and agrees as follows:

a)    it is a duly organized, validly existing New York municipal corporation;

b)    it is the record and beneficial owner of the Church/Division Lot and the Prospect Lot, as respectively described on Schedules A and C; and

c)    it has the full power and authority to execute, deliver and perform this MOU and full power and authority to consummate the transactions herein described, and the person who has executed this MOU on behalf of the City has the authority to do so.

Section 2.2.  Simone Church Street LLC.  Simone Church Street LLC represents, warrants, covenants and agrees as follows:

a)    it is a New York limited liability company of which Joseph Simone and Thomas Metallo own an aggregate interest of at least 51% and Joseph Simone shall be its managing member; and

b)    it has the full power and authority to execute, deliver and perform this MOU and full power and authority to consummate the transactions herein described and the person who has executed this MOU on behalf of Simone Church Street LLC has the authority to do so.

Section 2.3.  Joseph Simone and Thomas Metallo.  Joseph Simone and Thomas Metallo covenant and agree that until such time as permanent certificates of occupancy for the entire Project are issued, they shall own an aggregate interest of at least 51% and Joseph Simone shall be the managing member of Simone Church Street LLC and its permitted assignees, if any.

ARTICLE III

GRANTING OF PURCHASE OPTION, PRECONDITIONS TO EXERCISE OF OPTION, AND GENERAL TERMS AND CONDITIONS OF LAND DISPOSITION AND DEVELOPMENT AGREEMENT

Section 3.1.   Church/Division Lot Purchase Option.   The City hereby grants an exclusive purchase option to the Developer through the earlier of a) July 10, 2006; b) ten (10) days after the date of site plan approval for the Project; or (c) the termination of this MOU pursuant to the terms and conditions of this MOU.  During the option period the Developer shall plan and obtain approvals for development and construction of the Project.   The preconditions set forth in Section 3.3 below must be met before the Developer may exercise its option to purchase and develop the Church/Division Lot upon the general disposition terms and conditions set forth in Section 3.4 below.

Section 3.2.   Exclusivity Payment and Consideration for Grant of Purchase Option.   The parties acknowledge that the Developer made an exclusivity payment to the City in the amount of $50,000 on March 23, 2005 ("Exclusivity Payment").  Developer, Joseph Simone, and Thomas Metallo acknowledge, recognize, and agree that the Exclusivity Payment has been made entirely at their risk and shall be nonrefundable and noncancellable, for any and all reasons whatsoever including but not limited to impossibility of performance and the failure of the City to grant environmental and other approvals for the Project.

Section 3.3.   SEQRA, Site Plan, and Building Permit Approvals; Performance Obligations.  The Developer may not exercise its option to purchase and develop the Church/Division Lot unless and until (a) the State Environmental Quality Review Act ("SEQRA") has been satisfied with respect to the proposed Project and the City Council has by resolution issued whatever findings or determinations are required under SEQRA with respect to the Project and (b) site plan approval for the entire Project has been obtained.  Developer shall be solely liable for all costs incurred in connection with the processing of applications for site plan and building permit approvals or other discretionary approvals which may be required from the City to construct the Project (collectively "City Approvals").  The Developer further agrees to reimburse the City for its outside legal counsel (including, without limitation, legal fees incurred by the City with respect to obtaining or defending any City Approvals and any other governmental approvals), SEQRA review, architectural peer review, and design review costs through the establishment of an escrow fund to be administered by the City's Finance Commissioner, with an initial deposit of $75,000 simultaneous on execution of this MOU and replenishment thereof whenever the balance in such escrow fund drops below $50,000, such escrow fund to be maintained and replenished until the issuance of all building permits for the entire Project ("Escrow Fund").  The terms and conditions of administering the Escrow Fund are set forth in the Escrow Agreement attached hereto as Schedule D.  The City makes no representations as to the City Approvals and the parties acknowledge that, based upon the findings issued in connection with the SEQRA review, the Project may be modified, reduced in scope or rejected in whole or in part.  The Developer expressly acknowledges that the City shall have no obligation to execute the LDA and

to sell the Church/Division Lot in the event that (i) any or all of the City Approvals are not granted, (ii) upon completion of the SEQRA review the City Council determines, in its sole discretion, that those findings under SEQRA which would permit development of the Project as proposed by Developer should not be issued or (iii) the City Council determines, as a result of the SEQRA review, that modifications to the Project should be made, or that mitigation measures should be implemented in order to avoid or minimize any environmental impacts disclosed in the SEQRA process, and the Developer does not agree to incorporate such modifications or mitigation measures into the Project. Notwithstanding the foregoing, the City agrees to diligently and in good faith process and review the Developer's applications for the City Approvals.

Developer shall have the following performance obligations under this MOU and the LDA. If Developer defaults in performing any of such obligations in a timely manner subject to Unavoidable Delay, and such default is not cured within thirty (30) days following receipt of such Notice of Default or, in the event that the default is not reasonably susceptible of being cured within such thirty (30) day period, the Developer has not commenced to cure such default or does not thereafter continue to diligently prosecute the cure of such default, then this MOU and the LDA shall be deemed terminated, cancelled, and of no further force and effect:

| Performance Obligation | Date For Performance On Or Before |
|---|---|
| Submit draft SEQRA Scoping Document | July 15, 2005 |
| Initial meeting with Architectural Peer Design Review Committee and City staff regarding exterior design of Project | August 1, 2005 |
| Submit preliminary DEIS to City | December 1, 2005 |
| Submit complete DEIS to City | January 31, 2006 |
| Submit specifications to City for Design/Build Agreement ("DBA") to construct Prospect Garage and Division Park and for Demolition Agreement to demolish, remove, and legally dispose of the Church/Division Garage | February 15, 2006 |
| Final meeting with Architectural Peer Design Review Committee and City staff regarding exterior design of Project, followed by such Committee's recommendation to the City Council | March 15, 2006 |

Obtain site plan approval for Project, following a) SEQRA public hearings and preparation of FEIS, if required, b) City's issuance of SEQRA Findings

and Determination, c) City's approval of exterior
design, and d) amendments to the City's Comprehensive
Plan, Zoning Code and Zoning Map to permit approval of
the Project                                                          June 30, 2006

Exercise purchase option by executing the LDA
including but not limited to the terms, conditions,
and specifications of the DBA and the
Demolition Agreement                                                 July 10, 2006

Obtain building permits for construction of the
Prospect Garage and demolition
permits for demolition, removal, and legal disposal
of the Church/Division Garage                                        October 1, 2006

Execute DBA for Prospect Garage and Division Park
and Demolition Agreement                                             October 1, 2006

Post Performance Bond for the Prospect Garage,
naming the City as sole beneficiary                                  October 1, 2006

Post Performance Bond for demolition of the
Church/Division Garage, naming the City as sole
Beneficiary                                                          October 1, 2006

Close Title on Church/Division Lot                                   October 1, 2006

Commence construction of the Prospect Garage                         November 15, 2006

Submit complete building plans for construction of
Church/Division Improvements                                         March 31, 2007

Complete construction of Prospect Garage, subject
to tolling not to exceed 4 months for
unavoidable winter weather                                           May 15, 2007

Complete demolition, removal, and legal disposal of
Church/Division Garage, following completion of
Prospect Garage                                                      May 15, 2007

Obtain building permits for construction of
Church/Division Improvements and
Division Park                                                        May 15, 2007

| | |
|---|---|
| Post performance bonds for construction of Public improvements in connection with the Church/Division Improvements, naming the City as sole beneficiary thereof | May 15, 2007 |
| Post Division Park Letter of Credit | May 15, 2007 |
| Commence construction of Church/Division Improvements and Division Park | May 15, 2007 |
| Complete Division Park | November 15, 2008 |
| Complete construction of Church/Division Improvements | May 15, 2009 |

Notwithstanding anything to the contrary in this MOU or in the LDA, the failure of the City or its consultants to take or complete any action which is necessarily a predicate to the satisfaction by the Developer of any of its performance obligations (including, but not limited to, (x) the City's failure to timely convene the Architectural Peer design Review Committee, or (y) the failure of such Committee to timely make its recommendations to the City, or (z) the failure of the City to timely adopt a scope for the DEIS or of the City's consultants to deliver to Developer the City's comments on a DEIS or FEIS in sufficient time to permit the Developer to timely submit a revised and "complete" document to the City in compliance with the milestone set forth above, shall be an Unavoidable Delay.

Section 3.4.  General Terms and Conditions of Land Disposition and Development Agreement. Upon Developer's fully and timely meeting the preconditions and performance obligations through site plan approval set forth in Section 3.3 above, the Developer may exercise its option and execute a Land Disposition and Development Agreement ("LDA") on or before July 10, 2006. If the Developer does not exercise its option and execute the LDA, both on or before July 10, 2006, this MOU shall be deemed cancelled and of no further force and effect if such option is not exercised and the LDA is not executed within thirty (30) days of Developer receiving notice to cure such default, except that should Developer earlier default in meeting any of its performance obligations set forth in Section 3.3 above and such default remain uncured pursuant to such Section 3.3, the MOU shall be deemed terminated and cancelled as of the date of such earlier default. The parties agree to diligently, with best efforts, and in good faith negotiate the terms and conditions of the LDA which shall be consistent with the material terms herein and which may include other general terms and conditions, and substantially complete such negotiations by December 31, 2005. Upon completing the negotiation of the LDA, the parties shall execute an amendment to this MOU agreeing to the form of the LDA and attaching same as an exhibit to the MOU.

3.4.1.  Church/Division Lot Title Closing.  Title Closing on the Church/Division Lot shall not occur until the following conditions have been satisfied:  a)  the LDA has been executed

10

including but not limited to the terms, conditions, and specifications of the DBA and the Demolition Agreement; b) building permits have been obtained for construction of the Prospect Garage, in accordance with the schematics attached hereto as Exhibit E, site plan approval, and the specifications set forth in the DBA; c) demolition permits have been obtained for the demolition, removal, and legal disposal of the Church/Division Garage, in accordance with the specifications set forth in the Demolition Agreement; d) the DBA and Demolition Agreement have been executed; e) performance bond for construction of the Prospect Garage and demolition of the Church/Division Garage, in accordance with the building permits and demolition permits, and in form and substance the same as the City receives with respect to other public improvement contracts of the City, have been posted by the Developer, or, if the Developer is not the general contractor, by the general contractor, naming the City as sole beneficiary thereof; and f) the City Approvals are final and unappealable. The Church/Division Lot Closing of Title and execution of the Bargain and Sale Deed with Covenant Against Grantor's Acts ("Deed") shall occur on or before October 1, 2006, subject to Unavoidable Delay.

The Deed shall be executed by the City at Closing of Title and shall be held in escrow by the City's Corporation Counsel and not released from such escrow for delivery to the Developer until i) completion of construction of the Prospect Garage and and issuance by the City of a temporary certificate of occupancy therefor, and delivery of a master waiver of lien from the Developer and matching waivers of lien from all contractors and subcontractors; ii) delivery to the City of an irrevocable letter of credit (the "Division Park Letter of Credit") in favor of the City in form and content reasonably satisfactory to the Corporation Counsel to secure the completion of Division Park, which shall be in the amount certified by the City Engineer to be sufficient to complete Division Park, and which shall be released and returned to Developer upon the issuance by the City of a temporary certificate of occupancy for Division Park, and delivery of a master waiver of lien from the Developer and matching waivers of lien from all contractors and subcontractors, provided however, that the City shall draw down the Division Park Letter of Credit if a temporary certificate of occupancy has not been obtained by November 15, 2008 and, with such proceeds, shall cause completion of Division Park, and any balance of the proceeds remaining from the Division Park Letter of Credit following such completion shall be returned to the Developer within sixty (60) days thereafter; (iii) completion of demolition, removal, and legal disposal of the Church/Division Garage, including delivery of a master waiver of lien from the Developer and matching waivers of lien from all contractors and subcontractors; iv) building permits have been obtained for construction of the Church/Division Improvements and Division Park, in accordance with the schematics attached hereto as Exhibit F and the site plan approval; and v) performance bonds have been posted to secure completion of the public improvements, in accordance with site plan approval for the Church/Division Improvements, naming the City as sole beneficiary thereof.

Notwithstanding anything herein to the contrary, if any of the conditions set forth in this Section 3.4.1 (i-v) are not satisfied by September 15, 2007, subject to Unavoidable Delay, the Deed shall be returned to the City, the Developer shall have no rights or interests whatsoever with respect to the Church/Division Lot and any rights of the Developer in this MOU or the LDA, or arising therefrom, shall terminate.

Notwithstanding anything to the contrary herein, this MOU shall be deemed cancelled and of no further force and effect if Closing of Title does not occur on or before October 1, 2006, subject to Unavoidable Delay, and Developer does not cure such default within thirty (30) days of Developer receiving notice to cure such default, except that should Developer earlier default in meeting any of its performance obligations set forth in Section 3.3 above and such default remain uncured pursuant to such Section 3.3, the MOU shall be deemed terminated and cancelled as of the date of such earlier default.

The Developer acknowledges that the City will continue to use and operate the Church/Division Garage as an active municipal parking garage in its discretion, until such time as it is demolished as provided hereunder. The Developer agrees that it will not interfere with, and have no control over, the use and operation of the Church/Division Garage prior to its demolition and prior to delivery of the Deed for Church/Division out of escrow.

    3.4.2  <u>Purchase Price</u>.  The Purchase Price, being the consideration for sale of the Church/Division Lot by the City to the Developer, shall be as follows:  a) Construction of the Prospect Garage and Division Park, pursuant to the DBA; and b) Demolition, removal, and legal disposal of the Church/Division Garage, pursuant to the Demolition Agreement.  All costs in connection with such construction and demolition including but not limited to design, obtaining City Approvals, obtaining other governmental and utility approvals, permitting, financing, environmental remediation, demolition including removal and legal disposal, and construction shall be borne by the Developer.  The Purchase Price shall not be reduced if the square footage of any component of the Church/Division Improvements and/or the number of residential condominium dwelling units is reduced during the SEQRA and City Approvals process.  In no event shall mortgages or liens be placed on the Prospect Lot.  In addition, prior to the delivery to Developer of the Deed from escrow as set forth in Section 3.4.1 above, no mortgages or liens shall be placed on the Church/Division Lot, in connection with the Developer's financing, if any, of construction of the Prospect Garage and Division Park and of demolition of the Church/Division Garage.

    3.4.3. <u>Permitted Uses.</u>  The Church/Division Improvements shall consist of and use of the Church/Division Site shall be limited to the following:  a) a maximum of 438 residential condominium dwelling units, of which at least five (5%) percent shall be sold to families with incomes not exceeding Westchester County Median Income at the time of sale with subsequent restrictions on resale above CPI increases, for at least 20 years, to families with incomes then not exceeding the then Westchester County Median Income ("Median Income Units");  b) approximately 44,000 s.f. of retail space; c) approximately 2,500 s.f. of professional office space; d) sufficient underground parking spaces to meet zoning requirements for the residential condominium dwellings units and the on-site handicapped parking needs for the retail and professional office space; and e) an approximately 24,000 s.f. landscaped public plaza.  In the event that the aggregate number of residential units should change during the City Approval process, the percentages set forth herein governing the number of Median Income Units would still apply as established hereunder.  In addition, the size of Median Income Units throughout the

13

Church/Division Site shall be commensurate with the mix of unit sizes of the market rate units and not more than two (2) Median Income Units shall be located on each floor of the Church/Division Site, beginning with the first floor containing residential condominium dwelling units and continuing on each floor thereafter until the total number of residential condominium dwelling units reaches at least 5% of the total number of residential condominium dwelling units, except that if more than one building containing residential condominium dwelling units is located on the Church/Division Site, the total number of Median Income Units located on the same level in such buildings shall not exceed an aggregate of two (2).   Further specifications and qualifications for such Median Income Units shall be set forth in the LDA.

     3.4.4    <u>Waiver of Public Bidding and Building Permit and Demolition Permit Fees for construction of the Prospect Garage and Division Park and demolition of the Church/Division Garage.</u>  Public bidding for construction of the Prospect Garage and Division Park and for demolition of the Church/Division Garage shall be waived by the City, pursuant to Section 143(A)(6) of the City Charter of the City, because the subject matter of the Design/Build Agreement and the Demolition Agreement is such that competition would be impracticable since the Purchase Price for the Church/Division Lot consists of such construction and demolition. City building permit and demolition fees and any other City fees for construction of the Prospect Garage and Division Park and the demolition of the Church/Division Garage shall be waived since they are City projects.

     3.4.5.   <u>Commencement and Completion of Construction of the Church/Division Improvements.</u>  Construction of the Church/Division Improvements shall commence by May 15, 2007, on delivery of the Deed out of escrow pursuant to Section 3.4.1, and construction of the Church/Division Improvements shall be completed and temporary certificates of occupancy obtained therefor by May 15, 2009, subject in both instances to Unavoidable Delay.

     3.4.6   <u>Parking on Church/Division Site.</u>  No portion of the Church/Division Site shall be used for parking open to the general public or users of other properties, by license or otherwise.

     3.4.7.   <u>Nondiscrimination and Equal Opportunity Policy.</u>  Developer shall abide by and shall cause its subtenants, assignees, and franchisees to abide by the City's Nondiscrimination and Equal Opportunity Policy adopted October 22, 1996, as amended.

     3.4.8   <u>Union Labor.</u>  Developer shall use reasonable efforts to employ or cause to be employed qualified union labor to construct and complete the Project; provided, however, that the foregoing shall not apply if the costs associated with union labor are not reasonably competitive with the costs of non-union labor at the then prevailing rates.  In the event labor unrest ensues either prior to or during construction of the Improvements, Developer shall use best reasonable efforts to resolve any and all issues relating to such unrest.

     3.4.9.   <u>No Assignment or Transfer.</u>  Developer may not assign this MOU and the LDA except to an affiliate in which Joseph Simone and Thomas Metallo own an aggregate interest of at least 51% and of which affiliate Joseph Simone is the managing member, all unless and until final certificates of occupancy for the entire Project have been issued.  Notwithstanding the

foregoing or any provision of this MOU, the Developer may from time to time before and after Closing of Title, assign and/or pledge its interests under this MOU, the LDA and/or in and to the Project, and the membership interests in Simon Church Street LLC, solely as collateral or security, to one or more equity participants and/or lenders in connection with equity financing, "mezzanine" financing or other financing for the construction of the Project, including the construction of the Prospect Garage and Division Park, provided that Joseph Simone and Thomas Metallo or an affiliate of Developer shall continue as Developer of the Project in accordance with the terms and conditions in the preceding sentence herein.

3.4.10. <u>Changes Requested by Mortgagee.</u> The City shall not unreasonably withhold its consent to amendments to this MOU or the LDA which are requested by a mortgagee of the Church/Division Site which is an institutional lender and which requests such amendments as a condition of making a loan to the Developer for construction of the Church/Division Improvements, provided however that no such amendments shall materially change the terms and conditions of this MOU or LDA or materially violate the City's rights and powers as a municipal corporation.

3.4.11. <u>Environmental Remediation and "As Is."</u> The Developer shall be responsible for undertaking and the cost of all environmental remediation and legal removal of contaminants, if any, found on the Church/Division Lot and the Prospect Lot as part of the Project. The Church/Division Lot shall be conveyed "as is" with no representations as to its condition, environmental or otherwise. Developer may conduct environmental and other investigations prior to Closing of Title, including prior to execution of the LDA, pursuant to the Early Entry Environmental Testing License Agreement attached hereto as Schedule G.

3.4.12 <u>Infrastructure Upgrades to Existing On-Site and Off-Site City Facilities.</u> Except as may otherwise be required by SEQRA, the Developer shall be responsible for undertaking and the cost of infrastructure upgrades to existing on-site infrastructure necessary to serve the Church/Division Improvements, and, if required by Westchester County, to off-site City sanitary sewer and/or stormwater facilities which may be impacted as a result of construction of the Church/Division Improvements.

3.4.13 <u>Use of Prospect Lot as Staging Area.</u> The City agrees that it shall permit the portion of the Prospect Lot on which Division Park is to be constructed to be used as a staging area for the construction of the Church/Division Improvements provided i) the Developer has delivered the Division Park Letter of Credit to the City, ii) the City determines, in its reasonable discretion, that the use of that portion of the Prospect Lot will not materially interfere with the use of the Prospect Garage for public parking given expected demand for parking prior to the completion of the Church/Division Improvements, iii) the Developer agrees to defend, hold harmless and indemnify the City from and against any liability which may be incurred, directly or indirectly, as a result of such use, and iv) the Developer insures the City from and against any such liability, which insurance shall be in form and content and in such amount as is reasonably satisfactory to the Corporation Counsel.

3.4.14  Completion of Construction of Division Park.  Notwithstanding anything herein to the contrary, construction of Division Park shall be completed no later than November 15, 2008, subject to Unavoidable Delay.

## ARTICLE IV GENERAL

## GENERAL REQUIREMENTS

Section 4.1.  Unavoidable Delay.  The performance dates and periods set forth in this MOU and the LDA shall be tolled only during a period of Unavoidable Delay as defined above.

Section 4.2.  Reservation of Rights in Event of Default.  The parties to this MOU specifically reserve any and all rights and remedies they may have if the other party materially defaults in any of its obligations under this MOU or related agreements, which rights and remedies shall survive termination or expiration of this MOU including but not limited to injunctive relief and other equitable remedies.

Section 4.3.  Brokerage.  Each of the parties hereto represents and warrants to the other parties that it has not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties, or the negotiation or execution of this MOU.  Each of the parties further agrees to indemnify and hold harmless the other parties and their respective successors and assigns, from and against any and all claims, losses, damages, liabilities, costs and expenses, including reasonable attorneys' fees, arising out of any breach by said party of the representations and warranties in this Section 4.3.

Section 4.4.  Legal Fees.  Except for outside legal counsel fees and disbursements to be paid pursuant to the Escrow Agreement as provided in Section 3.3, each party shall pay the fees and disbursements of its own legal counsel.

Section 4.5.  Conflict of Interest.  No member, official, consultant, professional, agent or employee of the City shall have any personal interest, direct or indirect, in this MOU or in Developer, nor shall any such member, official, consultant, professional, agent or employee participate in any decision relating to this MOU which affects his or her personal interests or the interest of any corporation, partnership, or association in which he or she is directly or indirectly interested.

Section 4.6.  Estoppel Certificates. Each of the parties agrees to at any time and from time to time, within thirty (30) days following written notice by any party to another party hereto, to execute, acknowledge and deliver to the party who gave such notice a statement in writing certifying that this MOU, and if amended as amended, is still in full force and effect and stating whether or not to the actual knowledge of the signer of such certificate, without any duty of inquiry or due diligence but based upon actual notice only, the other party is in default in performance of any covenant, agreement, or condition contained in this MOU, and, if so, specifying each such default of which the signer may have actual knowledge, it being intended

15

that any such statement delivered pursuant to this section may be relied upon only by any prospective mortgagee or assignee of any mortgage in respect of the requesting party's interest in the Church/Division Site.

Section 4.7.  Notice and Demand.  A notice, demand, consent, request, approval, or other communication under this MOU by a party to another party shall be deemed sufficiently given either on the third (3rd) business day following the date of its dispatch by certified mail, postage prepaid, return receipt requested, or on the day such writing is delivered (or delivery by courier or express mail is refused) during regular business hours if sent by telegram, facsimile (with a copy sent the same day by express mail, private courier or overnight courier), or express mail, addressed both to the address for the receiving party as set forth in the preamble to this MOU together with to the address of the attorney for the receiving party. At the time of execution of this MOU, the attorneys for the parties are as follows: City - Corporation Counsel of the City of New Rochelle; and Developer, Joseph Simone, and Thomas Metallo – care of Joseph Simone, Simone, Simone Development, LLC, 1000 Main Street, New Rochelle, New York 10801, with a copy to DelBello, Donnellan, Weingarten, Tartaglia, Wise, and Wiederhehr, LLP.  Unless and until such notice is thus received or deemed received, the notice in question shall have no force or effect.  If a party changes its address, it shall advise the other parties to this MOU of such new address in accordance with the notice requirements of this section.

Section 4.8.  Titles of Articles and Sections.  The titles of the several parts, Articles, and Sections of this MOU are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of its provisions.

Section 4.9.  Governing Law.  This MOU shall be governed by, interpreted under, and construed and enforced in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within New York.  All claims, actions, proceedings, and lawsuits brought in connection with, arising out of, related to, or seeking enforcement of this MOU and the LDA shall be brought in the Supreme Court of the State of New York, Westchester County.

Section 4.10.  Entire Agreement, Amendments, and Partial Invalidity.  This MOU including all schedules attached hereto contains the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior understandings and writings with respect thereto. This MOU may not be modified, changed, supplemented, or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged. The parties do not intend to confer any benefit hereunder on any person or entity other than the parties hereto. In the event that any provision of this MOU shall be held or determined to be invalid or unenforceable in any court proceeding, then, such invalidity or unenforceability shall affect only the provision which is the subject of such determination and all other provisions of this MOU shall remain in full force and effect, and the parties shall apply their best efforts to modify the affected provisions to eliminate such invalidity or unenforceability.

Section 4.11.  Waivers and Extensions.  No waiver of any breach or any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of

any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of time for performance of any other obligations or acts.

Section 4.12.  Successors and Assigns.  This MOU shall bind and enure to the benefit of the parties and their respective successors and assigns.  This MOU may not be assigned except in accordance with Section 3.4.9.

Section 4.13.  Notice and Demand to Cure.  In the event of any default of any of the material covenants or obligations contained herein by either the City or the Developer (such party a "Defaulting Party"), then the City or the Developer, as the case may be, shall deliver written notice of such default to the Defaulting Party setting forth the nature of such default (the "Notice of Default").  In the event that such default is not cured within thirty (30) days following receipt of such Notice of Default or, in the event that the default is not reasonably susceptible of being cured within such thirty (30) day period, the Defaulting Party has not commenced to cure such default or does not thereafter continue to diligently prosecute the cure of such default, then the party delivering such notice shall have, except as otherwise provided herein, the right to exercise any and all remedies available to it at law or equity.

Section 4.14.  No Third Party Rights.  Nothing contained in this Agreement is intended to create any rights or to otherwise benefit any parties other than the City and the Developer.

Section 4.15.  Performance of Governmental Functions.  Notwithstanding anything in this MOU to the contrary, nothing contained herein or any approvals or consents by the City in connection with the Project shall limit or impair the City from exercising or performing any regulatory, policing or permitting functions or obligations.

Section 4.16.  No Partnership Created.  It is understood and agreed that no agreement of partnership is intended hereby and nothing herein shall be deemed or construed to constitute the City as the partner of the Developer or constitute either the agent of the other such as to permit or empower the City or the Developer to bind the other to financial or other obligations to third parties or to constitute or give rise to any joint ownership or joint venture.

CITY OF NEW ROCHELLE

By: _____
CHARLES B. STROME III
City Manager

SIMONE CHURCH STREET LLC

By: _____
JOSEPH SIMONE
Managing Member

_____
JOSEPH SIMONE

_____
THOMAS METALLO

# EXHIBIT K

# DVD FILED SEPARATELY

**EXHIBIT L**

**d seaman**

**From:**      Peter F. Gaito [pgaito@pfga.net]
**Sent:**       Thursday, June 12, 2008 2:04 PM
**To:**          d seaman
**Cc:**          Austin Graff
**Subject:**   Fwd: Info to Saccardi

Begin forwarded message:

> **From:** "John Saccardi" <jsaccardi@saccschiff.com>
> **Date:** June 6, 2005 8:59:11 AM EDT
> **To:** "Martin Sumner" <msumner@simdev.com>, <pgaito@pfga.net>, <pjw@ddwt.com>
> **Cc:** "Nina Peek" <NPeek@saccschiff.com>
> **Subject:** RE: Info to Saccardi
>
> Peter,  Got the disk in this AM's Fed Ex.  Thanks.  John
>
> > -----Original Message-----
> > **From:** John Saccardi [mailto:jsaccardi@saccschiff.com]
> > **Sent:** Monday, June 06, 2005 8:10 AM
> > **To:** Martin Sumner; pgaito@pfga.net; pjw@ddwt.com
> > **Cc:** Nina Peek
> > **Subject:** RE: Info to Saccardi
> >
> > Can I get some info on the project, in addition to what Peter sent, prior to the conference call
> > e.g., site pan, existing conditions map, and details of proposed program in terms of units,
> > square footages, particularly of commercial space, parking, open space, building height, etc.
> > This can be send via e-mail for purposes of starting on the EAF. Thanks.   John
> >
> > > -----Original Message-----
> > > **From:** Martin Sumner [mailto:msumner@simdev.com]
> > > **Sent:** Thursday, June 02, 2005 2:56 PM
> > > **To:** pgaito@pfga.net
> > > **Cc:** mpw@ddwt.com; jsaccardi@saccschiff.com
> > > **Subject:** Info to Saccardi
> > >
> > > Peter  please forward the site plan information for New Rochelle to John Saccardi at
> > > j saccardi@saccschiff.com with a copy to Nina Peek atnpeek@saccardischiff.com
> > >
> > > thanks
> > >
> > > Martin J. Sumner
> > > Executive Vice President and Chief Operating Officer
> > > Simone Development Companies
> > > 1000 Main Street
> > > New Rochelle, New York 10801
> > >
> > > Tel  (914) 576-5000 x 16
> > > Fax (914) 576-4000
> > > Cell (917) 456-7127

# EXHIBIT M

**d seaman**

**From:**   Peter F. Gaito [pgaito@pfga.net]
**Sent:**   Thursday, June 12, 2008 2:05 PM
**To:**   d seaman
**Cc:**   Austin Graff
**Subject:** Fwd: Church/Division

Begin forwarded message:

**From:** Peter F. Gaito <pgaito@pfga.net>
**Date:** July 19, 2005 4:36:49 PM EDT
**To:** John Saccardi <jsaccardi@saccschiff.com>
**Cc:** "David Kosakoff, Esq." <Dkosakoff@ssklaw.net>
**Subject:** Church/Division

Dear John:

As per our phone conversation yesterday, please be advised that Peter F. Gaito and Associates has exclusive ownership of the copyright of all documents, drawings, calculations, and information prepared or derived from works of our office, with regard to the Church Division Project.  Without our express permission to do so, we view use or dissemination of any of these items  as a breach of our copyright protection.

**Peter F. Gaito and Associates**
*ARCHITECTS AND PLANNERS*
399 KNOLLWOOD RD, SUITE 106
WHITE PLAINS, NY. 10603
914-682-3381

**EXHIBIT N**

# I.    GENERAL OVERVIEW

In accordance with the New York State Environmental Quality Review Act (SEQRA), this Final Environmental Impact Statement (FEIS) for the Church/Division Mixed Use Development has been prepared in response to public comments on the Draft Environmental Impact Statement (DEIS).  The DEIS was accepted as complete on July 11, 2006 after extensive review by the Lead Agency, the City Council of the City of New Rochelle.  A public hearing on the DEIS was held on August 24, 2006.  Transcripts from the hearing are included in Appendix A of this FEIS, along with all written comments received by the Lead Agency during the DEIS comment period.

This FEIS incorporates the DEIS by reference and responds to all substantive comments received (either at the public hearing or in writing) on the DEIS.  Comments were compiled, and organized by topic.  Each comment is referenced as to its source, and responded to in Section 3 of the FEIS.

## A.  DESCRIPTION OF THE PROPOSED ACTION

The proposed project includes the redevelopment of two large City of New Rochelle owned parking facilities (the Prospect Street municipal parking lot and the Church/Division Street municipal parking garage), and the assemblage of several other privately owned parcels to comprise an approximately five acre site located in downtown New Rochelle.  The project includes public open space, residential, retail, and office uses and off-street parking facilities.  All of these uses are currently permitted in the Downtown Business (DB) District, which encompasses the majority of the project site.  However, the dimensional requirements of the DB District would not permit the project to be developed at the proposed size.  Therefore, to accommodate the proposed building program, a rezoning of the project site would be required.  The Applicant proposes that the Church/Division Lot be rezoned to the Downtown Mixed Use (DMU) District and the Downtown Density Bonus (DDB) Overlay Zone, which was adopted by the City of New Rochelle in May 2006.

Related actions to facilitate the development of the project include, among others: (i) amendment to the Zoning Map of the City to rezone the Church/Division Lot (on which the Church/Division Street municipal parking garage is located) to the DMU District; (ii) amendment of the Comprehensive Plan of the City; (iii) potential "Major Development Subdivision" approval; (iv) amendments to the maximum building length regulation of the DMU District from 300 feet to 456 feet[1].  (Section 331-62.B (3) of the City Zoning Ordinance) and the maximum building height regulation of the DDB Overlay Zone (Section 331-85.3.E (2) of City Zoning Ordinance; see Section B, below) from 390 to 500 feet; and (v) site plan approval of the project (vii) abandonment of Clinton Place between Church and Division Streets.

As described in the DEIS, the project included the following use components.

---

[1] The total length of the proposed structure on Church Street is 456 feet, which includes the 72 feet recessed outdoor play area for the child care facility.

*General Overview*

1. Municipal Parking Facility

The proposed project includes the construction of a new approximately 253,000 square foot City owned municipal parking garage and surface lot with at least 859 parking spaces on the Prospect Lot (on which the existing Prospect Street municipal parking lot is located). The Prospect Lot is bound on the north by Division Street, on the west by Leroy Place, on the south by Centre Avenue and on the east by Prospect Street.

The parking facility would provide at least 859 parking spaces, with approximately 772 spaces (including roof parking) in a parking structure and an additional 88 parking spaces in an at-grade lot. The façade of the municipal parking structure would be sensitively designed to minimize the appearance of bulk. The roof level would be appropriately landscaped, and lighting would be designed to minimize spillage. The at-grade parking lot would also be landscaped with trees and appropriate plantings. The municipal parking facility would have three separate entrances/exits: one on Prospect Street between Division Street and Centre Avenue, the second on Centre Avenue between Prospect Street and Main Street and one on Division Street between Prospect Street and Main Street.

The new municipal parking garage will be built by Simone Church Street, LLC as the City's contractor under a waiver of public bidding, and such garage will be owned, operated, and maintained by the City. The design of the at-grade lot and the parking structure would allow for future expansion should the City of New Rochelle determine this to be needed in the future.

2. Open Space

Exhibit 24 presents a preliminary design for LeRoy Place Park, an approximately 28,000 square foot public park to be constructed adjacent to the proposed municipal parking garage. The LeRoy Place Park would be landscaped and would provide an important amenity for residents of the neighborhood. The Park would provide a landscaped plaza on Division and LeRoy Streets and Centre Avenue and could be used as a venue for recreation activities including a farmer's market.

An approximately 29,000 square foot landscaped publicly accessible plaza is proposed to be constructed along the east side of Division Street to the center of the Church/Division Lot with a through connection to Main Street. This landscaped plaza would include a water feature that would serve as the visual focal point from Main Street. The plaza could include tables and seating.

Approximately 2,500 square feet of open space is proposed at the southeastern portion of the Church/Division Lot. This landscaped area would be located adjacent to the proposed retail with access to/from Church Street.

3. Private Use Components

   a. Residential Tower

   The residential component of the project would total approximately 563,000 square feet, in a 39 story residential tower containing approximately 373 units.

   b. Retail Space

   Approximately 44,000 square feet of retail uses are proposed. The retail component of the project would be as follows:

   - Approximately 4,100 square feet of retail located on the west side of the Main Street entrance. This two-story retail space would have frontage on Main Street and would wrap around to the interior walkway leading to the proposed landscaped plaza area.

   - Approximately 5,190 square feet of retail located on the east side of the Main Street entrance. This two-story retail space would also have frontage on Main Street, and wrap around the interior walkway.

   - Approximately 26,610 square feet of larger scale retail space located along the interior of the proposed landscaped plaza adjacent to the proposed residential tower. This retail space would be designed with floor heights varying from 18 feet to 27 feet, with the intention of attracting two larger scale retail tenants. It is anticipated that two retail tenants would occupy this entire space.

   - Approximately 4,850 square feet of retail space located in the southern portion of the residential tower, south of the residential lobby area. Access to this retail space would be from Division Street.

   - Approximately 3,250 s.f of retail/commercial space located at the southeastern end of the Church/Division Lot. Access would be provided from Church Street.

4. Commercial Space

   Approximately 2,500 square feet of commercial/office space is proposed at the southeastern end of the project site. Access to this space would be from Church Street.

5. Parking

   An approximately 214,000 square foot six-story (partially below grade) private parking structure is proposed on the Church/Division Lot to accommodate residences, commercial and retail tenants and patrons of the retail uses at the project site. This approximately 630 space parking garage would be located on the northeastern portion of the Church/Division Lot. Approximately 508 spaces would be provided for resident parking and 122 spaces would be provided for commercial/retail parking.

   The parking structure would be designed with residential parking on the upper levels, and commercial and retail parking on the lower levels. Access to the residential parking would most likely be accessible via key-card entry. Parking would not be permitted on the roof level of the parking garage.

*General Overview*

The eastern façade of the proposed parking structure, along Church Street, would be sensitively designed to minimize the appearance of bulk. In addition, on Church Street, the parking structure would be located above the ground floor retail.

## B.  REVISIONS TO THE PROPOSED ACTION

Subsequent to the public hearing on the DEIS, the City of New Rochelle's Professional Architectural Review Committee recommended that the design of the 39 story residential tower be refined to create a narrower profile, which would appear less massive and create a narrower shadow profile. As a result of this feedback, the Applicant has revised the design of the project. The current design proposes a 42 story, 455 foot high residential tower with an additional 35-foot tall bulkhead to accommodate rooftop mechanical equipment. The residential tower would include 396 units, broken down as follows: 180 one-bedroom units, 180 two-bedroom units and 36 three-bedroom units. The proposed parking on-site private structure adjacent to the residential tower would provide 630 parking spaces broken out as follows:

- Retail Parking: 55 (below grade) + 67 (first floor) = 122
- Residential Parking: 508

As is the case with the project discussed in the DEIS, the floor area ratio of the revised project would be 5.5 (yielding approximately 546,735 square feet of gross floor area), the maximum permitted under the density bonus regulations of the DDB Overlay Zone.

Exhibits 1 through Exhibit 7 present the revised design of the proposed residential tower. Because the design of the proposed project has changed, additional impact analyses are including in this FEIS. Exhibit 8 presents a schematic section of the revised design and Exhibit 8a presents a comparison of the original design for the residential tower and the revised design. Exhibit 8b presents a schematic section of the proposed municipal parking garage including the variation in the setbacks on LeRoy Place. Exhibit 24 presents the proposed landscape plan for the LeRoy Place Park.

Section 331-85.3.E (2) of the New Rochelle Zoning Ordinance provides a height bonus of up to 390 feet in the DDB Overlay Zone on qualifying sites zoned DMU District or Downtown Mixed Use Urban Renewal (DMUR) District. Because this regulation would have to be amended to permit the increased height of the revised project, this FEIS also includes analysis of increased maximum building height (at the currently permitted maximum density under the regulations of the DDB Overlay Zone) at the DMU District and DMUR District zoned sites identified in the New Rochelle Downtown Density Bonus DGEIS[2] as potentially eligible for the currently permitted 390 foot maximum height. The analysis for each site assumes a maximum building height of 575 feet (including mechanicals). The FEIS includes an analysis of a 575 foot building height because under Section 331-15 of the City of New Rochelle Zoning Ordinance, for properties located within the Central Parking Area, rooftop structures which are used solely for the purpose of housing building mechanicals are not be included in computing building height provided their vertical

---

[2] New Rochelle Downtown Density Bonus DGEIS, AKRF, January 2006.

*General Overview*

elevation does not exceed 15% of the height of a building, and provided that such rooftop structures are subject to a detailed architectural review and analysis facilitated by a Licensed Architect to ensure architectural excellence. As such, the analysis herein assumes a 575 foot building height for a worst case scenario assessment.

The sites are as follows and are highlighted in Exhibit 9.

- North Avenue and Lawton Street – As noted in the New Rochelle Downtown Density Bonus DGEIS, "Although the DMU, DMUR and DB zoning districts are all mapped on this assemblage, the majority is zoned DMUR, making the rezoning of two parcels and a portion of a third, a possibility for the future."

- LeCount Place and North Avenue – This assemblage of parcels is located with the DB and Mixed Use Family Entertainment (MUFE) Districts. The City of New Rochelle has accepted as complete a DEIS for a mixed-use development project at this site known as "LeCount Square."

- Garden Street – This assemblage of parcels is located entirely within the DMU District. While this site includes a municipal parking lot and is similar to the project site, the City currently has no plans to redevelop the site. Although the City currently considers redevelopment of this site to be unlikely, a shadow analysis was completed for the site to account for potential future development.

- North Avenue and Huguenot Street – This parcel is entirely within the DMU District, is close to New Roc City and the Intermodal Transportation Center and would therefore be eligible for height bonus of the DDB Overlay Zone. However, as noted in the New Rochelle Downtown Density Bonus DGEIS: "existing development at this site (e.g., the K Building) would make this assemblage less likely, and therefore, it is not considered as a potential development site."

## C. IMPACT ISSUES

Under Section 331-85.3.E(2) of the New Rochelle Zoning Ordinance, in the DDB Overlay Zone, maximum building height on properties which meet certain eligibility requirements may be increased to up to 390 feet. In addition, under Section 331-15 of the City of New Rochelle Zoning Ordinance, for properties located within the Central Parking Area, rooftop structures which are used solely for the purpose of housing building mechanicals are not be included in computing building height provided their vertical elevation does not exceed 15% of the height of a building, and provided that such rooftop structures are subject to a detailed architectural review and analysis facilitated by a Licensed Architect to ensure architectural excellence.

Based on the current regulations of the DDB Overlay Zone, the DEIS analyzed a proposed residential building with building height of 390 feet and an overall height of 405 feet, including mechanicals. The revised project proposes a building height of 455 feet, and an overall building height of 490 feet, including mechanicals. During the redesign, the units were reconfigured eliminating some of the three bedroom units and creating additional two bedroom units. The revised unit count is as follows: 396 units, broken down as follows: 180 one-bedroom units, 180 two-bedroom units and 36 three-bedroom units. Because the unit

THE SCHER LAW FIRM, LLP

## NOTICE OF ENTRY

Sir:- Please take notice that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within named court on 20

Dated,

Yours, etc.

THE SCHER LAW FIRM, LLP
Attorney for
Office and Post Office Address
ONE OLD COUNTRY ROAD
CARLE PLACE, N.Y. 11514

To
Attorney(s) for

## NOTICE OF SETTLEMENT

Sir:- Please take notice that an order
of which the within is a
true copy will be presented for settlement to the
Hon. one of the judges of the within named court, at
on the day of M.
Dated, 20

Yours, etc.

THE SCHER LAW FIRM, LLP
Attorney for
Office and Post Office Address
ONE OLD COUNTRY ROAD
CARLE PLACE, N.Y. 11514

To
Attorney(s) for

---

Index No.                    Year 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETER F. GAITO ARCHITECTURE, LLC d/b/a
PETER F. GAITO AND ASSOCIATES,

Plaintiff,

-against-

SIMONE DEVELOPMENT CORP., SIMONE CHURCH
STREET LLC, JOSEPH SIMONE, THOMAS METALLO,
SACCARDI & SCHIFF, INC., TNS DEVELOPMENT
GROUP LTD., and SLCE ARCHITECTS, LLP

Defendants.

## COMPLAINT

THE SCHER LAW FIRM, LLP
Attorney for Plaintiff
Office and Post Office Address
ONE OLD COUNTRY ROAD
CARLE PLACE, N.Y. 11514
(516) 746-5040

To
Attorney(s) for

Service of a copy of the within
is hereby admitted.

Dated,                    20

Attorney(s) for

---

## ATTORNEY'S AFFIRMATION

STATE OF NEW YORK
COUNTY OF                    ss.:

The undersigned, an attorney admitted to
practice in the courts of New York State, hereby
affirms as true under all the penalties of perjury
that affiant is

the attorney(s) of record for

In the within action; that affiant has read the fore-
going

and knows the contents thereof; that the same is
true to affiant's own knowledge, except as to the
matters therein stated to be alleged on information
and belief, and that those matters affiant believes
to be true. Affiant further says that the reason this
affirmation is made by affiant and not by

The grounds of affiant's belief as to all mat-
ters not stated upon affiant's knowledge are as fol-
low:

Dated                    20

# EXHIBIT J

CHURCH/DIVISION/PROSPECT
MEMORANDUM OF UNDERSTANDING

BY AND BETWEEN

CITY OF NEW ROCHELLE,

SIMONE CHURCH STREET LLC,

JOSEPH SIMONE,

AND

THOMAS METALLO

DATED AS OF JUNE 15, 2005

Corporation Counsel
City of New Rochelle
515 North Avenue
New Rochelle, N. Y. 10801

## LIST OF SCHEDULES

Schedule A    Description of Church/Division Lot

Schedule B    Description of Jamamy Lot

Schedule C    Description of Prospect Lot

Schedule D    Escrow Agreement

Schedule E    Schematics of Prospect Garage and Division Park

Schedule F    Schematics of Church/Division Improvements

Schedule G    Early Entry Environmental Testing License Agreement.

A Church/Division/Prospect Memorandum of Understanding ("MOU") dated as of June 15, 2005, by and between the CITY OF NEW ROCHELLE, a New York municipal corporation with offices at 515 North Avenue, New Rochelle, New York ("City"); SIMONE CHURCH STREET LLC, a New York limited liability company with offices at 1000 Main Street, New Rochelle, New York 10801 ("Developer"); JOSEPH SIMONE, residing at c/o 1000 Main Street, New Rochelle, New York 10801, and THOMAS METALLO, residing at

_____.

WHEREAS, the City is the record owner of that parcel of land, with the municipal Church/Division Garage constructed thereon, located between Church and Division Streets in the City of New Rochelle, County of Westchester, and State of New York, as described on Schedule A ("Church/Division Lot"), on which the Developer wishes to construct residential condominium dwelling units, retail space, professional office space, and underground parking for such dwelling units and for the handicapped parking needs of such retail and office space ; and

WHEREAS, Jamamy Realty Corp. is the record owner of that parcel of land with improvements thereon located on the westerly side of Church Street, southeasterly of and adjoining the Church/Division Lot, in the City of New Rochelle, County of Westchester, and State of New York, as described on Schedule B ("Jamamy Lot"), which Jamamy Lot the Developer wishes to include as part of the development of the Church/Division Lot (collectively the "Church/Division Site"); and

WHEREAS, the City is the record owner of that parcel of land currently used for municipal surface parking, located between Division Street and Centre Avenue, in the City of New Rochelle, County of Westchester, and State of New York, as described on Schedule C ("Prospect Lot"), on which the City wishes Developer to construct a new public park and municipal parking garage to replace and increase the parking spaces presently located in the Church/Division Garage; and

WHEREAS, the Developer wishes to undertake such development on the Church/Division Lot and Prospect Lot in a timely and expeditious manner;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the parties agree as follows:

ARTICLE I

DEFINITIONS

Church/Division Lot - that parcel of land, with the municipal Church/Division Garage constructed thereon, located between Church and Division Streets in the City of New Rochelle,

County of Westchester, and State of New York, known as Section 2, Block 414, Lot 8 on the tax assessment maps and rolls of the City, as more fully described on Schedule A.

Church/Division Garage – municipal parking garage structure on the Church/Division Lot.

Church/Division Site - the Church/Division Lot and the Jamamy Lot, the latter only if the Developer and Jamamy reach an agreement regarding inclusion of the Jamamy Lot as part of development of the Church/Division Lot. The acquisition of the Jamamy Lot by the Developer is not a condition precedent to the parties' respective rights and obligations under this MOU.

City - City of New Rochelle.

Developer – Simone Church Street LLC.

Jamamy - Jamamy Realty Corp., owner of the Jamamy Lot.

Jamamy Lot - that parcel of land with improvements thereon located on the westerly side of Church Street, southeasterly of and adjoining the Church/Division Lot, in the City of New Rochelle, County of Westchester, and State of New York, known as Section 2, Block 414, Lot 51 on the tax assessment maps and rolls of the City, as more fully described on Schedule B.

LDA – the Church/Division/Prospect Land Disposition and Development Agreement to be made between the City and the Developer for the conveyance to the Developer of the Church/Division Lot and the development of the Project.

Project - the following work to be undertaken by the Developer:

1) Design and build on the Prospect Lot a new municipal parking garage consisting of at least 525 new parking spaces together with 334 existing surface spaces representing all of the existing Prospect Lot surface parking spaces, for a total of at least 859 parking spaces ("Prospect Garage");

2) Design and build on the Prospect Lot a minimum of 19,200 s.f. of publicly useable landscaped open space, which may, in the City's discretion, be dedicated as a public park ("Division Park");

3) Demolition, removal, and legal disposal of the Church/Division Garage;

4) Design and build on the Church/Division Site a maximum of 438 residential condominium dwelling units of which at least five (5%) percent shall be sold to families with incomes not exceeding Westchester County Median Income at the time of sale with subsequent restrictions on resale above CPI increases, for at least 20 years, to families with incomes then not exceeding the then Westchester County Median Income ("Median Income Units"). In the event that the aggregate number of residential units should change during the City Approval process, the percentages set forth herein governing the number

4

of Median Income Units would still apply as established hereunder. In addition, the size of Median Income Units throughout the Church/Division Site shall be commensurate with the mix of unit sizes of the market rate units and not more than two (2) Median Income Units shall be located on each floor of the Church/Division Site, beginning with the first floor containing residential condominium dwelling units and continuing on each floor thereafter until the total number of residential condominium dwelling units reaches at least 5% of the total number of residential condominium dwelling units, except that if more than one building containing residential condominium dwelling units is located on the Church/Division Site, the total number of Median Income Units located on the same level in such buildings shall not exceed an aggregate of two (2). Further specifications and qualifications for such Median Income Units shall be set forth in the LDA;

5)  Design and build on the Church/Division Site approximately 44,000 s.f. of retail space;

6)  Design and build on the Church/Division Site approximately 2,500 s.f. of professional office space;

7)  Design and build on the Church/Division Site sufficient underground parking spaces to meet zoning requirements for the residential condominium dwellings units and the on-site handicapped parking needs for the retail and professional office space; and

8)  Design and build on the Church/Division Site an approximately 24,000 s.f. landscaped public plaza ("Plaza"),

9)  The Floor Area Ratio for the Church/Division Site shall not exceed 5.5.

Items 4 - 7 being collectively known as the "Church/Division Improvements."

Prospect Lot - that parcel of land currently used for municipal surface parking, located between Division Street and Centre Avenue, in the City of New Rochelle, County of Westchester, and State of New York, known as Section 2, Block 412, Lot 7 on the tax assessment maps and rolls of the City, as more fully described on Schedule C.

Unavoidable Delay - any delay, obstruction, or interference resulting from any act or event which has a material adverse effect on a party's obligations to perform under this MOU provided that such act or event is beyond the reasonable control of such party and was not separately, concurrently or partially caused by any negligent or willful act or omission of such party, and provided that such act or event could not have been prevented by reasonable action on such party's part and such party asserting such act or event has used its best efforts to remedy the delaying condition in an expedient and efficient manner, including, without limitation, acts of force majeure. If a third party, unrelated to the parties to this MOU, commences a legal proceeding (a "Proceeding") which seeks to prevent the Developer from (x) obtaining or retaining City Approvals, or (y) obtaining or retaining a building permit or performing work on the Project pursuant to a building permit, or as a result of which financing for the construction of

the Project cannot be obtained upon commercially reasonable terms, or if committed, is temporarily suspended, and as a result thereof and notwithstanding the diligent, good faith defense by the Developer of such proceedings (if Developer is a defendant therein), Developer is delayed or prohibited from timely complying with its obligations hereunder, the pendency of such Proceeding shall be deemed an Unavoidable Delay, and deadlines imposed herein shall be extended by the number of days of actual delay caused by any such injunction for purposes of determining whether Developer is in default hereunder. However, an injunction which arises from Developer's violation of law in the manner in which Developer is constructing the Project (as opposed to the process in which it obtained its City Approvals) shall not excuse timely performance hereunder.

ARTICLE II

REPRESENTATIONS, WARRANTIES, COVENANTS, AND AGREEMENTS

Section 2.1. <u>City</u>. The City represents, warrants, covenants, and agrees as follows:

a)    it is a duly organized, validly existing New York municipal corporation;

b)    it is the record and beneficial owner of the Church/Division Lot and the Prospect Lot, as respectively described on Schedules A and C; and

c)    it has the full power and authority to execute, deliver and perform this MOU and full power and authority to consummate the transactions herein described, and the person who has executed this MOU on behalf of the City has the authority to do so.

Section 2.2. <u>Simone Church Street LLC.</u>    Simone Church Street LLC represents, warrants, covenants and agrees as follows:

a)    it is a New York limited liability company of which Joseph Simone and Thomas Metallo own an aggregate interest of at least 51% and Joseph Simone shall be its managing member; and

b)    it has the full power and authority to execute, deliver and perform this MOU and full power and authority to consummate the transactions herein described and the person who has executed this MOU on behalf of Simone Church Street LLC has the authority to do so.

Section 2.3. <u>Joseph Simone and Thomas Metallo</u>. Joseph Simone and Thomas Metallo covenant and agree that until such time as permanent certificates of occupancy for the entire Project are issued, they shall own an aggregate interest of at least 51% and Joseph Simone shall be the managing member of Simone Church Street LLC and its permitted assignees, if any.

ARTICLE III

GRANTING OF PURCHASE OPTION, PRECONDITIONS TO EXERCISE OF OPTION, AND GENERAL TERMS AND CONDITIONS OF LAND DISPOSITION AND DEVELOPMENT AGREEMENT

Section 3.1.  Church/Division Lot Purchase Option.  The City hereby grants an exclusive purchase option to the Developer through the earlier of a) July 10, 2006; b) ten (10) days after the date of site plan approval for the Project; or (c) the termination of this MOU pursuant to the terms and conditions of this MOU.  During the option period the Developer shall plan and obtain approvals for development and construction of the Project.  The preconditions set forth in Section 3.3 below must be met before the Developer may exercise its option to purchase and develop the Church/Division Lot upon the general disposition terms and conditions set forth in Section 3.4 below.

Section 3.2.  Exclusivity Payment and Consideration for Grant of Purchase Option.  The parties acknowledge that the Developer made an exclusivity payment to the City in the amount of $50,000 on March 23, 2005 ("Exclusivity Payment").  Developer, Joseph Simone, and Thomas Metallo acknowledge, recognize, and agree that the Exclusivity Payment has been made entirely at their risk and shall be nonrefundable and noncancellable, for any and all reasons whatsoever including but not limited to impossibility of performance and the failure of the City to grant environmental and other approvals for the Project.

Section 3.3.  SEQRA, Site Plan, and Building Permit Approvals; Performance Obligations.  The Developer may not exercise its option to purchase and develop the Church/Division Lot unless and until (a) the State Environmental Quality Review Act ("SEQRA") has been satisfied with respect to the proposed Project and the City Council has by resolution issued whatever findings or determinations are required under SEQRA with respect to the Project and (b) site plan approval for the entire Project has been obtained.  Developer shall be solely liable for all costs incurred in connection with the processing of applications for site plan and building permit approvals or other discretionary approvals which may be required from the City to construct the Project (collectively "City Approvals").  The Developer further agrees to reimburse the City for its outside legal counsel (including, without limitation, legal fees incurred by the City with respect to obtaining or defending any City Approvals and any other governmental approvals), SEQRA review, architectural peer review, and design review costs through the establishment of an escrow fund to be administered by the City's Finance Commissioner, with an initial deposit of $75,000 simultaneous on execution of this MOU and replenishment thereof whenever the balance in such escrow fund drops below $50,000, such escrow fund to be maintained and replenished until the issuance of all building permits for the entire Project ("Escrow Fund").  The terms and conditions of administering the Escrow Fund are set forth in the Escrow Agreement attached hereto as Schedule D.  The City makes no representations as to the City Approvals and the parties acknowledge that, based upon the findings issued in connection with the SEQRA review, the Project may be modified, reduced in scope or rejected in whole or in part.  The Developer expressly acknowledges that the City shall have no obligation to execute the LDA and

to sell the Church/Division Lot in the event that (i) any or all of the City Approvals are not granted, (ii) upon completion of the SEQRA review the City Council determines, in its sole discretion, that those findings under SEQRA which would permit development of the Project as proposed by Developer should not be issued or (iii) the City Council determines, as a result of the SEQRA review, that modifications to the Project should be made, or that mitigation measures should be implemented in order to avoid or minimize any environmental impacts disclosed in the SEQRA process, and the Developer does not agree to incorporate such modifications or mitigation measures into the Project. Notwithstanding the foregoing, the City agrees to diligently and in good faith process and review the Developer's applications for the City Approvals.

Developer shall have the following performance obligations under this MOU and the LDA. If Developer defaults in performing any of such obligations in a timely manner subject to Unavoidable Delay, and such default is not cured within thirty (30) days following receipt of such Notice of Default or, in the event that the default is not reasonably susceptible of being cured within such thirty (30) day period, the Developer has not commenced to cure such default or does not thereafter continue to diligently prosecute the cure of such default, then this MOU and the LDA shall be deemed terminated, cancelled, and of no further force and effect:

| Performance Obligation | Date For Performance On Or Before |
|---|---|
| Submit draft SEQRA Scoping Document | July 15, 2005 |
| Initial meeting with Architectural Peer Design Review Committee and City staff regarding exterior design of Project | August 1, 2005 |
| Submit preliminary DEIS to City | December 1, 2005 |
| Submit complete DEIS to City | January 31, 2006 |
| Submit specifications to City for Design/Build Agreement ("DBA") to construct Prospect Garage and Division Park and for Demolition Agreement to demolish, remove, and legally dispose of the Church/Division Garage | February 15, 2006 |
| Final meeting with Architectural Peer Design Review Committee and City staff regarding exterior design of Project, followed by such Committee's recommendation to the City Council | March 15, 2006 |

Obtain site plan approval for Project, following a) SEQRA public hearings and preparation of FEIS, if required, b) City's issuance of SEQRA Findings

and Determination, c) City's approval of exterior
design, and d) amendments to the City's Comprehensive
Plan, Zoning Code and Zoning Map to permit approval of
the Project                                                    June 30, 2006

Exercise purchase option by executing the LDA
including but not limited to the terms, conditions,
and specifications of the DBA and the
Demolition Agreement                                           July 10, 2006

Obtain building permits for construction of the
Prospect Garage and demolition
permits for demolition, removal, and legal disposal
of the Church/Division Garage                                  October 1, 2006

Execute DBA for Prospect Garage and Division Park
and Demolition Agreement                                       October 1, 2006

Post Performance Bond for the Prospect Garage,
naming the City as sole beneficiary                            October 1, 2006

Post Performance Bond for demolition of the
Church/Division Garage, naming the City as sole
Beneficiary                                                    October 1, 2006

Close Title on Church/Division Lot                             October 1, 2006

Commence construction of the Prospect Garage                   November 15, 2006

Submit complete building plans for construction of
Church/Division Improvements                                   March 31, 2007

Complete construction of Prospect Garage, subject
to tolling not to exceed 4 months for
unavoidable winter weather                                     May 15, 2007

Complete demolition, removal, and legal disposal of
Church/Division Garage, following completion of
Prospect Garage                                                May 15, 2007

Obtain building permits for construction of
Church/Division Improvements and
Division Park                                                  May 15, 2007

| | |
|---|---|
| Post performance bonds for construction of Public improvements in connection with the Church/Division Improvements, naming the City as sole beneficiary thereof | May 15, 2007 |
| Post Division Park Letter of Credit | May 15, 2007 |
| Commence construction of Church/Division Improvements and Division Park | May 15, 2007 |
| Complete Division Park | November 15, 2008 |
| Complete construction of Church/Division Improvements | May 15, 2009 |

Notwithstanding anything to the contrary in this MOU or in the LDA, the failure of the City or its consultants to take or complete any action which is necessarily a predicate to the satisfaction by the Developer of any of its performance obligations (including, but not limited to, (x) the City's failure to timely convene the Architectural Peer design Review Committee, or (y) the failure of such Committee to timely make its recommendations to the City, or (z) the failure of the City to timely adopt a scope for the DEIS or of the City's consultants to deliver to Developer the City's comments on a DEIS or FEIS in sufficient time to permit the Developer to timely submit a revised and "complete" document to the City in compliance with the milestone set forth above, shall be an Unavoidable Delay.

Section 3.4.  <u>General Terms and Conditions of Land Disposition and Development Agreement.</u> Upon Developer's fully and timely meeting the preconditions and performance obligations through site plan approval set forth in Section 3.3 above, the Developer may exercise its option and execute a Land Disposition and Development Agreement ("LDA") on or before July 10, 2006. If the Developer does not exercise its option and execute the LDA, both on or before July 10, 2006, this MOU shall be deemed cancelled and of no further force and effect if such option is not exercised and the LDA is not executed within thirty (30) days of Developer receiving notice to cure such default, except that should Developer earlier default in meeting any of its performance obligations set forth in Section 3.3 above and such default remain uncured pursuant to such Section 3.3, the MOU shall be deemed terminated and cancelled as of the date of such earlier default. The parties agree to diligently, with best efforts, and in good faith negotiate the terms and conditions of the LDA which shall be consistent with the material terms herein and which may include other general terms and conditions, and substantially complete such negotiations by December 31, 2005.  Upon completing the negotiation of the LDA, the parties shall execute an amendment to this MOU agreeing to the form of the LDA and attaching same as an exhibit to the MOU.

3.4.1.  <u>Church/Division Lot Title Closing.</u>  Title Closing on the Church/Division Lot shall not occur until the following conditions have been satisfied:  a)  the LDA has been executed

10

including but not limited to the terms, conditions, and specifications of the DBA and the Demolition Agreement; b) building permits have been obtained for construction of the Prospect Garage, in accordance with the schematics attached hereto as Exhibit E, site plan approval, and the specifications set forth in the DBA; c) demolition permits have been obtained for the demolition, removal, and legal disposal of the Church/Division Garage, in accordance with the specifications set forth in the Demolition Agreement; d) the DBA and Demolition Agreement have been executed; e) performance bond for construction of the Prospect Garage and demolition of the Church/Division Garage, in accordance with the building permits and demolition permits, and in form and substance the same as the City receives with respect to other public improvement contracts of the City, have been posted by the Developer, or, if the Developer is not the general contractor, by the general contractor, naming the City as sole beneficiary thereof; and f) the City Approvals are final and unappealable. The Church/Division Lot Closing of Title and execution of the Bargain and Sale Deed with Covenant Against Grantor's Acts ("Deed") shall occur on or before October 1, 2006, subject to Unavoidable Delay.

The Deed shall be executed by the City at Closing of Title and shall be held in escrow by the City's Corporation Counsel and not released from such escrow for delivery to the Developer until i) completion of construction of the Prospect Garage and and issuance by the City of a temporary certificate of occupancy therefor, and delivery of a master waiver of lien from the Developer and matching waivers of lien from all contractors and subcontractors; ii) delivery to the City of an irrevocable letter of credit (the "Division Park Letter of Credit") in favor of the City in form and content reasonably satisfactory to the Corporation Counsel to secure the completion of Division Park, which shall be in the amount certified by the City Engineer to be sufficient to complete Division Park, and which shall be released and returned to Developer upon the issuance by the City of a temporary certificate of occupancy for Division Park, and delivery of a master waiver of lien from the Developer and matching waivers of lien from all contractors and subcontractors, provided however, that the City shall draw down the Division Park Letter of Credit if a temporary certificate of occupancy has not been obtained by November 15, 2008 and, with such proceeds, shall cause completion of Division Park, and any balance of the proceeds remaining from the Division Park Letter of Credit following such completion shall be returned to the Developer within sixty (60) days thereafter; (iii) completion of demolition, removal, and legal disposal of the Church/Division Garage, including delivery of a master waiver of lien from the Developer and matching waivers of lien from all contractors and subcontractors; iv) building permits have been obtained for construction of the Church/Division Improvements and Division Park, in accordance with the schematics attached hereto as Exhibit F and the site plan approval; and v) performance bonds have been posted to secure completion of the public improvements, in accordance with site plan approval for the Church/Division Improvements, naming the City as sole beneficiary thereof.

Notwithstanding anything herein to the contrary, if any of the conditions set forth in this Section 3.4.1 (i-v) are not satisfied by September 15, 2007, subject to Unavoidable Delay, the Deed shall be returned to the City, the Developer shall have no rights or interests whatsoever with respect to the Church/Division Lot and any rights of the Developer in this MOU or the LDA, or arising therefrom, shall terminate.

Notwithstanding anything to the contrary herein, this MOU shall be deemed cancelled and of no further force and effect if Closing of Title does not occur on or before October 1, 2006, subject to Unavoidable Delay, and Developer does not cure such default within thirty (30) days of Developer receiving notice to cure such default, except that should Developer earlier default in meeting any of its performance obligations set forth in Section 3.3 above and such default remain uncured pursuant to such Section 3.3, the MOU shall be deemed terminated and cancelled as of the date of such earlier default.

The Developer acknowledges that the City will continue to use and operate the Church/Division Garage as an active municipal parking garage in its discretion, until such time as it is demolished as provided hereunder. The Developer agrees that it will not interfere with, and have no control over, the use and operation of the Church/Division Garage prior to its demolition and prior to delivery of the Deed for Church/Division out of escrow.

3.4.2  <u>Purchase Price.</u>  The Purchase Price, being the consideration for sale of the Church/Division Lot by the City to the Developer, shall be as follows:  a) Construction of the Prospect Garage and Division Park, pursuant to the DBA; and b) Demolition, removal, and legal disposal of the Church/Division Garage, pursuant to the Demolition Agreement.  All costs in connection with such construction and demolition including but not limited to design, obtaining City Approvals, obtaining other governmental and utility approvals, permitting, financing, environmental remediation, demolition including removal and legal disposal, and construction shall be borne by the Developer.  The Purchase Price shall not be reduced if the square footage of any component of the Church/Division Improvements and/or the number of residential condominium dwelling units is reduced during the SEQRA and City Approvals process.  In no event shall mortgages or liens be placed on the Prospect Lot.  In addition, prior to the delivery to Developer of the Deed from escrow as set forth in Section 3.4.1 above, no mortgages or liens shall be placed on the Church/Division Lot, in connection with the Developer's financing, if any, of construction of the Prospect Garage and Division Park and of demolition of the Church/Division Garage.

3.4.3.  <u>Permitted Uses.</u>  The Church/Division Improvements shall consist of and use of the Church/Division Site shall be limited to the following:  a) a maximum of 438 residential condominium dwelling units, of which at least five (5%) percent shall be sold to families with incomes not exceeding Westchester County Median Income at the time of sale with subsequent restrictions on resale above CPI increases, for at least 20 years, to families with incomes then not exceeding the then Westchester County Median Income ("Median Income Units");  b) approximately 44,000 s.f. of retail space; c) approximately 2,500 s.f. of professional office space; d) sufficient underground parking spaces to meet zoning requirements for the residential condominium dwellings units and the on-site handicapped parking needs for the retail and professional office space; and e) an approximately 24,000 s.f. landscaped public plaza.  In the event that the aggregate number of residential units should change during the City Approval process, the percentages set forth herein governing the number of Median Income Units would still apply as established hereunder.  In addition, the size of Median Income Units throughout the

Church/Division Site shall be commensurate with the mix of unit sizes of the market rate units and not more than two (2) Median Income Units shall be located on each floor of the Church/Division Site, beginning with the first floor containing residential condominium dwelling units and continuing on each floor thereafter until the total number of residential condominium dwelling units reaches at least 5% of the total number of residential condominium dwelling units, except that if more than one building containing residential condominium dwelling units is located on the Church/Division Site, the total number of Median Income Units located on the same level in such buildings shall not exceed an aggregate of two (2).    Further specifications and qualifications for such Median Income Units shall be set forth in the LDA.

    3.4.4    <u>Waiver of Public Bidding and Building Permit and Demolition Permit Fees for construction of the Prospect Garage and Division Park and demolition of the Church/Division Garage.</u>  Public bidding for construction of the Prospect Garage and Division Park and for demolition of the Church/Division Garage shall be waived by the City, pursuant to Section 143(A)(6) of the City Charter of the City, because the subject matter of the Design/Build Agreement and the Demolition Agreement is such that competition would be impracticable since the Purchase Price for the Church/Division Lot consists of such construction and demolition. City building permit and demolition fees and any other City fees for construction of the Prospect Garage and Division Park and the demolition of the Church/Division Garage shall be waived since they are City projects.

    3.4.5.   <u>Commencement and Completion of Construction of the Church/Division Improvements.</u>  Construction of the Church/Division Improvements shall commence by May 15, 2007, on delivery of the Deed out of escrow pursuant to Section 3.4.1, and construction of the Church/Division Improvements shall be completed and temporary certificates of occupancy obtained therefor by May 15, 2009, subject in both instances to Unavoidable Delay.

    3.4.6   <u>Parking on Church/Division Site.</u>  No portion of the Church/Division Site shall be used for parking open to the general public or users of other properties, by license or otherwise.

    3.4.7.   <u>Nondiscrimination and Equal Opportunity Policy.</u>  Developer shall abide by and shall cause its subtenants, assignees, and franchisees to abide by the City's Nondiscrimination and Equal Opportunity Policy adopted October 22, 1996, as amended.

    3.4.8   <u>Union Labor.</u>  Developer shall use reasonable efforts to employ or cause to be employed qualified union labor to construct and complete the Project; provided, however, that the foregoing shall not apply if the costs associated with union labor are not reasonably competitive with the costs of non-union labor at the then prevailing rates.  In the event labor unrest ensues either prior to or during construction of the Improvements, Developer shall use best reasonable efforts to resolve any and all issues relating to such unrest.

    3.4.9.   <u>No Assignment or Transfer.</u>  Developer may not assign this MOU and the LDA except to an affiliate in which Joseph Simone and Thomas Metallo own an aggregate interest of at least 51% and of which affiliate Joseph Simone is the managing member, all unless and until final certificates of occupancy for the entire Project have been issued.  Notwithstanding the

foregoing or any provision of this MOU, the Developer may from time to time before and after Closing of Title, assign and/or pledge its interests under this MOU, the LDA and/or in and to the Project, and the membership interests in Simon Church Street LLC, solely as collateral or security, to one or more equity participants and/or lenders in connection with equity financing, "mezzanine" financing or other financing for the construction of the Project, including the construction of the Prospect Garage and Division Park, provided that Joseph Simone and Thomas Metallo or an affiliate of Developer shall continue as Developer of the Project in accordance with the terms and conditions in the preceding sentence herein.

3.4.10. <u>Changes Requested by Mortgagee.</u>  The City shall not unreasonably withhold its consent to amendments to this MOU or the LDA which are requested by a mortgagee of the Church/Division Site which is an institutional lender and which requests such amendments as a condition of making a loan to the Developer for construction of the Church/Division Improvements, provided however that no such amendments shall materially change the terms and conditions of this MOU or LDA or materially violate the City's rights and powers as a municipal corporation.

3.4.11. <u>Environmental Remediation and "As Is."</u>  The Developer shall be responsible for undertaking and the cost of all environmental remediation and legal removal of contaminants, if any, found on the Church/Division Lot and the Prospect Lot as part of the Project.  The Church/Division Lot shall be conveyed "as is" with no representations as to its condition, environmental or otherwise.  Developer may conduct environmental and other investigations prior to Closing of Title, including prior to execution of the LDA, pursuant to the Early Entry Environmental Testing License Agreement attached hereto as Schedule G.

3.4.12  <u>Infrastructure Upgrades to Existing On-Site and Off-Site City Facilities.</u>  Except as may otherwise be required by SEQRA, the Developer shall be responsible for undertaking and the cost of infrastructure upgrades to existing on-site infrastructure necessary to serve the Church/Division Improvements, and, if required by Westchester County, to off-site City sanitary sewer and/or stormwater facilities which may be impacted as a result of construction of the Church/Division Improvements.

3.4.13  <u>Use of Prospect Lot as Staging Area.</u>  The City agrees that it shall permit the portion of the Prospect Lot on which Division Park is to be constructed to be used as a staging area for the construction of the Church/Division Improvements provided i) the Developer has delivered the Division Park Letter of Credit to the City, ii) the City determines, in its reasonable discretion, that the use of that portion of the Prospect Lot will not materially interfere with the use of the Prospect Garage for public parking given expected demand for parking prior to the completion of the Church/Division Improvements, iii) the Developer agrees to defend, hold harmless and indemnify the City from and against any liability which may be incurred, directly or indirectly, as a result of such use, and iv) the Developer insures the City from and against any such liability, which insurance shall be in form and content and in such amount as is reasonably satisfactory to the Corporation Counsel.

3.4.14  <u>Completion of Construction of Division Park</u>.  Notwithstanding anything herein to the contrary, construction of Division Park shall be completed no later than November 15, 2008, subject to Unavoidable Delay.

ARTICLE IV GENERAL

GENERAL REQUIREMENTS

Section 4.1. <u>Unavoidable Delay</u>.  The performance dates and periods set forth in this MOU and the LDA shall be tolled only during a period of Unavoidable Delay as defined above.

Section 4.2. <u>Reservation of Rights in Event of Default</u>.  The parties to this MOU specifically reserve any and all rights and remedies they may have if the other party materially defaults in any of its obligations under this MOU or related agreements, which rights and remedies shall survive termination or expiration of this MOU including but not limited to injunctive relief and other equitable remedies.

Section 4.3.  <u>Brokerage</u>.  Each of the parties hereto represents and warrants to the other parties that it has not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties, or the negotiation or execution of this MOU.  Each of the parties further agrees to indemnify and hold harmless the other parties and their respective successors and assigns, from and against any and all claims, losses, damages, liabilities, costs and expenses, including reasonable attorneys' fees, arising out of any breach by said party of the representations and warranties in this Section 4.3.

Section 4.4.  <u>Legal Fees</u>.  Except for outside legal counsel fees and disbursements to be paid pursuant to the Escrow Agreement as provided in Section 3.3, each party shall pay the fees and disbursements of its own legal counsel.

Section 4.5.  <u>Conflict of Interest</u>.  No member, official, consultant, professional, agent or employee of the City shall have any personal interest, direct or indirect, in this MOU or in Developer, nor shall any such member, official, consultant, professional, agent or employee participate in any decision relating to this MOU which affects his or her personal interests or the interest of any corporation, partnership, or association in which he or she is directly or indirectly interested.

Section 4.6.  <u>Estoppel Certificates</u>. Each of the parties agrees to at any time and from time to time, within thirty (30) days following written notice by any party to another party hereto, to execute, acknowledge and deliver to the party who gave such notice a statement in writing certifying that this MOU, and if amended as amended, is still in full force and effect and stating whether or not to the actual knowledge of the signer of such certificate, without any duty of inquiry or due diligence but based upon actual notice only, the other party is in default in performance of any covenant, agreement, or condition contained in this MOU, and, if so, specifying each such default of which the signer may have actual knowledge, it being intended

that any such statement delivered pursuant to this section may be relied upon only by any prospective mortgagee or assignee of any mortgage in respect of the requesting party's interest in the Church/Division Site.

Section 4.7. Notice and Demand. A notice, demand, consent, request, approval, or other communication under this MOU by a party to another party shall be deemed sufficiently given either on the third (3rd) business day following the date of its dispatch by certified mail, postage prepaid, return receipt requested, or on the day such writing is delivered (or delivery by courier or express mail is refused) during regular business hours if sent by telegram, facsimile (with a copy sent the same day by express mail, private courier or overnight courier), or express mail, addressed both to the address for the receiving party as set forth in the preamble to this MOU together with to the address of the attorney for the receiving party. At the time of execution of this MOU, the attorneys for the parties are as follows: City - Corporation Counsel of the City of New Rochelle; and Developer, Joseph Simone, and Thomas Metallo – care of Joseph Simone, Simone, Simone Development, LLC, 1000 Main Street, New Rochelle, New York 10801, with a copy to DelBello, Donnellan, Weingarten, Tartaglia, Wise, and Wiederhehr, LLP. Unless and until such notice is thus received or deemed received, the notice in question shall have no force or effect. If a party changes its address, it shall advise the other parties to this MOU of such new address in accordance with the notice requirements of this section.

Section 4.8. Titles of Articles and Sections. The titles of the several parts, Articles, and Sections of this MOU are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of its provisions.

Section 4.9. Governing Law. This MOU shall be governed by, interpreted under, and construed and enforced in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within New York. All claims, actions, proceedings, and lawsuits brought in connection with, arising out of, related to, or seeking enforcement of this MOU and the LDA shall be brought in the Supreme Court of the State of New York, Westchester County.

Section 4.10. Entire Agreement, Amendments, and Partial Invalidity. This MOU including all schedules attached hereto contains the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior understandings and writings with respect thereto. This MOU may not be modified, changed, supplemented, or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged. The parties do not intend to confer any benefit hereunder on any person or entity other than the parties hereto. In the event that any provision of this MOU shall be held or determined to be invalid or unenforceable in any court proceeding, then, such invalidity or unenforceability shall affect only the provision which is the subject of such determination and all other provisions of this MOU shall remain in full force and effect, and the parties shall apply their best efforts to modify the affected provisions to eliminate such invalidity or unenforceability.

Section 4.11. Waivers and Extensions. No waiver of any breach or any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of

16

any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of time for performance of any other obligations or acts.

Section 4.12.  Successors and Assigns.  This MOU shall bind and enure to the benefit of the parties and their respective successors and assigns.  This MOU may not be assigned except in accordance with Section 3.4.9.

Section 4.13.  Notice and Demand to Cure.  In the event of any default of any of the material covenants or obligations contained herein by either the City or the Developer (such party a "Defaulting Party"), then the City or the Developer, as the case may be, shall deliver written notice of such default to the Defaulting Party setting forth the nature of such default (the "Notice of Default").  In the event that such default is not cured within thirty (30) days following receipt of such Notice of Default or, in the event that the default is not reasonably susceptible of being cured within such thirty (30) day period, the Defaulting Party has not commenced to cure such default or does not thereafter continue to diligently prosecute the cure of such default, then the party delivering such notice shall have, except as otherwise provided herein, the right to exercise any and all remedies available to it at law or equity.

Section 4.14.  No Third Party Rights.  Nothing contained in this Agreement is intended to create any rights or to otherwise benefit any parties other than the City and the Developer.

Section 4.15.  Performance of Governmental Functions.  Notwithstanding anything in this MOU to the contrary, nothing contained herein or any approvals or consents by the City in connection with the Project shall limit or impair the City from exercising or performing any regulatory, policing or permitting functions or obligations.

Section 4.16.  No Partnership Created.  It is understood and agreed that no agreement of partnership is intended hereby and nothing herein shall be deemed or construed to constitute the City as the partner of the Developer or constitute either the agent of the other such as to permit or empower the City or the Developer to bind the other to financial or other obligations to third parties or to constitute or give rise to any joint ownership or joint venture.

CITY OF NEW ROCHELLE

By: _____
CHARLES B. STROME III
City Manager

SIMONE CHURCH STREET LLC

By: _____
JOSEPH SIMONE
Managing Member

_____
JOSEPH SIMONE

_____
THOMAS METALLO

# EXHIBIT K

# DVD FILED SEPARATELY

**EXHIBIT L**

**d seaman**

| | |
|---|---|
| **From:** | Peter F. Gaito [pgaito@pfga.net] |
| **Sent:** | Thursday, June 12, 2008 2:04 PM |
| **To:** | d seaman |
| **Cc:** | Austin Graff |
| **Subject:** | Fwd: Info to Saccardi |

Begin forwarded message:

**From:** "John Saccardi" <jsaccardi@saccschiff.com>
**Date:** June 6, 2005 8:59:11 AM EDT
**To:** "Martin Sumner" <msumner@simdev.com>, <pgaito@pfga.net>, <pjw@ddwt.com>
**Cc:** "Nina Peek" <NPeek@saccschiff.com>
**Subject:** RE: Info to Saccardi

Peter,  Got the disk in this AM's Fed Ex.  Thanks.  John

-----Original Message-----
**From:** John Saccardi [mailto:jsaccardi@saccschiff.com]
**Sent:** Monday, June 06, 2005 8:10 AM
**To:** Martin Sumner; pgaito@pfga.net; pjw@ddwt.com
**Cc:** Nina Peek
**Subject:** RE: Info to Saccardi

Can I get some info on the project, in addition to what Peter sent, prior to the conference call
e.g., site pan, existing conditions map, and details of proposed program in terms of units,
square footages, particularly of commercial space, parking, open space, building height, etc.
This can be send via e-mail for purposes of starting on the EAF. Thanks.   John

-----Original Message-----
**From:** Martin Sumner [mailto:msumner@simdev.com]
**Sent:** Thursday, June 02, 2005 2:56 PM
**To:** pgaito@pfga.net
**Cc:** mpw@ddwt.com; jsaccardi@saccschiff.com
**Subject:** Info to Saccardi

Peter  please forward the site plan information for New Rochelle to John Saccardi at
j saccardi@saccschiff.com with a copy to Nina Peek atnpeek@saccardischiff.com

thanks

Martin J. Sumner
Executive Vice President and Chief Operating Officer
Simone Development Companies
1000 Main Street
New Rochelle, New York 10801

Tel  (914) 576-5000 x 16
Fax (914) 576-4000
Cell (917) 456-7127

# EXHIBIT M

**d seaman**

**From:**    Peter F. Gaito [pgaito@pfga.net]
**Sent:**    Thursday, June 12, 2008 2:05 PM
**To:**      d seaman
**Cc:**      Austin Graff
**Subject:** Fwd: Church/Division


Begin forwarded message:

> **From:** Peter F. Gaito <pgaito@pfga.net>
> **Date:** July 19, 2005 4:36:49 PM EDT
> **To:** John Saccardi <jsaccardi@saccschiff.com>
> **Cc:** "David Kosakoff, Esq." <Dkosakoff@ssklaw.net>
> **Subject:** Church/Division

Dear John:

As per our phone conversation yesterday, please be advised that Peter F. Gaito and Associates has exclusive ownership of the copyright of all documents, drawings, calculations, and information prepared or derived from works of our office, with regard to the Church Division Project.  Without our express permission to do so, we view use or dissemination of any of these items  as a breach of our copyright protection.

**Peter F. Gaito and Associates**
*ARCHITECTS AND PLANNERS*
399 KNOLLWOOD RD, SUITE 106
WHITE PLAINS, NY. 10603
914-682-3381

**EXHIBIT N**

## I.    GENERAL OVERVIEW

In accordance with the New York State Environmental Quality Review Act (SEQRA), this Final Environmental Impact Statement (FEIS) for the Church/Division Mixed Use Development has been prepared in response to public comments on the Draft Environmental Impact Statement (DEIS). The DEIS was accepted as complete on July 11, 2006 after extensive review by the Lead Agency, the City Council of the City of New Rochelle. A public hearing on the DEIS was held on August 24, 2006. Transcripts from the hearing are included in Appendix A of this FEIS, along with all written comments received by the Lead Agency during the DEIS comment period.

This FEIS incorporates the DEIS by reference and responds to all substantive comments received (either at the public hearing or in writing) on the DEIS. Comments were compiled, and organized by topic. Each comment is referenced as to its source, and responded to in Section 3 of the FEIS.

## A.  DESCRIPTION OF THE PROPOSED ACTION

The proposed project includes the redevelopment of two large City of New Rochelle owned parking facilities (the Prospect Street municipal parking lot and the Church/Division Street municipal parking garage), and the assemblage of several other privately owned parcels to comprise an approximately five acre site located in downtown New Rochelle. The project includes public open space, residential, retail, and office uses and off-street parking facilities. All of these uses are currently permitted in the Downtown Business (DB) District, which encompasses the majority of the project site. However, the dimensional requirements of the DB District would not permit the project to be developed at the proposed size. Therefore, to accommodate the proposed building program, a rezoning of the project site would be required. The Applicant proposes that the Church/Division Lot be rezoned to the Downtown Mixed Use (DMU) District and the Downtown Density Bonus (DDB) Overlay Zone, which was adopted by the City of New Rochelle in May 2006.

Related actions to facilitate the development of the project include, among others: (i) amendment to the Zoning Map of the City to rezone the Church/Division Lot (on which the Church/Division Street municipal parking garage is located) to the DMU District; (ii) amendment of the Comprehensive Plan of the City; (iii) potential "Major Development Subdivision" approval; (iv) amendments to the maximum building length regulation of the DMU District from 300 feet to 456 feet[1]. (Section 331-62.B (3) of the City Zoning Ordinance) and the maximum building height regulation of the DDB Overlay Zone (Section 331-85.3.E (2) of City Zoning Ordinance; see Section B, below) from 390 to 500 feet; and (v) site plan approval of the project (vii) abandonment of Clinton Place between Church and Division Streets.

As described in the DEIS, the project included the following use components.

---

[1] The total length of the proposed structure on Church Street is 456 feet, which includes the 72 feet recessed outdoor play area for the child care facility.

*General Overview*

1. Municipal Parking Facility

The proposed project includes the construction of a new approximately 253,000 square foot City owned municipal parking garage and surface lot with at least 859 parking spaces on the Prospect Lot (on which the existing Prospect Street municipal parking lot is located). The Prospect Lot is bound on the north by Division Street, on the west by Leroy Place, on the south by Centre Avenue and on the east by Prospect Street.

The parking facility would provide at least 859 parking spaces, with approximately 772 spaces (including roof parking) in a parking structure and an additional 88 parking spaces in an at-grade lot. The façade of the municipal parking structure would be sensitively designed to minimize the appearance of bulk. The roof level would be appropriately landscaped, and lighting would be designed to minimize spillage. The at-grade parking lot would also be landscaped with trees and appropriate plantings. The municipal parking facility would have three separate entrances/exits: one on Prospect Street between Division Street and Centre Avenue, the second on Centre Avenue between Prospect Street and Main Street and one on Division Street between Prospect Street and Main Street.

The new municipal parking garage will be built by Simone Church Street, LLC as the City's contractor under a waiver of public bidding, and such garage will be owned, operated, and maintained by the City. The design of the at-grade lot and the parking structure would allow for future expansion should the City of New Rochelle determine this to be needed in the future.

2. Open Space

Exhibit 24 presents a preliminary design for LeRoy Place Park, an approximately 28,000 square foot public park to be constructed adjacent to the proposed municipal parking garage. The LeRoy Place Park would be landscaped and would provide an important amenity for residents of the neighborhood. The Park would provide a landscaped plaza on Division and LeRoy Streets and Centre Avenue and could be used as a venue for recreation activities including a farmer's market.

An approximately 29,000 square foot landscaped publicly accessible plaza is proposed to be constructed along the east side of Division Street to the center of the Church/Division Lot with a through connection to Main Street. This landscaped plaza would include a water feature that would serve as the visual focal point from Main Street. The plaza could include tables and seating.

Approximately 2,500 square feet of open space is proposed at the southeastern portion of the Church/Division Lot. This landscaped area would be located adjacent to the proposed retail with access to/from Church Street.

3. Private Use Components

   a. Residential Tower

     The residential component of the project would total approximately 563,000 square feet, in a 39 story residential tower containing approximately 373 units.

   b. Retail Space

     Approximately 44,000 square feet of retail uses are proposed. The retail component of the project would be as follows:

- Approximately 4,100 square feet of retail located on the west side of the Main Street entrance. This two-story retail space would have frontage on Main Street and would wrap around to the interior walkway leading to the proposed landscaped plaza area.

- Approximately 5,190 square feet of retail located on the east side of the Main Street entrance. This two-story retail space would also have frontage on Main Street, and wrap around the interior walkway.

- Approximately 26,610 square feet of larger scale retail space located along the interior of the proposed landscaped plaza adjacent to the proposed residential tower. This retail space would be designed with floor heights varying from 18 feet to 27 feet, with the intention of attracting two larger scale retail tenants. It is anticipated that two retail tenants would occupy this entire space.

- Approximately 4,850 square feet of retail space located in the southern portion of the residential tower, south of the residential lobby area. Access to this retail space would be from Division Street.

- Approximately 3,250 s.f of retail/commercial space located at the southeastern end of the Church/Division Lot. Access would be provided from Church Street.

4. Commercial Space

   Approximately 2,500 square feet of commercial/office space is proposed at the southeastern end of the project site. Access to this space would be from Church Street.

5. Parking

   An approximately 214,000 square foot six-story (partially below grade) private parking structure is proposed on the Church/Division Lot to accommodate residences, commercial and retail tenants and patrons of the retail uses at the project site. This approximately 630 space parking garage would be located on the northeastern portion of the Church/Division Lot. Approximately 508 spaces would be provided for resident parking and 122 spaces would be provided for commercial/retail parking.

   The parking structure would be designed with residential parking on the upper levels, and commercial and retail parking on the lower levels. Access to the residential parking would most likely be accessible via key-card entry. Parking would not be permitted on the roof level of the parking garage.

*General Overview*

The eastern façade of the proposed parking structure, along Church Street, would be sensitively designed to minimize the appearance of bulk. In addition, on Church Street, the parking structure would be located above the ground floor retail.

## B. REVISIONS TO THE PROPOSED ACTION

Subsequent to the public hearing on the DEIS, the City of New Rochelle's Professional Architectural Review Committee recommended that the design of the 39 story residential tower be refined to create a narrower profile, which would appear less massive and create a narrower shadow profile. As a result of this feedback, the Applicant has revised the design of the project. The current design proposes a 42 story, 455 foot high residential tower with an additional 35-foot tall bulkhead to accommodate rooftop mechanical equipment. The residential tower would include 396 units, broken down as follows: 180 one-bedroom units, 180 two-bedroom units and 36 three-bedroom units. The proposed parking on-site private structure adjacent to the residential tower would provide 630 parking spaces broken out as follows:

- Retail Parking: 55 (below grade) + 67 (first floor) = 122
- Residential Parking: 508

As is the case with the project discussed in the DEIS, the floor area ratio of the revised project would be 5.5 (yielding approximately 546,735 square feet of gross floor area), the maximum permitted under the density bonus regulations of the DDB Overlay Zone.

Exhibits 1 through Exhibit 7 present the revised design of the proposed residential tower. Because the design of the proposed project has changed, additional impact analyses are including in this FEIS. Exhibit 8 presents a schematic section of the revised design and Exhibit 8a presents a comparison of the original design for the residential tower and the revised design. Exhibit 8b presents a schematic section of the proposed municipal parking garage including the variation in the setbacks on LeRoy Place. Exhibit 24 presents the proposed landscape plan for the LeRoy Place Park.

Section 331-85.3.E (2) of the New Rochelle Zoning Ordinance provides a height bonus of up to 390 feet in the DDB Overlay Zone on qualifying sites zoned DMU District or Downtown Mixed Use Urban Renewal (DMUR) District. Because this regulation would have to be amended to permit the increased height of the revised project, this FEIS also includes analysis of increased maximum building height (at the currently permitted maximum density under the regulations of the DDB Overlay Zone) at the DMU District and DMUR District zoned sites identified in the New Rochelle Downtown Density Bonus DGEIS[2] as potentially eligible for the currently permitted 390 foot maximum height. The analysis for each site assumes a maximum building height of 575 feet (including mechanicals). The FEIS includes an analysis of a 575 foot building height because under Section 331-15 of the City of New Rochelle Zoning Ordinance, for properties located within the Central Parking Area, rooftop structures which are used solely for the purpose of housing building mechanicals are not be included in computing building height provided their vertical

---

[2] New Rochelle Downtown Density Bonus DGEIS, AKRF, January 2006.

elevation does not exceed 15% of the height of a building, and provided that such rooftop structures are subject to a detailed architectural review and analysis facilitated by a Licensed Architect to ensure architectural excellence. As such, the analysis herein assumes a 575 foot building height for a worst case scenario assessment.

The sites are as follows and are highlighted in Exhibit 9.

- North Avenue and Lawton Street – As noted in the New Rochelle Downtown Density Bonus DGEIS, "Although the DMU, DMUR and DB zoning districts are all mapped on this assemblage, the majority is zoned DMUR, making the rezoning of two parcels and a portion of a third, a possibility for the future."

- LeCount Place and North Avenue – This assemblage of parcels is located with the DB and Mixed Use Family Entertainment (MUFE) Districts. The City of New Rochelle has accepted as complete a DEIS for a mixed-use development project at this site known as "LeCount Square."

- Garden Street – This assemblage of parcels is located entirely within the DMU District. While this site includes a municipal parking lot and is similar to the project site, the City currently has no plans to redevelop the site. Although the City currently considers redevelopment of this site to be unlikely, a shadow analysis was completed for the site to account for potential future development.

- North Avenue and Huguenot Street – This parcel is entirely within the DMU District, is close to New Roc City and the Intermodal Transportation Center and would therefore be eligible for height bonus of the DDB Overlay Zone. However, as noted in the New Rochelle Downtown Density Bonus DGEIS: "existing development at this site (e.g., the K Building) would make this assemblage less likely, and therefore, it is not considered as a potential development site."

## C. IMPACT ISSUES

Under Section 331-85.3.E(2) of the New Rochelle Zoning Ordinance, in the DDB Overlay Zone, maximum building height on properties which meet certain eligibility requirements may be increased to up to 390 feet. In addition, under Section 331-15 of the City of New Rochelle Zoning Ordinance, for properties located within the Central Parking Area, rooftop structures which are used solely for the purpose of housing building mechanicals are not be included in computing building height provided their vertical elevation does not exceed 15% of the height of a building, and provided that such rooftop structures are subject to a detailed architectural review and analysis facilitated by a Licensed Architect to ensure architectural excellence.

Based on the current regulations of the DDB Overlay Zone, the DEIS analyzed a proposed residential building with building height of 390 feet and an overall height of 405 feet, including mechanicals. The revised project proposes a building height of 455 feet, and an overall building height of 490 feet, including mechanicals. During the redesign, the units were reconfigured eliminating some of the three bedroom units and creating additional two bedroom units. The revised unit count is as follows: 396 units, broken down as follows: 180 one-bedroom units, 180 two-bedroom units and 36 three-bedroom units. Because the unit

THE SCHER LAW FIRM, LLP

**NOTICE OF ENTRY**

Sir:- Please take notice that the within is a (certified) true copy of a duly entered in the office of the clerk of the within named court on _____ 20

Dated,

Yours, etc.

THE SCHER LAW FIRM, LLP
Attorney for
Office and Post Office Address
ONE OLD COUNTRY ROAD
CARLE PLACE, N.Y. 11514

To
Attorney(s) for

_____

**NOTICE OF SETTLEMENT**

Sir:- Please take notice that an order of which the within is a true copy will be presented for settlement to the Hon. one of the judges of the within named court, at _____ on the ___ day of ___ M. at ___ Dated, 20

Yours, etc.

THE SCHER LAW FIRM, LLP
Attorney for
Office and Post Office Address
ONE OLD COUNTRY ROAD
CARLE PLACE, N.Y. 11514

To
Attorney(s) for

---

**Index No.**                    **Year 20**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETER F. GAITO ARCHITECTURE, LLC d/b/a
PETER F. GAITO AND ASSOCIATES,

Plaintiff,

-against-

SIMONE DEVELOPMENT CORP., SIMONE CHURCH
STREET LLC, JOSEPH SIMONE, THOMAS METALLO,
SACCARDI & SCHIFF, INC., TNS DEVELOPMENT
GROUP LTD., and SLCE ARCHITECTS, LLP

Defendants.

**COMPLAINT**

THE SCHER LAW FIRM, LLP
Attorney for    Plaintiff
Office and Post Office Address
ONE OLD COUNTRY ROAD
CARLE PLACE, N.Y. 11514
(516) 746-5040

To
Attorney(s) for

Service of a copy of the within _____ is hereby admitted.

Dated,                           20

Attorney(s) for

---

STATE OF NEW YORK                ss.:
COUNTY OF

The undersigned, an attorney admitted to practice in the courts of New York State, hereby affirms as true under all the penalties of perjury that affiant is

the attorney(s) of record for

In the within action; that affiant has read the foregoing

and knows the contents thereof; that the same is true to affiant's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that those matters affiant believes to be true. Affiant further says that the reason this affirmation is made by affiant and not by

The grounds of affiant's belief as to all matters not stated upon affiant's knowledge are as follows:

Dated                            20

# Section 3 – Development Proposal

The pages that follow provide architectural exhibits and details as follows:

- Overall Square Foot Summary
- Visuals
- Design Concept and Approach
- Firm Profile
- Floor Area Ratio Sheet

Also the following exhibits, on succeeding pages, are related to the market demand:

- The market demand for such condo housing is documented in a letter dated October 25, 2004, from The Marketing Directors, Inc., a well-recognized authority on the demand for housing within a geographic area and at specific quality and prices

- The Equity Breakdown Excerpt shows a sellout in three years from Certificate of Occupancy on a total of five years from the start of the project.

- Retail demand is indicated by a letter from Esquire Properties, Inc., concerning six potential tenants as well as by the expressions of interest from seven potential tenants as listed on the page entitled Retail Demand Indicators.



Peter F. Gaito and Associates

# OVERALL SQUARE FOOTAGE SUMMARY

## GROUND FLOOR

| | | |
|---|---|---|
| 1. | Retail Westside | 28,800 sq.ft. |
| 2. | Retail Eastside | 10,200 sq.ft. |
| | **Total** | **39,000 sq.ft.** |

| | | |
|---|---|---|
| 3. | Restaurant – Unit #23 Duplex | **5,200 sq.ft.** |
| 4. | Lobby (for Tower) | **2,000 sq.ft.** |
| 5. | Service Area | **2,450 sq.ft.** |
| 6. | Public Plaza | **24,000 sq.ft.** |
| 7. | Prospect Park | **19,200 sq.ft.** |

## SECOND FLOOR

8. Duplex Apartments (above Retail) -- <u>25 Apartments</u>
   Live/Work Loft apartments

| | |
|---|---|
| #1-5, 7, 9-11, 13-18, 20, 22-25 | 1,600 sq.ft. |
| #6 | 2,770 sq.ft. |
| #8 | 1,975 sq.ft. |
| #12 | 1,850 sq.ft. |
| #19 | 2,850 sq.ft. |
| #21 | 1,920 sq.ft. |
| **Total** | **43,365 sq.ft** |

| | | |
|---|---|---|
| 9. | Residential Courtyard - Eastside | **9,400 sq.ft.** |
| 10. | Residential Courtyard – Westside (See Tower Outdoor Amenities below) | |
| 11. | Roof Gardens w/ planters and roof pavers | **8,500 sq.ft.** |

## TOWER

12. Luxury Residential Apartments -- <u>360 Apartments</u>
    - 30 floors
    - 12 apartments per floor:    (4) one-bedrooms, (8) two-bedrooms
    - Totals:    (120) one-bedrooms
       (240) two-bedrooms

    - 1 bedrooms    800 sq.ft.
    - 2 bedrooms    1,100 sq.ft.

    **Total 450,000 sq.ft**

13. <u>Amenities -Outdoor</u>
    - Pool    **3,000 sq.ft.**
    - Landscaped Courtyard    **30,000 sq.ft.**
    - Kitchen area    **3,000 sq.ft.**
14. <u>Amenities -Indoor</u>
    - Luxurious lobby
    - 24 hour concierge
    - Fitness area
    - Two Entertainment Lounge areas

- Full Kitchen to service Lounges
- Media Room
- Laundry Room
- Child Play Room
- Meeting/study rooms
- Full Kitchen/ Bar at Courtyard level
- Wireless Internet Café

15. Amenities- Apartment  - -360 Apartments                    **Total    8,000 sq.ft**
- Floor to ceiling windows
- L.I. Sound views
- Private Balconies
- Gourmet kitchens
- Luxury baths
- Washer/Dryer
- Spacious layouts
- Generous closet space
- Pre-wired for high speed internet

## PARKING

16. On-site, three-level underground levels -
    632 Spaces + 69 Tandem  = 701 Total Spaces
    - 540 for Tower Apartments (1.5 per unit)
    - 38 for Duplex Units (1.5 per unit)
    - 18 for Retail Employees Parking
    - 36 for 43 Church Street - Building C (1 per unit)
    - 69 Tandem spaces for residents

17. Off-site, two-level relocated steel structure to be installed       **Total  239,514 sq.ft.**
    on existing Prospect Lot with new stepped back profile with
    garden edges to minimize impact on street.
    - 438 Spaces for Retail shoppers  *(388+50 =438)*

    *+ 90 spaces*    *(438+90 = 528)*                              **Total  143,352 sq.ft.**
                                                                  *23,430 sq. ft.*

## ADDITIONAL WORK TO BE DONE

18. Renovation of City owned parks and surrounding streets: plant
    grass areas, trees, concrete sidewalks

19. Remove building at corner of Main/Church                       **Total    50,000 sq.ft**

                                                                  **Total    10,000 sq.ft**

# GREEN TECHNOLOGY INCORPORATED IN ALL BUILDINGS

HVAC
- A centralized heating and air-conditioning system and fresh air ventilation system that filters 85% of the particulate matter that delivers filtered, climate controlled air to each residence.

Energy Efficiency Features
- Energy Star Appliances
- High-performance Windows
- Daylighting - Double insulated low-e glazing
- Occupancy-sensing lighting
- Compact Fluorescent Lights
- Photovoltaics
- Zoned HVAC

Water Conservation Features
- Low-flow fixtures
- Rainwater collection
- Graywater reuse
- Indoor/Outdoor Landscaping for Water Conservation

Green Products
- Low-VOC Paints and Adhesives
- Recycled/Recyclable floor covering
- Certified Wood - Bamboo flooring

# VISUALS

1.      Site Area Map

2.      Area Map

3.      Site Plan

4.      Ground Floor Plan

5.      Second Floor Plan

6.      Third Floor Plan

7.      Fourth Floor Plan

8.      Typical Floor Plan – Tower Apartments

9.      Parking Level 1

10.     Parking Level 2

11.     Parking Level 3

12.     Sections A-A & B-B

13.     Sections C-C & D-D

14.     North Elevation

15.     South Elevation

16.     East Elevation

17.     West Elevation

18.     Aerial Site Overview 1

19.     Aerial Site Overview 2

20.     Aerial Site Overview 3

21.     View Looking North at Tower Entry

22.     Plaza View Looking West Toward Main Street

23.     Pedestrian Plaza View Looking North

24.     Plaza View Looking Northeast

25.     View of New Park and Relocated Parking Structure

26.     View from Pedestrian Bridge Looking South Toward New Park

27.     View Looking South Toward New Park and Relocated Garage

28.     Perspective Close-up View of Pedestrian Plaza

29.     Night View of Plaza Looking Northeast

SITE AREA MAP

PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

TRAIN STATION
LIBRARY
PROJECT SITE
NEW PARK
RELOCATED PARKING FACILITY
I-95
MAIN STREET



**AREA MAP**

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/ DIVISION GARAGE SITE
NEW ROCHELLE, NY

0  40    140    240 FT  — Scale: 1"=250'



PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

SITE PLAN

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004

GROUND FLOOR: Retail Level and
Underground Garage access

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004

2ND FLOOR: Town House Lower Level (Bldgs A & B) and
2ND FLOOR: Bldg C

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

3RD FLOOR: Town House Upper Level (Bldgs A & B) and
3ND FLOOR: Bldg C

PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004



PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004

4TH FLOOR: Tower Amenities Level and
5TH FLOOR: BLDG C

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

BLDG "C"

BLDG "B"

BLDG "A"

175'-1"

175'-6"

60'-10"

5'-0 3'-6"

97'-11"

33'-0 10'-4"

42'-0"

25'-6"

100'-4"

206'-5"

Scale: 1" = 40 ft

PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004

TYPICAL FLOOR: Tower

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004

SECTIONS A-A & B-B

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004

SECTIONS C-C & D-D

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004

PARKING LEVEL I: 208 Spaces + 23 Tandem Spaces

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



PROSPECT

BONNEFOY PL.

BLDG "C"

DIVISION ST.

BLDG "B"

CLINTON PL.

LE ROY PL.

BLDG "A"

CHURCH ST.

MAIN ST

Scale: 1" = 40 ft

PETER F. GATTO and Associates
ARCHITECTS AND PLANNERS

November 1, 2004

PARKING LEVEL 2: 212 Spaces + 23 Tandem Spaces

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



PETER F. GAITO and Associates
ARCHITECTS AND PLANNERS
November 1, 2004

PARKING LEVEL 3: 212 Spaces + 23 Tandem Spaces

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



NORTH ELEVATION

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

MAIN STREET

PEDESTRIAN PLAZA



SOUTH ELEVATION

**PROPOSED MIXED USE DEVELOPMENT FOR:**
**CHURCH/DIVISION GARAGE SITE**
**New Rochelle, NY**

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS



CHURCH STREET

DIVISION STREET

RELOCATED PARKING STRUCTURE

EAST ELEVATION

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS



WEST ELEVATION

**PROPOSED MIXED USE DEVELOPMENT FOR:**
**CHURCH/DIVISION GARAGE SITE**
New Rochelle, NY

**PETER F. GAITO and ASSOCIATES**
**ARCHITECTS AND PLANNERS**

CHURCH STREET

DIVISION STREET

BELOW GRADE PARKING



PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

AERIAL SITE OVERVIEW I

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



AERIAL SITE OVERVIEW 2

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS



PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

AERIAL SITE OVERVIEW 3

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



VIEW LOOKING NORTH AT TOWER ENTRY

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS



PLAZA VIEW LOOKING WEST TOWARD MAIN STREET

**PROPOSED MIXED USE DEVELOPMENT FOR:**
**CHURCH/DIVISION GARAGE SITE**
New Rochelle, NY

PETER F. GAITO and ASSOCIATES
**ARCHITECTS AND PLANNERS**



PEDESTRIAN PLAZA VIEW LOOKING NORTH

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/ DIVISION GARAGE SITE
New Rochelle, NY



PLAZZA VIEW LOOKING NORTH EAST

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/ DIVISION GARAGE SITE
New Rochelle, NY

VIEW OF NEW PARK AND RELOCATED PARKING STRUCTURE

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS





VIEW FROM PEDESTRIAN BRIDGE LOOKING SOUTH TOWARD NEW PARK

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY



PLAZA VIEW LOOKING SOUTH TOWARD NEW PARK AND RELOCATED GARAGE

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS



CLOSE-UP VIEW OF PEDESTRIAN PLAZA

PETER F. GAITO and ASSOCIATES
ARCHITECTS AND PLANNERS

PROPOSED MIXED USE DEVELOPMENT FOR:
CHURCH/DIVISION GARAGE SITE
New Rochelle, NY

# DESIGN CONCEPT AND APPROACH

## PFGA Design Concept

We are very enthusiastic and look optimistically towards the design and completion of the Church/Division Mixed Use Development Project. The Architect/Owner team's enthusiasm and efforts will produce ideas and conclusions that will result in renovated and new structures of which the current and future occupants, the organizers, New Rochelle citizens and the Church/Division Mixed Use Development Project developers will be proud.

This project will be successful on a number of levels. The buildings will be designed to suit the needs of the entire community as well as visitors to the area. The renovated and new buildings will work seamlessly with the existing buildings and main access roads. The resulting design will be a lively 24-hour campus and a complement to the streetscape, and promote a sense of welcoming, professional excellence, safety, security, enjoyment and pride for the residents and the staff living and working at the new Church/Division Mixed Use project.

Our tasks as Architects are varied and complex, and are customized for each project. We would set forth the effort and vigor with which our other projects and clients have had much success, and will continue that attention for Church/Division Mixed Use Development Project. We design according to specific site conditions, as well as local and State Governments. PFGA seeks valuable input from City Officials, local residents, and future occupants to finalize the program.

## PFGA Design Approach

We envision the creation of a place that provides a safe, fun and attractive environment for residents, retailers and shoppers alike. Stores and restaurants situated within a lively 24-hour landscaped plaza creates an environment that is both engaging and rewarding.

The new Church/Division Mixed Use Development Project will be carefully situated to promote a sense of social interaction and effectively tie into the existing neighborhood buildings. The new buildings would stand gracefully amidst the brownstones along Main Street and its adjacent streets, highlighting its individual qualities, yet work together with the existing buildings, and improved landscaping, to yield an attractive new highly desirable destination

point for locals and visitors alike. Creating a mixed-use community will not only enhance the quality of life, but will become a catalyst for other positive development for the city.

This new Development Project will serve as a proud symbol of comfort, confidence, community and safety. It will also remedy all of New Rochelle's architectural concerns and cleverly satisfy all of the present and future program needs. The ornately-detailed interior and exterior spaces will offer a pleasant and attractive neighborhood addition. Special attention will be paid to the overall flow of public and private people traffic, noise level concerns, heating and cooling balances, maintenance concerns and multi-use flexible spaces.

Another component of this development project is the incorporation of another proposed 8-story mixed-use building (Building "C"). This brick and limestone residential building, with ground floor retail spaces, will be another handsome complement to the streetscape. Like the other proposed buildings, this building will also benefit from the richly landscaped retail plaza, new Prospect Park, proximity to Main Street shopping and walking distance to the library and the Intermodel Transportation Center. Building "C" will be physically linked to the

rest of the new mixed-use campus by a pedestrian bridge and through on-site underground garage where the residents will have ample parking.

We have many exciting ideas whereby through architecture and "green" design, we can improve upon the current success of the main street and the current revitalization of New Rochelle. We look forward to continuing to the success of New Rochelle's Restaurant Recruitment Program, Downtown Streetscape Program, and the Business Improvement District Program. Our ideas would be to effectively incorporate the following:

- **Create** a visual icon for the city, enhancing its image as a waterfront community

- **Create** a new plaza at the Main/Church Street corner to serve as a Tower entrance plaza

- **Create** a new lively pedestrian plaza by closing Clinton Place to vehicular traffic

- **Create** a project complex that promotes quality "green" environmental construction standards

- **Create** a vibrant 24-hour neighborhood

- **Create** a new park to increase outdoor community interaction



- **Create** an energized mixed-use environment to complement the Main Street corridor.

- **Create** a cohesive exciting project to help reaffirm New Rochelle as a highly desirable destination point.

- **Encourage** city residents to shop and eat locally in and around Main Street

- **Encourage** use of public transportation, the Intermodal Transportation Center and local public services

- **Establish** an inviting street presence with inviting retail/residential architecture

- **Establish** design/construction parameters that enable the new buildings to be built so that daily parking, residential, and commercial operations will not be interrupted

- **Establish** an organization of spaces to promote social interaction between citizens, merchants and visitors

- **Establish** mini-museum: A 'wall of New Rochelle history' with stories, photos, awards, past & future community events, and volunteer information, etc.

- **Establish** a high quality 'Green' HVAC system to yield energy and cost efficient buildings

- **Establish** buildings with an aesthetic and scale that complement the architectural vocabulary of the Main Street corridor

- **Establish** entire project complex as a catalyst and destination point for the entire area

- **Improve** pedestrian activity in and around Main Street

- **Improve** public parking areas by providing covered areas for protection from Winter elements

- **Improve** the exterior look of the streetscape by designing the new buildings to relate to the Main Street architectural vocabulary and offer additional site and building design support where needed

- **Improve** landscaping of surrounding areas in and around Main Street

- **Provide** appropriate building, park and street signage

- **Provide** an opportunity to effectively adapt re-use of an underutilized parking structure

- **Provide** newly relocated Garage to Prospect Lot to accommodate 438 cars in addition to the existing ground floor parking spaces

- **Provide** newly relocated garage with new concrete parking decks, brick stair /elevator towers, new paint, lighting and signage

- **Provide**    a new stepped back profile with garden edges at the newly relocated garage to minimize impact on street and to increase city "green" space

- **Provide**    exterior lighting that will provide safety without disturbing neighboring residences

- **Provide**    well designed outdoor spaces with flexibility for varied usage

- **Provide**    new green areas including a new ground level park, townhouse rooftop gardens, sculpture garden, and seating garden at tower entry plaza and richly landscaped pedestrian plaza

- **Provide**    public-friendly building entrances for the retailers, restaurants, residences, and residential tower

## Residential Tower Amenities

<u>Amenities -Tower</u>

- Luxurious lobby
- 24-hour concierge
- 24/7 Fitness area
- Two Entertainment Lounge areas
- Full Kitchen to service Lounges
- Media Room
- Laundry Room

- Child Play Room

- Meeting/study rooms

- Landscaped courtyard

- Outdoor pool

- Full Kitchen/ Bar at Courtyard level

- Wireless Internet Café

Amenities- Apartment

- Floor to ceiling windows

- Windowed bathrooms

- Spectacular Long Island Sound views

- Private Balconies

- Gourmet kitchens

- Luxury baths

- Washer/Dryer

- Spacious layouts

- Generous closet space

- Pre-wired Ethernet

Amenities- Parking

On-site, three-level underground garage - 701 Spaces

- 540 spaces for Tower Apartments (1.5 per unit)

Page 8

- 38 spaces for Duplex Units (1.5 per unit)

- 18 spaces for Retail Employees

- 36 spaces for 43 Church St. - Building C (1 per unit)

- 69 Tandem spaces for Residents

## PFGA Green Design Technology

Our firm seeks to implement Green design standards, which are architectural methods to increase building energy savings while reducing the adverse impact on the environment. Through architectural design decisions, product choices, and engineering methods, we can deliver an aesthetically pleasing, healthy building, which will result in increased energy efficiency, which translates into lower building operating costs and less taxing for the city utilities and services. We seek to implement these Green design and engineering methods through well thought out design, selection of efficient and safe equipment and products while remaining within budget.

Such methods include the incorporation of natural light to normally dark interior environments whenever possible, providing natural vegetation inside and out, exterior sun/shade techniques, and the collection of rain water for irrigation of the site vegetation. Aside from aesthetic value, vegetation greatly

increases the amount of fresh oxygen to the entire space, and help the building become a healthier, more energy efficient, environmentally friendly machine.

## GREEN TECHNOLOGY TO BE INCORPORATED IN ALL BUILDINGS

### HVAC

- A centralized heating and air-conditioning system and fresh air ventilation system that filters 85% of the particulate matter that delivers filtered, climate controlled air to each residence.

### Energy Efficiency Features

- Energy Star Appliances

- High-performance Windows

- Daylighting - Double insulated low-e glazing

- Occupancy-sensing lighting

- Zoned HVAC

- Compact Fluorescent Lights

- Photovoltaics

### Water Conservation Features

- Low-flow fixtures

- Rainwater collection

- Graywater reuse

- Interior and exterior landscaping for water conservation

**Green Products**

- Low-VOC Paints and Adhesives

- Recycled/Recyclable floor coverings

- Certified Wood - Bamboo flooring

## PFGA Design Coordination

The specific building design of the new Church/Division Mixed Use Development Project would be developed in conjunction with the overall master plan of the entire site, the existing buildings to remain, the landscape and parking, and other surrounding areas. A complete landscaping master plan would be developed in union with the new and existing buildings, to beautify and better service the entire Church/Division Mixed Use Development Project campus and the surrounding areas. Incorporation of these site designs would be implemented based on discussions of the final scope of work, program and budget and input from City Officials.

At this time with the information available, we anticipate the design and construction will progress rapidly and smoothly, to be completed in a timely

and safe manner. The Church/Division Mixed Use Development Project promises to be a handsome compliment to the New Rochelle urban landscape. It will soon become a destination point and a suitable home, and a pleasant and safe work place for all involved residents and staff.

## Consistent Parking Availability

"How can we maintain a minimum number of City Parking spaces operational throughout the entire construction process?" we asked ourselves. Our answer to this question was part of how we originally conceived and designed the master plan.

The Church/Division Mixed Use Development Project can be done in a straightforward manner that would allow daily parking to continue completely uninterrupted. This construction process involves disassembling the existing Church/Division Garage and reassembling it with improvements across the street on the Prospect lot. Part of the Church/Division site shall remain available for parking until the reconstruction of the 'new' garage is completed. The site plan and construction staging area is planned so that the Mixed Use Development Buildings will not interfere with the daily operation of any

existing surrounding building, or recreation areas during the entire construction process. The remaining site work and completion of the landscaping can then be completed also without any interruption to daily neighborhood activities.

## Summary of Consistent Parking Availability

1. Begin site work

2. Disassemble existing Church/Division Garage

3. Maintain minimum number of spaces on Church/Division site

4. Reassemble garage with modifications on Prospect lot

5. Update existing Prospect Lot ground level parking

6. When newly relocated garage is completed, continue Church/Division site excavation and construction

7. Construct Church/Division underground parking levels

8. Construct Buildings

9. Complete site work

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

AERIAL OVERVIEW AT NIGHT



CHURCH / DIVISION MIXED-USE DEVELOPMENT

4

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO ✦ ASSOCIATES • HRH CONSTRUCTION LLC

## SITE AREA MAP



CHURCH / DIVISION MIXED-USE DEVELOPMENT

5

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## SITE PLAN



## CHURCH / DIVISION MIXED-USE DEVELOPMENT

6

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## P1 – TYPICAL PARKING LEVEL



CHURCH / DIVISION MIXED-USE DEVELOPMENT

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## GROUND FLOOR - RETAIL LEVEL



GROUND FLOOR: Retail Level and
Underground Garage access

## CHURCH / DIVISION MIXED-USE DEVELOPMENT

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## SECOND & THIRD FLOORS - TOWN HOUSE LEVEL



SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## SECTION THROUGH SITE



BLDG "A"

BLDG "C"

BLDG "B"

PROSPECT STREET          MAIN STREET

## CHURCH / DIVISION MIXED-USE DEVELOPMENT

10

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## CHURCH STREET ELEVATION



CHURCH / DIVISION MIXED-USE DEVELOPMENT

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO ✦ ASSOCIATES • HRH CONSTRUCTION LLC

## ELEVATION VIEW TOWARD MAIN STREET



## CHURCH / DIVISION MIXED-USE DEVELOPMENT

12

## AERIAL OVERVIEW I



## CHURCH / DIVISION MIXED-USE DEVELOPMENT

13

## AERIAL OVERVIEW 2



CHURCH / DIVISION MIXED-USE DEVELOPMENT

14

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC



VIEW LOOKING EAST AT TOWER ENTRY

CHURCH / DIVISION MIXED-USE DEVELOPMENT

15

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## PLAZA VIEW LOOKING WEST TOWARD MAIN STREET



CHURCH / DIVISION MIXED-USE DEVELOPMENT

16

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## PEDESTRIAN PLAZA VIEW LOOKING NORTH



CHURCH / DIVISION MIXED-USE DEVELOPMENT

17

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## PLAZA VIEW LOOKING NORTH EAST



CHURCH / DIVISION MIXED-USE DEVELOPMENT

18

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## VIEW OF PARK AND RELOCATED PARKING STRUCTURE



CHURCH / DIVISION MIXED-USE DEVELOPMENT

19

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## VIEW FROM PEDESTRIAN BRIDGE LOOKING SOUTH AT NEW PARK



CHURCH / DIVISION MIXED-USE DEVELOPMENT

20

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

**CLOSE-UP OF PEDESTRIAN PLAZA**



CHURCH / DIVISION MIXED-USE DEVELOPMENT

21

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## MID-RISE RESIDENTIAL BUILDING



## CHURCH / DIVISION MIXED-USE DEVELOPMENT

22

SIMONE DEVELOPMENT COMPANIES

PETER F. GAITO & ASSOCIATES • HRH CONSTRUCTION LLC

## ROOF DECK PLAZA AND SCULPTURE COURTYARD



CHURCH / DIVISION MIXED-USE DEVELOPMENT

23

# DVD FILED SEPARATELY